# EXHIBIT F

Page 1

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF MISSOURI
2  EASTERN DIVISION
3  CASE NO. 4:13-CV-00800-SRC
4
   MARY BAYES AND PHILIP BAYES,
5
                Plaintiffs,
6
   -vs-
7
   BIOMET, INC., BIOMET ORTHOPEDICS,
8  LLC, BIOMET U.S. RECONSTRUCTION,
   LLC, BIOMET MANUFACTURING, LLC
9  f/k/a BIOMET MANUFACTURING CORP.,
10             Defendants.
   _____/
11
12
              VIDEOTAPED DEPOSITION OF
13               GEORGE S. KANTOR, M.D.
14
15            Monday, May 4, 2020
              9:03 a.m. - 5:47 p.m.
16
17            BY VIDEOCONFERENCE
18
19
20
21
22
23
24       Stenographically Reported By:
              Dianelis Hernandez
25

Page 78

1  Exhibit 4.  So it will pop up in your folder.  This is a
2  list of prior testimony that your counsel gave to me last
3  week.
4         MS. BUSBY:  So if, Tiffany, you could mark
5     as Exhibit 4 for me, and then everyone will want
6     to hit refresh and you'll see the PDF pop up.
7         (Defense Exhibit No. 4 was marked for
8     identification.)
9  BY MS. BUSBY:
10     Q.   Do you see Exhibit 4, Dr. Kantor?
11     A.   I do not.
12     Q.   Have you hit the refresh button?
13     A.   Where is the refresh button here?
14        MR. WOOL:  It will be at the top of the
15     browser, looks like a little circle with an arrow,
16     looks like it's going around and around.
17        THE WITNESS:  Got you.  Okay.
18     A.   Okay.  And then click to the -- do you want
19  exhibit -- are we now to 0004?
20  BY MS. BUSBY:
21     Q.   Yes, sir, we are.
22     A.   Okay.
23     Q.   And I will represent to you, sir, that we
24  served a notice of deposition and your counsel provided
25  this list to me in response.  Did you prepare this list?

Page 79

1     A.   I -- well, I think it was prepared -- no, I
2  didn't prepare it.  It was prepared in my office by my
3  office manager.  I asked her to prepare it.
4     Q.   Okay.  And, sir, do you know the time frame
5  for this list?  Are these depositions for all time or for
6  a certain period of time?
7     A.   I believe that they -- I was instructed
8  that I needed, I think, depositions for five -- four- or
9  five-year period.  This is basically, you know, for that
10 time period.
11    Q.   Okay.  Very good.
12        I want to ask you a couple questions about
13 these, sir.  I know you testified before about the role
14 you had in the DePuy litigation, so I don't belabor that.
15 I just want to see if I can get a timeline, okay?
16        So number one, you provided deposition and
17 testimony in the David E. Kauthen v. DePuy Orthopedics
18 case.  My first question is:  Was it deposition testimony
19 only or did you also testify at trial?
20    A.   That's only deposition.
21    Q.   Okay.  Do you recall what year that
22 happened -- that testimony was given?
23    A.   I believe that was either 2015, 2015, 2016.
24 I think it's 2015.  That's David Kauthen was my patient.
25 And then that deposition morphed into the DePuy

Page 80

1  litigation with the MDL, the combination of both the
2  Pinnacle and the ASR prior to the recalls.
3     Q.   Okay.
4     A.   So that's deposition testimony.  There were
5  multiple depositions both patient specific as well as
6  related to their ASR and Pinnacle platforms.
7     Q.   Okay.
8     A.   Multiple depositions on multiple days,
9  separate periods.
10    Q.   Okay.  And, sir, you said that Mr. Kauthen
11 was your patient, were you testifying as a treating
12 physician or an expert witness or both?
13    A.   As both.
14    Q.   Do you recall how many depositions were
15 given?  I know you said there were several, but do you
16 know how many?
17        MR. WOOL:  Object to form.
18    A.   I think that there were -- I think that
19 there were two separate days of deposition related to
20 Kauthen.  Then there were three depositions scheduled for
21 Pinnacle and ASR.  They kind of went back and forth with
22 those two things interchangeably with the defense team,
23 and after the second complete day of deposition -- they
24 were arduous.  They were from 8:00 in the morning to 5:00
25 in the evening, maybe even one went to 6:00 -- after the

