# EXHIBIT N

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION
CAUSE NO. 4:13-cv-00800-SCR

MARY BAYES and PHILIP BAYES,       )
                                   )
         Plaintiffs,               )
                                   )
                                   )
    -vs-                           )
                                   )
BIOMET, INC., BIOMET               )
ORTHOPEDICS, LLC, BIOMET U.S.      )
RECONSTRUCTION, LLC, BIOMET        )
MANUFACTURING, LLC, f/k/a BIOMET   )
MANUFACTURING CORP.,               )
                                   )
         Defendants.               )

ZOOM VIDEOCONFERENCE VIDEOTAPED
DEPOSITION OF MARI S. TRUMAN

    The deposition upon oral examination of MARI S.
TRUMAN, a witness produced and sworn electronically
via Zoom Videoconference before, Tracy Larimore,
RPR, Notary Public in and for the County of Allen,
State of Indiana, taken on behalf of the Defendants,
at the location of the witness, 221 N. Union Street,
Warsaw, Indiana, on the 19th day of May, 2020,
scheduled to commence at 10:00 a.m. pursuant to the
Federal Rules of Civil Procedure 30(b)(4) and In Re:
Judge Clark's Case-Management Procedures Due to
Covid-19 Response with written notice as to time and
place thereof.

## Page 2

1    A P P E A R A N C E S (VIA ZOOM)
2  FOR THE PLAINTIFF(S):
   Mary Bayes, et al.:
3
4      Darin L. Schanker, Esq.
       Melanie R. Sulkin, Esq.
5      BACHUS & SCHANKER LLC
       101 West Colfax, Suite 650
6      Denver, CO 80202
       303.222.2222
7      dschanker@coloradolaw.net
       melanie.sulkin@coloradolaw.net
8  and
9      Zachary Wool, Esq.
       BARRIOS KINGSDORF & CASTEIX, L.L.P.
10     701 Poydras Street, #3650
       New Orleans, LA 70139
11     504.524.3300
       zwool@bkc-law.com
12
13 FOR THE DEFENDANT(S):
   Biomet, Inc., et al.:
14
15     Adrienne Franco Busby, Esq.
       FAEGRE DRINKER BIDDLE & REATH LLP
16     300 N. Meridian Street, Suite 2500
       Indianapolis, IN 46204
17     317.237.0300
       adrienne.busby@faegredrinker.com
18 and
19     Tiffany Heavlin Riffer, Esq.
       FAEGRE DRINKER BIDDLE & REATH, LLP
20     1050 K Street NW, Suite 400
       Washington, DC 20001
21     202.312.7065
       tiffany.riffer@faegredrinker.com
22
23
24 THE VIDEOGRAPHER: Steve Troncone
25

## Page 3

1         INDEX OF EXAM
2                                        Page
   DIRECT EXAMINATION ..........................5
3  Questions by Ms. Busby
   CROSS-EXAMINATION ..........................301
4  Questions by Mr. Schanker
5
6         INDEX OF EXHIBITS
7  Deposition Exhibits:                    Page
8  Exhibit 1  Three-Ring Binder used by ........13
       Witness
9
   Exhibit 2  Common Issue Report ..............17
10
   Exhibit 3  Bayes Rebuttal Report ............21
11
   Exhibit 4  Notice of Deposition .............29
12
   Exhibit 5  Testimony list ...................53
13
   Exhibit 6  OIC Report .......................66
14
   Exhibit 7  Email correspondence .............67
15
   Exhibit 8  Invoice ..........................85
16
   Exhibit 9  Invoice...........................85
17
   Exhibit 10 Invoice ..........................85
18
   Exhibit 11 Invoice ..........................85
19
   Exhibit 12 Dr. Nunley's right hip ..........130
20            revision report
21 Exhibit 13 EBRA Analysis ...................159
22 Exhibit 14 Dr. Lewallen's 3/13/15 note .....228
23
24
25