Page 81

1  first two days, they were scheduled for three days, and
2  apparently the -- after the second full day of testimony
3  they canceled the third day and I think that was the
4  major massive settlement that they had.
5  BY MS. BUSBY:
6     Q.   Okay.  And then the deposition and trial
7  testimony in McDonald v. Zimmer; do you recall when that
8  was?
9     A.   I would say that that was probably '17.  I
10 actually had to go to New Mexico for that trial.
11    Q.   And was --
12    A.   That was deposition plus trial testimony.
13 So that's one of the few trials I've actually attended.
14    Q.   Okay.  And was that a metal-on-metal
15 device, sir?
16    A.   That was a mix metal -- that was a Zimmer
17 mix metal trunnion issue, metallosis related to a
18 trunnion as opposed to metal-on-metal bearing surface
19 metallosis.
20    Q.   Okay.  And the next one, deposition and
21 trial testimony, Frank Bifano, I may not be saying that
22 right, versus DePuy in the Superior Court of New Jersey;
23 do you know when that one occurred?
24    A.   I don't have a specific date on that, and
25 that was just a deposition.  The trial was canceled.  I

Page 142

1 the articulation itself in an asymptomatic patient just
2 coming in for a routine follow-up of a metal-on-metal
3 bearing surface.  But we would follow that patient on a
4 regular basis having an established MRI.
5         We also, obviously, know that there is a
6 significant portion of 51 plus percent of the patients
7 who have positive MARS reduction sequence MRI that are
8 asymptomatic.  And I think that that's really the crux of
9 where we are with this whole issue.  We are finally
10 starting to understand how to deal with this to prevent
11 complication or worsening of complications down the road.
12 BY MS. BUSBY:
13    Q.   Okay.  Well, thank you.  I appreciate that.
14         My next question that follows along that is
15 at what point do you make the determination that the
16 patient does need that hip aspirate, is it the positive
17 MRI?
18    A.   Yes.  If you have -- the algorithm is
19 pretty clear to me.  And, you know, I don't mean to sound
20 like I was so prescient that I understood it because so
21 many people taught me along the way.  But the baseline
22 evaluation would be the MRI, okay, but obviously you are
23 doing plain X-ray serology, you are doing the MRI.
24         If the MRI comes back positive in the
25 asymptomatic patient, we had tendency in the past to

Page 143

1 establish some false ion levels.  So you could go to
2 these meetings, and it was infuriating to me because you
3 would see these supposed leaders that were up there
4 saying, well, you could have a cobalt level of seven if
5 it's bilateral or five if it's unilateral.  But if the
6 patient is asymptomatic don't worry about them, follow
7 them until they become symptomatic.
8         Now we clearly understand, and in the past
9 six months from the registry data, what has come back
10 from the results for re-revision.  Now we now know that
11 if you have a positive MRI in the asymptomatic patient,
12 you are better off -- in other words, the positive MRI
13 I'm describing is an organized cystic pseudotumor, okay,
14 that you should operate on before as opposed to after.
15         In other words, the recommendation now is
16 to operate on that patient before they become symptomatic
17 because by the time they become symptomatic the patient
18 is having damage to the abductor mechanism and the soft
19 tissues and the capsules that control the stability --
20 that give you the stability of the hip.
21         So that is the key.  I think that's the
22 biggest thing that's come out in the past six months to a
23 year, is to finally recognize that sooner as opposed to
24 later.  And the results have proven that the sooner you
25 get in there the better you are able and the more you are

Page 144

1 able to save the abductor function.
2         I submitted to you through photographs from
3 MRI that follow that course of the patient.  If the
4 patient was symptomatic but relatively mildly so
5 intervenes relatively quickly before the abductor is done
6 and you can see that I'm surgically able to remove it and
7 get the tumor out.
8         You can almost look at it as if you had --
9 if you had a colonoscopy with a lesion, with a tumor
10 there, you would not say, well, it's asymptomatic.
11 Somebody came in for a routine colonoscopy and we found a
12 lesion there, and the patient says, well, I don't feel
13 any different.  You say, okay.  Well, we'll just follow
14 it.  No, that's not what you do.  You take the lesion out
15 before it causes obstruction.  That's where we are at
16 with this situation; albeit, it is not a carcinoma or
17 malignancy, although it's a destructive lesion.
18    Q.   Okay.  Dr. Kantor, do you have any
19 criticisms of the way that the physicians at Washington
20 University and the Mayo Clinic evaluated the ion levels
21 for Ms. Bayes in this case?
22         MR. WOOL:  Object to form.
23    A.   The ion levels?
24 BY MS. BUSBY:
25    Q.   Yes, sir.