## Page 4

1       VIDEOGRAPHER:  We are now on the video
2  record.  Today is May 19th, 2020.  The time is
3  approximately 10:04 a.m.
4       Will you please raise your right hand to be
5  sworn for the record?  And I believe she has a
6  statement to make.
7       COURT REPORTER:  I'm Tracy Larimore, court
8  reporter in Fort Wayne, Indiana, and I just want
9  to get a stipulation on the record that it is
10 okay with all counsel present that I swear the
11 witness via Zoom.
12      MR. SCHANKER:  This is Darin Schanker and I
13 represent Mary Bayes, and I have no objection to
14 you swearing in the witness via Zoom.
15      MS. BUSBY:  This is Adrienne Busby --
16      MR. WOOL:  Zachary Wool for the plaintiff.
17      MS. BUSBY:  Go ahead, Zachary.
18      MR. WOOL:  Zachary Wool for the plaintiff.
19 I have no objection.
20      MS. SULKIN:  Melanie Sulkin for the
21 plaintiffs, Mary and Philip Bayes, I have no
22 objection.
23      MS. BUSBY:  Adrienne Busby, Faegre Drinker
24 for the Biomet defendants.  I have no objection.
25      COURT REPORTER:  Ma'am, if you --

Page 149

1    before the fusion and after the fusion, you can
2    then keep track of the change, but I hadn't seen
3    that in this particular case.
4    Q   Okay.  Because that's not an analysis that you
5    were able to undertake?
6    A   Right, not with the information I had.
7    Q   Okay.  Looking at the reports that the -- the
8    paragraph that we had been talking about, that
9    is marked with the little "i", it starts on Page
10   1, carries over to Page 2, your first full
11   sentence that begins, "Wear debris"; do you see
12   that sentence, ma'am?
13   A   Yes.
14   Q   Okay.  There's a parenthetical there and I want
15   to -- we've been talking about the whole
16   sentence, but I want to talk about the
17   parenthetical.  You say here, "And potentially
18   head taper adapter interface in the left hip."
19   What does that parenthetical mean?
20   A   That means that we didn't have the left hip to
21   take out and you can -- you have a cobalt-chrome
22   titanium interface, and you can get a metallosis
23   reaction from cobalt-chrome titanium tapers.
24   And without looking at the device, given all of
25   the other aspects of this case, I couldn't rule

Page 150

1    in or rule out that that could, it could have --
2    it could be something that would play a role.
3    And you'd actually have to have the device and
4    section it and see what kind of -- what was
5    going on in that interface.
6    Q   Okay.  So just to be clear, because you didn't
7    have the device and you couldn't section it and
8    see what was going on in that interface, you are
9    not able to conclude to a reasonable degree of
10   scientific certainty whether there was taper
11   corrosion in that left hip; correct?
12       MR. SCHANKER:  Object to form.
13   A   Okay.  There's taper corrosion and taper
14   corrosion.  What I'm not able to conclude is
15   that there's any significant amount of taper
16   corrosion.  Most likely there's some taper
17   corrosion, because there's going to be a crust,
18   because it's not going to have been a perfect
19   fit, there's going to be some fluid that gets in
20   there, it's going to -- it's titanium.  It
21   oxidizes well.  Oxidation.  If there's any
22   motion at all, there's going to be a little bit,
23   a little bit of corrosion.  I just can't tell
24   you that it's a significant amount or clinically
25   significant amount.

Page 151

1    Q   Okay.  And so you would agree with me that all
2    modular devices have the potential to corrode;
3    correct?
4        MR. SCHANKER:  Objection.  Form.
5    A   There is potential for corrosion at anywhere
6    where you have a metal-metal interface where
7    there's some motion, especially if there's a
8    little crevice.  There's, there's potential for
9    that mechanically assisted crevice corrosion
10   situation on any of the modular components with
11   taper interfaces and other, and other
12   metal-metal interfaces have that risk, yes.
13   Q   Okay.  And that's not specific to devices that
14   have a metal-on-metal articulation; correct?
15       MR. SCHANKER:  Objection.  Form.
16   A   That is correct.  And the only thing that I've
17   stated relative to the metal-on-metal
18   articulations is that because we have the
19   cobalt-chromium debris, which then ionizes into
20   cobalt ions very quickly and if you get a -- if
21   you get an inflammatory response, and I do
22   believe that there was some inflamed synovium
23   even in Ms. Bayes' right hip, when you get an
24   inflammatory response, that -- those reactive
25   oxygen CCs that, that are there increase the