Page 145

1    A.   No.  Because if you go back, and I'm just
2 looking at my little chart here with my dates.  You know,
3 in fairness, the index procedures were done in
4 January 8th -- in January 2008.  At the time of the
5 revision procedures, I think that Dr. Lux at least had an
6 understanding that he was dealing with metallosis, with
7 metal disease emanating from the hip articulation.  ==But==
8 ==our first recall -- the first recall with Zimmer's Durom==
9 ==was in 2008.==
10         So the physicians here are, you know, the
11 physicians here in a timeline, you know, this is their
12 understanding of the process.  Your question is
13 specifically to metal ions.  I don't see, you know, I
14 would be more intellectually curious to want to follow
15 the metal ions every year even though the hips -- the
16 metal-on-metal articulation -- but that's just before my
17 understanding in a relatively young patient where you are
18 with that.
19         Obviously, you are not going to do a repeat
20 aspiration of the hip articulation and run the risk.  But
21 we like to see the -- we continue even after we take the
22 metal-on-metal hips out, we continue to follow and track
23 the ion levels in the serum; albeit, it is not perfect,
24 but it does give an idea what's happening systemically.
25    Q.   Okay.  Moving along to page 17 of your

Page 181

1  A. I have not. I've never met the man. I
2  know people that know him because he was a few classes
3  ahead of me, but I have never personally met him. He has
4  a good reputation.
5      Q. Okay. There are a few other experts that
6  the plaintiffs have designated in this case, and I'm just
7  trying to move things along here. Have you talked to any
8  other experts that have been designated by the plaintiffs
9  in this case about this case?
10         MR. WOOL: Object to form.
11     A. Who are the -- I don't know who the experts
12 are other than the two you mentioned previously.
13 BY MS. BUSBY:
14     Q. Sure. Let me go ahead and give you some
15 names and you can let me know whether you have talked to
16 any of these folks. How about Ms. Mary Truman?
17     A. No.
18     Q. Dr. Francis Gannon?
19     A. No.
20     Q. Dr. Toback, who I believe to be an
21 economist?
22     A. No.
23     Q. Mr. Succarello who prepared a functional
24 capacity evaluation?
25     A. No.

Page 182

1      Q. Ms. Corwin, who prepared a future needs
2  assessment?
3      A. No.
4      Q. Did you review any of the reports that
5  those individuals provided in this case in the
6  development of your own opinion?
7      A. I did not.
8      Q. You just saved us a whole page worth of
9  questions, Dr. Kantor.
10         We talked about Dr. Lux, do you know
11 Dr. Martin independently?
12     A. I do not.
13     Q. Do you know Dr. Mudd?
14     A. I do not.
15     Q. Do you know Dr. Nunley?
16     A. I do not.
17     Q. Do you know Dr. Lewallen?
18     A. I've met Dr. Lewallen in the past in
19 conference meetings, but I don't know that -- it's
20 probably been 10 years ago, and I don't know that I would
21 recognize him to talk to him if he walked by me.
22     Q. Okay. Is there anything that you wanted to
23 do in formulating your opinion in this case that you were
24 not able to do, Dr. Kantor?
25         MR. WOOL: Object to form.

Page 183

1      A. I mean, I would -- just more as a point
2  of -- because I think patient, unfortunately, where she
3  is clinically is sort of complete, I would like to see
4  the patient. I mean, I would always like to evaluate
5  patients and -- to do a gait analysis study on her to
6  confirm maybe a little more detail what has been done, to
7  do a true formal gait analysis.
8          But other than that I don't think there is
9  anything. That would be more for intellectual curiosity
10 as opposed to be able -- even if I evaluated her, I don't
11 know that I can necessarily offer her anything. Matter
12 of fact, I could not offer her anything. There is only
13 one surgical solution that would even be considered, and
14 I wouldn't consider it now.
15 BY MS. BUSBY:
16     Q. Briefly, sir, what is that one surgical
17 solution?
18     A. Well, she's had a dislocation, I believe
19 her last dislocation was in May, I believe, in 2009. So,
20 you know, basically she hasn't had a dislocation for
21 year. If in point of fact she dislocated and then
22 subsequently continued to dislocate in the numerically
23 quantitatively, the way she was dislocating up to this
24 point in time, I think the only thing you can possibly
25 even consider, and I almost mention it to condemn it, is