Page 152

1    corrosion at -- specifically at a cobalt
2    interface, so that is -- that when you have
3    metal-on-metal and you've got metal ions and
4    you've got these -- especially these chrom--
5    cobalt and chromium ions that are in the area,
6    you're more likely to get the taper corrosion.
7    So it's just an exacerbating factor, basically.
8    Q   Okay.  So I think we can agree that the
9    potential for corrosion at metal-metal modular
10   interfaces is not specific to metal-on-metal
11   devices; correct?
12       MR. SCHANKER:  Objection.  Form.
13   A   That is, that is correct.
14   Q   And corrosion at modular interfaces, when it
15   happens, is not always clinically significant to
16   the patient; correct?
17       MR. SCHANKER:  Objection.  Form.
18   A   Correct.  Like I said, corrosion -- and it
19   depends on the material coupled and what are the
20   effects, and in some patients, there is a large
21   effect and some there is not.  I mentioned --
22   it's not applicable in this case, but I did
23   mention because I didn't go into as much in the,
24   the MDL.  The original report was about a
25   clinical cold welding, which is when the

Page 165

1    certainty about the angles of this cup at any
2    particular time?
3         MR. SCHANKER:  Objection.  Form.
4    A  What I'm going to say is that when you look at
5    these, you can see that in 2008, they -- the cup
6    angles were lower and there's a slight
7    difference between the right and left.  Then you
8    go to 2010, the cup angles are higher and
9    there's a bigger difference between the right
10   and left.  That, you can see on the x-rays that
11   I have.  Again, assuming -- we know that there's
12   some error in the x-rays, in their orientation
13   and all, but I can say we can say that happened,
14   but I'm not going to give you exact angles.  I'm
15   going to defer to Dr. Lux and the orthopedic
16   people in this case for the exact angles.
17   Q  Okay.
18        MS. BUSBY:  Very good.  Let's go ahead and
19   take a break.
20        VIDEOGRAPHER:  One moment.  Okay.  We are
21   off the video record.
22        (A short recess was had.)
23        VIDEOGRAPHER:  We are back on the video
24   record.
25   BY MS. BUSBY:

Page 166

1    Q  Ms. Truman, you are still under oath, you
2    recall -- same as you swore this morning --
3    A  Yes.
4    Q  -- correct?
5    A  Correct.
6    Q  And you have no no, no, currently, open lines of
7    communication?  No texts, no email, no
8    telephone, nothing with anyone while we're on
9    this deposition session; correct?
10        MR. SCHANKER:  Objection.  Form.
11   A  Correct.
12   Q  Okay.  Are you able to -- now, having to reboot
13   your computer, are you able to access the
14   Exhibit Share website again?
15   A  Yeah.  It's already up and going.  I'm -- it's
16   ready to go.  Whichever you want me to look at.
17   Q  Okay.  And could you please look at Exhibit 13,
18   which is the EBRA analysis --
19   A  Uh-oh.  My mouse locked again.
20        VIDEOGRAPHER:  Let's go off the record
21   because she's frozen.  One moment.
22        Off the record.
23        (A short recess was had.)
24        VIDEOGRAPHER:  Okay.  We are back on the
25   video record.

Page 167

1    BY MS. BUSBY:
2    Q  Okay.  Ms. Truman, welcome back.  I think we've
3    solved our technological issues, and you've got
4    a little bit of different scenery behind you
5    now.
6         You remember that you are still under oath;
7    correct?
8    A  I do.  Yes.
9    Q  Okay.  And you have the same materials we talked
10   about, the notebook containing your report,
11   available to you if you want to refer to it?
12   A  Right.  I have the notebook here, and then I
13   left your other papers at the other desk,
14   because we weren't using them.  And then I've
15   got the exhibits in front of me on the computer.
16   Q  Okay.  That is great.
17        And just to confirm what we talked about
18   before, you don't have any live text chatting or
19   email chats or anything like that going right
20   now; correct?
21   A  That is correct.
22   Q  Okay.  Ma'am, just a couple of cleanups from the
23   conversation we were having that I neglected to
24   ask you.  We focused our discussion mainly on
25   the left hip.

Page 168

1    With respect to Ms. Bayes' right hip, do
2    you hold the opinion, to a reasonable degree of
3    scientific and engineering certainty, that there
4    was clinically significant taper corrosion in
5    the right hip?
6         MR. SCHANKER:  Objection.  Form.
7    A  I -- actually, the answer is similar.  There --
8    first, there -- we don't know because we didn't
9    take it apart, and so I don't know that that was
10   any worse than, than the cobalt coming from the
11   head.  I think most likely it was from the head.
12   Again, without taking the taper apart
13   destructively, we can't tell.
14   Q  Okay.  And you did not conduct any tests on that
15   right hip device to determine whether the debris
16   on the device was actually corrosion debris;
17   correct?
18   A  Well, it depends on which taper you're talking
19   about.  I did not do a -- an analysis.  In other
20   words, I didn't -- we didn't have -- I didn't
21   have OIC use their scanning electron microscope
22   and -- with the E-, EDX to go through and
23   determine what constitutes the, the material we
24   saw at the surface perimeter.
25        So we have two tapers.  We have the little