Page 184

1  to a resection arthroplasty and take everything out.
2          Because the problem, she is very fortunate
3  that she has not had an infection with this amount of
4  necrosis, and the amount of surgical interventions she's
5  had, and the amount of trauma she's had. And the only
6  other thing that you -- I don't think there is anything
7  you can offer this patient surgically.
8          So that leads me to the point that what do
9  you do when she does the next dislocation? And it's a
10 very difficult choice that her and her family,
11 unfortunately her son is a physician, will have to make.
12 To continue to reduce it, because you always run the risk
13 in these cases when you open them whether you are doing a
14 revision or you are doing a resection of getting an
15 infection. I think that's the last thing you would want
16 to so because it will probably end up killing her.
17     Q. And no one has talked about performing a
18 resection arthroplasty at this point, correct?
19     A. You know, I mention it almost to condemn it
20 because it's -- you know, we discussed it, my partner and
21 I discussed where we are in looking at the initial
22 procedures and looking at the X-rays and explaining where
23 we are. And we both agree that there is nothing
24 surgically that can be done for this patient. And,
25 again, trying to do something -- there is no tendon

Page 229

1  Q. May of 2011, May 18, 2011.
2  A. Okay. So it's three months. Okay. Just
3  wanted to make sure that we were three months past the
4  revision date when she dislocated. Okay.
5  Q. Okay. Take a look, please, at Exhibit 12.
6  This is again another ER note. If you look under triage.
7  A. Okay.
8  Q. A few lines down it starts, "chief
9  complaint quote to nurse: Patient states I was at home
10 looking at television sitting in a 90-degree angle and
11 leaning forward, and I heard a pop to my left hip." Do
12 you see that?
13 A. Yes.
14 Q. So here she is at a 90-degree angle and she
15 takes her hip past 90 degrees when she moves forward,
16 correct?
17     MR. WOOL: Object to form. It doesn't say
18 hip.
19     MS. BUSBY: Counsel. Object to form is
20 sufficient.
21     MR. WOOL: Well, if you stop misleading the
22 witness and trying to imply things that the
23 document doesn't say, we won't have a problem.
24     MS. BUSBY: Counsel, if you stop coaching
25 the witness, we won't have to call the judge.

Page 230

1 BY MS. BUSBY:
2  Q. Doctor, would you agree with me that
3 description describes the patient who has moved her hip
4 past 90 degrees?
5  A. I would not.
6  Q. Okay. Doctor, do you hold the opinion that
7 Ms. Bayes was compliant with postoperative hip
8 precautions?
9  A. I would because every indication of
10 everyone that was an actual -- involved in her surgical
11 care says that she was compliant, that she worked hard
12 and diligently with her physical therapy, that she
13 understood her precautions, and that those hip
14 precautions were thoroughly explained to her.
15     I think the -- I'm very glad that you put
16 that first dislocation because now we've clearly
17 established that she dislocated, unfortunately, the start
18 of her series of dislocations happens during -- after the
19 three-month period of time. This is not an acute or
20 subacute time frame.
21     So it's after that three-month period of
22 time where the hip in the normal set of circumstance
23 nonmetal-on-metal including revisions would be stable.
24 So I'm glad that you put that up so we can clarify
25 because the line of the questioning was that she had

Page 231

1 dislocated in the acute or subacute period of time. So I
2 thank you for that.
3  Q. Well, in fairness, Dr. Kantor, she was
4 revised on March 28, 2011 for the first time, correct?
5  A. March 28, 2011. Correct. What is her next
6 dislocation?
7  Q. May 14, 2011, seven weeks post op.
8  A. Okay.
9  Q. And then she dislocated again four days
10 later and underwent her second revision.
11 A. Correct.
12 Q. So she --
13 A. So she --
14 Q. Would you characterize seven weeks as the
15 acute postoperative period?
16 A. Yes. I mean, before I even knew those
17 dates I told you that the postoperative period for the
18 acute was -- again, this are standard recognized time
19 frames -- acute meaning operative date to seven to 10
20 days, and then operative date to the six-week period of
21 time. So she is beyond that six-week period of time.
22 Q. Did you review Dr. Lewallen's notes form
23 the Mayo Clinic, Dr. Kantor?
24 A. I did. I did.
25 Q. Okay.

Page 232

1     MS. BUSBY: Tiffany, could you please put
2 up Dr. Lewallen's March 13, 2015.
3     (Defense Exhibit No. 13 was marked for
4 identification.)
5     MS. RIFFER: Yes. It's loading now. Just
6 one second.
7     MS. BUSBY: Excellent. That will be, for
8 the record, that will be Exhibit 13.
9 BY MS. BUSBY:
10 Q. And, Dr. Kantor, I think you said you
11 thought you may have met Dr. Lewallen?
12 A. I believe I met him at a hip conference,
13 yes.
14 Q. Okay.
15     MS. RIFFER: It's loaded, sorry.
16     MS. BUSBY: Thank you, Tiffany. That's all
17 right.
18 BY MS. BUSBY:
19 Q. He is a fairly well-known orthopedic
20 surgeon, correct?
21 A. I don't --
22     MR. WOOL: Object to form.
23 A. I don't know that. I know he is published.
24 I don't know how fairly well-known he is.
25