Page 169

1	taper that you could see into that looked like a
2	lot of biologic debris, most of the same surface
3	finish, probably some little bits of corrosion.
4	I didn't have them go in and measure that.  It
5	does not -- that particular taper didn't look to
6	have a significant amount of damage, which is --
7	which I would concur with that.
8	    Most of the tapers, even when there's
9	massive corrosion, don't have significant
10	amounts of material loss, but they do have a lot
11	of damage.  This one didn't have a lot of
12	damage.  And it was able to be removed.  So it
13	didn't -- even if it had, which I'm sure it had
14	some corrosion, it wasn't a clinically
15	significant amount at the taper, that high taper
16	that we could see.
17	    The other taper, we didn't -- we'd have to
18	take it apart to see what was on the inside.
19	And I did not have somebody all the way
20	around the outside to document with what we saw
21	visibly there, was that a corrosion product or
22	was that, or was that a biologic material.
23	Q	Without using an SEM, are you able to determine
24	visually whether you're seeing corrosion
25	byproduct or a biologic material on an explant?

Page 170

1	    MR. SCHANKER:  Objection.  Form.
2	A	It depends on what explant you're talking about
3	and where we're at.  In other words, you can see
4	corrosion damage that you can tell like the
5	imprinting inside of heads when you have a
6	cobalt-chrome head, you can tell that that's
7	corrosion damage and that that's significant
8	corrosion going on.  But as far as it -- what is
9	that element?  Is it, is it an oxide?  What is
10	it an oxide of?  You can't tell without using
11	SEM exactly what the elements on the surface
12	are, but you can see evidence of corrosion
13	damage.
14	    And then the debris, the biologic debris,
15	no, I, I -- just by looking, I mean, unless it's
16	clearly a glob of something biologic, like a big
17	glob of, looked like dried blood, you wouldn't
18	expect that to be.  So there's, there's some,
19	some things you can tell a little bit and the
20	rest, no, you can't tell exactly.
21	Q	Okay.  And just so that we're clear, you didn't
22	ask OIC to undertake that analysis with respect
23	to the right hip, and you did not undertake that
24	analysis with respect to the right hip; correct?
25	A	You are correct on both counts.

Page 171

1	Q	Okay.  And I think you also told me that, you
2	mentioned clinical cold welding.  And in, a
3	couple times in your report, I see "CCW" in all
4	caps.  When I see that in your report, does that
5	refer to clinical cold welding?
6	A	Yes.  And that's basically saying that the --
7	that there's so much corrosion that you could
8	not get them to disassociate, basically.
9	Q	And for those among us who are not engineers,
10	disassociate means pull apart; right?  You can't
11	take them apart?
12	A	That's correct.  Right.  You can't take them
13	apart, correct.
14	Q	Okay.  And that -- and clinical cold welding did
15	not happen in either the left or the right hip
16	for Ms. Bayes; correct?
17	    MR. SCHANKER:  Objection.  Form.
18	A	That is correct.  That's correct.  So the -- so
19	that discussion actually does not apply to
20	Ms. Bayes.
21	Q	Okay.  Very good.  That trims things down.
22	    Ma'am, could you take a look at Exhibit 13,
23	which we have published to you in the marked
24	exhibit folder?  Do you have that up?
25	A	It is thinking.

Page 172

1	Q	Okay.  Okay.  Let me know when it's there.
2	A	I wonder if it has pictures.  It might be kind
3	of big.  I don't know.  It's taking a while.
4	Q	Well, while it loads up, let me, let me ask you
5	a couple preliminary questions that we may have
6	covered, but we took kind of a lengthy break,
7	and I want to make sure that, that I've got this
8	right.
9	    So you saw Dr. Kurtz's deposition, but you
10	did not have an opportunity to review his
11	exhibits; is that correct?
12	A	That is correct.
13	Q	Okay.  Were you able to see, at any time, the,
14	the documents that includes all of the x-ray
15	analyses that formed the basis of Dr. Kurtz's
16	EBRA opinions?
17	A	No.  I just saw what was in the report.  So I
18	did -- in fact, I cannot -- now I can see --
19	here -- I do recall there was some discussion
20	that there were more x-rays looked at in his
21	deposition and I do -- that document is open and
22	I can scroll through it now, just so you know.
23	Q	Okay.  If you have not seen this document before
24	and you'd like to scroll through and take a look
25	and familiarize yourself with it, you're welcome