Page 233

1  BY MS. BUSBY:
2      Q.  Did you know that Dr. Lewallen is the
3  current president of the Orthopedic Research and
4  Education Foundation?
5      A.  I did not.
6      Q.  Did you know that Dr. Lewallen is the
7  medical director and hip society representative for the
8  American Joint Replacement Registry?
9          MR. WOOL:  Object to form.
10     A.  I did not.  I did not know that we had an
11 established joint registry functioning as we speak.
12 BY MS. BUSBY:
13     Q.  My copy of the Exhibit 13 is still loading,
14 are you able to access yours, Doctor?
15     A.  Yes.
16     Q.  Okay.  Bear with me a moment while my
17 system catches up.
18         While we wait for that to load, Dr. Kantor,
19 do you know how Ms. Bayes came to see Dr. Lewallen at the
20 Mayo Clinic?
21     A.  I believe she was referred to the Mayo
22 Clinic and to Lewallen specifically by Nunley.  I think
23 that was the -- or possibly because of the son as well as
24 Nunley.  But I don't know who made the phone calls, who
25 made the contacts for the consultation.

Page 234

1      Q.  Okay.  Fair enough.  I'm still struggling a
2  bit with access.  I apologize for the delay.
3          Looking at Dr. Lewallen's note, which we've
4  marked as Exhibit Number 13, this is just a two-page
5  note, and this is something you reviewed in the course of
6  developing your opinions?
7      A.  Yes.
8      Q.  Okay.  Dr. Lewallen discusses her history
9  of damage musculature from adverse local tissue reaction
10 and the fact that she was ultimately converted to a dual
11 mobility articulation, correct?
12     A.  That's correct.
13     Q.  Okay.  Dr. Lewallen has in his history of
14 present illness, about a third of the way down, he
15 states, "we have a copy of the operative report and it is
16 clear that at the same time a transfer of a portion of
17 the gluteus maximum to trochanter was accomplished to try
18 to restore her abductor power.  And, in fact, this has
19 been remarkably successful."  Did I read that correctly?
20     A.  You read it correctly, but it's incorrect.
21     Q.  That was my next question, sir.
22         Do you disagree with Dr. Lewallen's
23 assessment?
24     A.  Most definitely.
25     Q.  On what basis do you disagree with

Page 235

1  Dr. Lewallen?
2      A.  Well, why don't you read the operative
3  report by the man who supposedly transferred fibers to
4  the -- muscle fibers to the greater trochanter after
5  debriding to bleeding bone, to bleeding bone.  It's not a
6  tendon transfer.  There was nothing -- there was no
7  fixation used on the X-ray to fix anything.  He simply
8  transferred a few fibers muscle -- I believe the term is
9  muscle fibers, if I pull up the op report.
10     Q.  Okay.  So Dr. Kantor, I just want to be
11 clear on what the nature of your objection is.
12         MR. WOOL:  Counsel, I don't think he was
13     done with his answer.  He was pulling up that
14     report to take a look to finish the answer.
15         MS. BUSBY:  I understand that, Counsel, and
16     I'm trying to make sure we are moving things
17     along.
18 BY MS. BUSBY:
19     Q.  Dr. Kantor, I want to make sure I
20 understand.  Do you disagree with his characterization of
21 the operative report or do you disagree with his
22 characterization that the procedure was successful?
23     A.  Well, it obviously isn't successful because
24 she continues to dislocate so you know that.  And it's
25 not dictated in the operative report that the tendon was

Page 236

1  transferred to the greater trochanter.  And the last
2  person that operated on the patient, which is Dr. Mudd on
3  8/19/17 gives a clear indication that there is absolutely
4  nothing attached to the greater trochanter, nothing.
5          So we know it's not successful because the
6  tendon transfer wasn't carried out.  There was simply a
7  few, quote, muscle fibers to try to get an attachment.
8  She dislocates.  She dislocates repeatedly.  And then one
9  month later it describes that the condition of the
10 greater trochanter was nothing being attached to it.  As
11 a matter of fact, I'm looking at this description, I'm
12 looking up -- I'm reading now the last operative
13 procedure, the last person to visibly see this.
14     Q.  Can you give us the date, sir, can you give
15 us the date of the document from which you are reading?
16     A.  8/19/2019, Dr. Christopher Mudd.  Second
17 page, gluteus maximus muscle was essentially fibrotic.
18 At this point in time there was some capsule, synovial
19 fluid.  There was no soft tissue attached to the greater
20 trochanter posteriorly, superiorly, and very sparsely
21 anteriorly.  It is truly abductor deficient with
22 essentially a bald trochanter and essentially a naked
23 capsule.
24         In other words, the bald trochanter, there
25 is nothing attached to it.  He is the last person that