Page 261

```
1    offer any opinions critical of the design of the
2    Magnum taper adaptor; correct?
3         MR. SCHANKER: Objection.  Form.
4    A  I think the only thing that I did discuss was
5    probably something about the testing, that there
6    was not significant testing of the corrosion of
7    that.  I did note that there was some.  So that
8    would be -- without going through and reading
9    the report again, that's what I recall talking
10   about, as I sit here.
11   Q  Okay.  Let's take a look at Finding 9B.  Finding
12   9B relates to assembly instructions and tools to
13   assure adequate impaction force for
14   multi-modular Magnum head and stem tapered
15   junctions.  Again, this is not an opinion that
16   was included in your MDL report or about which
17   you testified; correct?
18   A  That is correct.
19   Q  So this is also a new common issue opinion?
20   A  It is, in general, yes, or common.
21   Q  Okay.  And then we move along to -- well, let me
22   back up again and, frankly, because we don't --
23   you don't hold the opinion that there was
24   clinically significant taper corrosion or
25   clinical cold welding with Ms. Bayes' case, this
```

Page 262

```
1    finding at 9B isn't relevant to Ms. Bayes' at
2    all; correct?
3    A  Yeah.  In general, Finding 9A and B, given
4    that -- given the fact that we didn't take apart
5    the taper, really, it's saying that through the
6    analysis, I have the critiques, but they're
7    really -- I don't have evidence to, to, to say
8    that that was a part of her failures.
9    Q  Okay.  And then Finding Number 10, that's
10   basically adopting and incorporating the common
11   issue opinions that you've already provided;
12   correct?
13   A  It is.
14   Q  Okay.  I do, ma'am, have some other questions,
15   including questions related to the retrieval
16   analysis of this device, but I feel the need to
17   go ahead and make the record now.
18        MS. BUSBY:  The opportunity to provide
19   common issue opinions has expired in these
20   remanded cases.  They've been subjected to
21   depositions and to Daubert motions, which have
22   been ruled on.  So I'll make a formal motion to
23   strike any common issue opinions that have not
24   been properly and timely disclosed in the MDL.
25   And I will also state that, you know, Counsel, I
```

Page 263

```
1    know you're going to have your objections and
2    it's probably something that we will need to
3    deal with off the record.  I'm not going to
4    question Ms. Truman on new common issue opinions
5    right now.  I don't think it's appropriate to
6    require my client to expend the resources to do
7    that, for inappropriately disclosed opinions.
8        So if the Court decides that these are
9    appropriate, then I'll reserve the right to come
10   back and question on them, but I'm not going to
11   do that right now.
12        So Counsel, if you wish to respond to that
13   on the record, you're welcome to; otherwise, we
14   can take it up off the record.
15        MR. WOOL:  Darin may have dropped off,
16   Adrienne.  Your comments are noted, some of them
17   disagreed with, some of the characterizations as
18   to what's appropriate and what's not.
19        And why don't we take a break?  I'm not
20   sure what happened to Darin.
21        MS. BUSBY:  Yeah.  I want to make sure that
22   he's back, but we'll go ahead -- and if we can
23   make this a short break.  We have some time left
24   under the Federal rule, but it is quite late and
25   it's been a long day for Ms. Truman and everyone
```

Page 264

```
1    else, and I'd like to get back on the record and
2    wrap this up as quickly as we can.
3        MR. WOOL:  Sure.
4        MS. BUSBY:  Okay?  Zach, is it -- with your
5    permission, can we go off the record?
6        MR. WOOL:  Sure.  And Steve, once we're
7    off, if you can just tell us how much time is
8    left.
9        VIDEOGRAPHER:  Sure.  We are off the
10   record.
11       (A short recess was taken.)
12       VIDEOGRAPHER:  We are back on the video
13   record.
14   BY MS. BUSBY:
15   Q  Okay.  Ms. Truman, you're still under oath as
16   you recall; right?  You may be muted.
17   A  Uh-oh.  Can you hear me?
18   Q  I can, I can hear you now.
19       Just to confirm, you, you are still under
20   the oath you swore this morning, Ms. Truman;
21   correct?
22   A  Correct.
23   Q  And you have no current open lines of
24   communication, text, email, carrier pigeon, with
25   anyone while we are on the record; correct?
```