Page 237

1  operated on it.  He is the last person that visualized it
2  and there is nothing attached to the greater trochanter,
3  which is what you would expect.  And it's certainly not a
4  successful procedure considering, number one, it wasn't
5  the procedure done, there was never a tendon transfer
6  done, it's never described in the op report, it's an
7  extensive operative procedure because I've done it.  It's
8  not described in the operative report.  It's not
9  described in the listing of what was done.  It's not
10 charged for the patient in terms of billing charged.  And
11 the last surgeon that operated on her certainly doesn't
12 see it there because it's nonexistent.  There is nothing
13 attached to the greater trochanter.  Trochanter is bald.
14      Q.   Okay.  Dr. Kantor, Dr. Lewallen's note is
15 from March 2015, correct?
16      A.   Correct.
17      Q.   And you just read from Dr. Mudd's operative
18 report from August of 2017, so almost two and a half
19 years later, correct?
20      A.   Mudd's operative report is actually from, I
21 believe, from August '17.
22      Q.   Yes.  2017, sir, correct?
23      A.   That's correct.  I thought you said 2019.
24      Q.   No, sir.  I'm sorry if I misspoke.
25           And so that -- in that two-year period of

Page 238

1  time Ms. Bayes continued to dislocate, correct?
2       A.   Yes.
3       Q.   And in that -- and as we discussed before
4  dislocation themselves can cause damage to the tissue,
5  correct?
6       A.   They can.
7       Q.   I'd like you to focus on Dr. Lewallen's
8  note from March 13, 2015.
9       A.   Let's get it.  It's in front of me.  Why
10 don't you ask me what you need to know.
11      Q.   Okay.  Dr. Lewallen notes in his history,
12 "we talked with her in detail about the events
13 surrounding the dislocation, and all of these have
14 occurred with her flexed at the waist and with her knees
15 in a relatively neutral or abductive position often with
16 rotation of the trunk towards the affected left side,
17 which basically results in an abducted and internally
18 rotated position in addition to the flexion producing the
19 recurrent dislocations."  Did I read that correctly?
20      A.   You did.
21      Q.   And do you disagree with his observation?
22      A.   Well, I don't think, you know, the idea
23 that you are going to blame the patient for her
24 positional dislocations is kind of absurd.  I think --
25 and I'd like point out for the record, I believe that Dr.

Page 239

1  Lewallen has disclosures in terms of money received from
2  your company, which I think is important.  That comes
3  into play here.
4            I do find it somewhat offensive -- and I
5  have to tell you this, I know this is your job, as a
6  physician talking about a woman whose life has been
7  ruined by this, I find it somewhat offensive that someone
8  would attempt to blame the patient, including the
9  dislocation that occurred in church, on position --
10 malpositioning of her limb and doing something wrong to
11 create what has happened here.  I find that extremely,
12 extremely offensive.
13           MS. BUSBY:  Objection.  Move to strike.
14 Nonresponsive.
15 BY MS. BUSBY:
16      Q.   Doctor, my question is simply this:  Do you
17 disagree with Dr. Lewallen's observation?
18      A.   I disagree with Dr. Lewallen's
19 observations.  There may have been a time in one of her
20 16 or 18 dislocations that maybe she did something in
21 terms of going beyond what was described, but everything
22 that this woman has done in terms of dislocations has
23 been done within activities of daily living.  This is not
24 someone doing gymnastics.  Certainly, even you, Counsel,
25 wouldn't consider going to church to be some kind of a

Page 240

1  reckless activity.
2            So I don't agree with it.  I think it's a
3  very self-serving -- it's a very self-serving letter
4  trying to justify what has happened to this patient and
5  the fact that this patient has sustained all these
6  dislocations because she has not followed advice.  And
7  it's contrary to the records because every physician,
8  every physical therapist that I have seen has documented
9  that they have explained to her what the dislocation
10 precautions are, that she understands them, and she is
11 compliant and is attempting to carry them out.
12      Q.   Referring back to the documents,
13 Dr. Kantor, at the bottom of that page under physical
14 examination Dr. Lewallen writes, "musculoskeletal:  On
15 examination she walks with a nonantalgic gait, and has
16 remarkably normal hip abductor strength better than
17 antigravity on manual testing, perhaps very slightly weak
18 but only slightly so."  Did I read that correctly?
19      A.   You did.
20      Q.   Do you disagree with Dr. Lewallen's
21 physical examination of Ms. Bayes?
22      A.   I disagree completely.  Number one, I would
23 question, did Dr. Lewallen dictate this or was this
24 dictated by someone else.  Number two, I have never in
25 all my years in orthopedics, and I have published on gait

Page 241

1   analysis, it's one of my areas of specialty, I have never
2   seen a patient that has absolutely no abductor be able to
3   walk with a normal or near normal gait.
4           And it just does not make any anatomical
5   sense and it defies -- it defies any anatomical truth.
6   So I don't know how anybody without an abductor can walk
7   without a Trendelenburg type of a gait, which is
8   pathognomonic with this type of problem, with metallosis
9   and destruction of the abductor muscle group.
10      Q.   I understand.  And to confirm, Dr. Kantor,
11  you've not had the opportunity to examine Ms. Bayes?
12          MR. WOOL:  Object to form.
13      A.   I have not.
14  BY MS. BUSBY:
15      Q.   And you did not have the opportunity to
16  examine Ms. Bayes in 2015?
17          MR. WOOL:  Object to form.
18      A.   I haven't examined her at all.  You know
19  that.
20  BY MS. BUSBY:
21      Q.   Okay.  Let's look down under impression,
22  and Dr. Lewallen writes, "discussed with the patient.  I
23  told her that after some detailed discussion and review
24  of her circumstances I think the first step would be for
25  her to, for the very first time, be compliant with

Page 242

1   reasonable restrictions for her hip."  Did I read that
2   correctly, sir?
3       A.   You did.
4       Q.   Do you disagree with Dr. Lewallen's
5   assessment under impression after his physical
6   examination of Ms. Bayes?
7       A.   I do.
8       Q.   And what is the basis for that
9   disagreement?
10      A.   Basis for that disagreement is nowhere in
11  her records other than this self-serving report of
12  Dr. Lewallen who is employed by your company, receives
13  funding from your company, there is no record that this
14  patient is a noncompliant patient or who has done
15  anything wrong.  And that includes multiple physical
16  therapists and multiple physicians on multiple occasions,
17  and it's well-documented in the literature -- I'm sorry,
18  well-documented in her chart.
19      Q.   So, Dr. Kantor, am I understanding you
20  correctly that you believe Dr. Lewallen issued this
21  report because of some monetary benefit he was receiving
22  from Zimmer Biomet?
23          MR. WOOL:  Object to form.
24      A.   You should ask Dr. Lewallen that.
25

Page 243

1   BY MS. BUSBY:
2       Q.   Sir, you just said this is a doctor who is
3   receiving benefits from my client.  So I'd like to know
4   what evidence you have that Dr. Lewallen was receiving
5   some benefit from my client at the time that he wrote
6   this report about his patient?
7           MR. WOOL:  Counsel, are you going to argue
8   with the witness?
9           MS. BUSBY:  No, I'm asking him questions,
10  Counsel.
11  BY MS. BUSBY:
12      Q.   Go ahead, Doctor.  You can answer.
13      A.   Because his disclosure statements states
14  that he receives money and funding from your company,
15  from the people that are paying you are also paying him.
16      Q.   When did he receive money from Zimmer
17  Biomet, sir?
18      A.   Dr. Lewallen has been receiving money from
19  Zimmer Biomet for a number of years.  If you look at the
20  disclosures related to his article, it will document it.
21      Q.   You received funding from Johnson & Johnson
22  DePuy for two decades, correct, sir?
23      A.   I did.
24      Q.   You did not allow that funding to interfere
25  with your analysis and treatment of your patient, did

Page 244

1   you?
2       A.   I certainly did not.  Maybe I'm different
3   than Dr. Lewallen.
4       Q.   On what basis do you have for claiming that
5   Dr. Lewallen's care and treatment of his patient was
6   inappropriate or biased?
7           MR. WOOL:  Object to form.  Asked and
8   answered.
9       A.   Well, first of all, he is not treating the
10  patient, he saw her in evaluation.  And in terms of this
11  evaluation I do not see, number one, is not a correct
12  dictation.  Now again, maybe he did not do the dictation.
13  The dictation is not correct in terms of what was done to
14  this patient.  This patient has never had a tendon
15  transfer.  This patient in every evaluation and every
16  operative report that we looked at states the damage.
17  You can see the pictures.
18          I have a hard time even believing that a
19  gait analysis in a Trendelenburg test was performed on
20  this patient because I have never seen a patient who is
21  completely deficient on the abductor muscle group being
22  able to walk without a limp or without abductor or
23  Trendelenburg gait.  It almost defies -- it defies logic.
24          And either he didn't examine her or he is
25  misleading people in terms of what he is putting in here.

Page 245

1  Now, you should ask him if he examined her.  You should
2  ask him if he read these other operative reports.  But
3  the patient obviously doesn't have an abductor, and I
4  find it amazing that she has despite restoration of
5  abductor strength with the gluteus maximus -- he also
6  notes that the gluteus maximus is severely diseased and
7  fibrotic and it hasn't been transferred to the greater
8  trochanter.
9           So there is something that is not right
10 about this op report, the operative reports and this
11 dictation.  It does not coincide with, number one, the
12 operative pictures.  Number two, the pathology pictures
13 that you are seeing documented from the first revision.
14 The multiple descriptions of the lack and the
15 deterioration of the abductor to the point that it's
16 completely detached.  The fact that there is nothing
17 attached that can even be found.
18          So I don't know how you can make this
19 statement when you have no muscle tendon transfer
20 restoration of abductor strength with gluteus maximus
21 transfer when she hasn't had one.
22 BY MS. BUSBY:
23     Q.   If you would scroll down to the bottom of
24 that second page, the very last sign, sir, says,
25 electronically signed 17th March, 2015, 8:08 by Dr. D.G.

Page 246

1  Lewallen; do you see that, sir?
2      A.   I see it.
3      Q.   Does that indicate to you that Dr. Lewallen
4  reviewed and signed this document?
5      A.   He apparently electronically signed this
6  document, whether he read it or not I don't know.  But
7  there is nothing about this dictation that -- it's almost
8  as if the patient that I'm reading about, the patient
9  that's had all these operations, all these findings, it's
10 almost like it's a different patient.  You should
11 probably send him my dictation -- I mean, my deposition
12 with these questions I have in conjunction with all these
13 operative reports and the pictures, and see if he would
14 again say this is the case.
15          Because unless we are talking about a
16 different patient this does not make any sense to me.
17 Now, maybe he was busy, maybe he just electronically
18 signed, like unfortunately a lot of us do, without
19 reading it.  It was probably dictated by a resident or a
20 fellow.  But I have a hard time putting this impression,
21 this consultation report with this patient.  I really do.
22 It just doesn't make any sense.
23      Q.   And you do understand that Dr. Lewallen has
24 not been retained to provide an expert opinion by either
25 party in this case, correct, Dr. Kantor?

Page 247

1      MR. WOOL:  Object to form.
2      A.   I didn't know that at all until you just
3  stated it.
4  BY MS. BUSBY:
5      Q.   Now, there is a note in Dr. Lewallen's note
6  that he does make reference to the fact that she had her
7  right hip revised in 2014.  And then at that point she
8  was not having any issues or complaints with respect to
9  her right hip; do you agree with that?
10     MR. WOOL:  Object to form.
11     A.   It appears so.
12 BY MS. BUSBY:
13     Q.   Do you have any information that Ms. Bayes
14 has gone on to have any problems right hip post revision?
15     A.   I do not.
16     Q.   And she'd had that Magnum device in her
17 right hip for approximately six and a half years; is that
18 correct?
19     A.   That's correct.
20     Q.   Okay.  You refer in your report to the
21 deposition [sic] of the right hip as being both
22 appropriate and timely and undertaken to remove the index
23 metal-on-metal THA on the right in an effort to prevent
24 further tissue destruction experienced on the left THA;
25 is that correct, sir?

Page 248

1      MR. WOOL:  Object to the form.
2      A.   That is exactly right.
3  BY MS. BUSBY:
4      Q.   And when you say it was a timely revision,
5  you used the word timely.  Tell me why you used that word
6  and what you mean by that.
7      A.   Well, as you'll see from the documentation
8  that we are going to send you with the updates on
9  treatment algorithms for this, if we timely had gone
10 through the surgical -- the surgical photographs that
11 were sent to you that we'll be discussing in trial,
12 you'll see why now the treatment course is the quicker
13 you can get in to get these aggressive destructive
14 pseudotumors out the better off you are, even if the
15 patient is clinically asymptomatic.
16          If you look at the picture which we will
17 then go over at trial and I will show you a surgical
18 intervention at an earlier period of time, a timely
19 intervention so you are available to resect the
20 pseudotumor before it destroys the capsule, the external
21 rotators, and the most importantly abductor muscle group,
22 which interestingly is the only muscle group that
23 provides abductor and inherent stability to the hip to
24 maintain it within the joint articulation and prevent it
25 from dislocating.