**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

MARY BAYES and PHILIP BAYES,           )
                                       )
        Plaintiff(s),                  )
                                       )
        vs.                            )       Case No. 4:13-cv-00800-SRC
                                       )
BIOMET, INC., et al.,                  )
                                       )
        Defendant(s).                  )

## Memorandum and Order

Plaintiff Mary Bayes had both her hips replaced with artificial hip implants designed, manufactured, and sold by Defendant Biomet Orthopedics, LLC.  She encountered severe complications after her hip replacements, requiring numerous additional hip surgeries.  Mary Bayes and her husband, Philip Bayes, filed suit against Biomet in 2013.  With trial soon approaching, the Court continues to address the throng of motions filed by the parties.  Having ruled on the summary judgment motions and Biomet's motion to exclude Plaintiffs' case-specific causation experts, the Court now takes up Biomet's four remaining motions to exclude expert testimony [102] [109] [115] [121].

## I.      Background

The Court has thoroughly recounted the facts of this case in its Order on Biomet's Motion for Summary Judgment.  *See* Doc. 225.  In the same Order, the Court explains some of the medical terminology at issue in this case and likewise does not repeat those explanations here.  Also in that Order, the Court denied Biomet's motion to exclude Plaintiffs' medical causation experts, Dr. Paul Lux and Dr. George Kantor. *Id.*

## II.     Legal Standard

1

To be admissible, Federal Rule of Evidence 702 requires that expert testimony (1) help the trier of fact determine facts at issue; (2) be based on sufficient facts or data; and (3) be the product of reliable principles and methods.  In addition, the expert must have reliably applied those principles and methods to facts of the case.  This Court must act as a "gatekeeper" in determining the admissibility of expert testimony and must "make a preliminary assessment of whether the proffered expert's methodology is both scientifically valid and applicable to the case."  *Bland v. Verizon Wireless, (VAW) LLC*, 538 F.3d 893, 896 (8th Cir. 2007); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  With this standard in mind, the Court addresses the four motions in turn.

### III.    Plaintiffs' expert Dr. Francis Gannon

Plaintiffs' expert Dr. Francis H. Gannon, M.D., is an orthopedic pathologist and Professor of Pathology and Orthopedic Surgery at Baylor College of Medicine in Houston, Texas.  Gannon is a staff pathologist in the Departments of Pathology at Texas Children's Hospital, Ben Taub General Hospital, and Debakey VA Medical Center, all in Houston.  He also serves as a Veterans Affairs National Bone Pathology Consultant.  Gannon is board certified in Anatomic Pathology by the American Board of Pathology.

#### A.    Gannon's opinions

Gannon provided a non-case-specific expert report in the MDL.  Biomet did not move to exclude Gannon's non-case-specific opinions before the deadline and the MDL judge held that any subsequent motion to exclude those opinions would be untimely.  Doc. 18 at 8-9.  In the present case, Plaintiffs retained Gannon to provide a rebuttal opinion in response to Biomet's case-specific expert reports.  Gannon reviewed Mary Bayes's medical records, tissue removed

2

during Mary's[1] 2011 left hip revision, photographs taken during the 2011 revision, and other expert reports disclosed in this matter.  Gannon also provided an addendum report after reviewing pathology slides from Mary's 2014 right hip revision.

Based on his review of Mary's tissue and medical records, Gannon opines that Mary's M2a Magnum hip implants released wear debris into the surrounding joint tissue.  Macrophages (white blood cells) drawn to the area by the body's immune response then ingested the wear debris, leading to cellular death and scarring.  Gannon opines that "[t]his necrosis is directly associated with the metal laden macrophages."  Doc. 103-1 at 1.  Gannon further opines that the accumulation of wear debris led to tissue destruction (necrosis), which in turn caused Mary's numerous dislocations and necessitated multiple revision surgeries.  *Id.*

### B.    Defendants' motion to exclude

Biomet does not challenge Gannon's qualifications.  Instead, Biomet argues that the Court should exclude certain opinions Gannon expressed during his deposition as not based on reliable principles or methods.  First, Biomet seeks to exclude Gannon's opinion that the same processes observed in Mary's left hip were also occurring in her right hip, even though Gannon did not observe all of the same biological markers in Mary's right-hip tissue.  Biomet also seeks to exclude Gannon's opinions on Mary's clinical course (meaning the progression of her hip injuries) after the time her tissue samples were taken.

### 1.    Gannon's opinions regarding Mary's right hip

Gannon testified that he observed "adverse reaction to metal debris" (ARMD) in both Mary's left and right hips.  Doc. 103-3 at 74:9-75:22.  Gannon further testified that ARMD is characterized by the presence of metal-laden macrophages plus either tissue necrosis or

---

[1] The Court refers to Plaintiffs Mary and Philip Bayes by their first names to distinguish them, and not to imply any familiarity.

inflammation.  *Id.*  Gannon observed all three markers in his examination of tissue from Mary's left hip.  Gannon observed metal-laden macrophages and necrosis (but not inflammation) in his review of tissue from Mary's right hip.  When asked his opinion on why he did not observe inflammation in the right hip, Gannon attributed the difference to a sampling issue:

> A.   It's absolutely a sampling issue.  There's more tissue that was taken – more tissue on the slides [from the left hip]. . . .  In the [slides from the right hip], a lot of the tissue was the scar tissue.  And I don't think the correct areas from that hip were sampled.  Given that this is . . . a systemic immunologic reaction to localized damage, the same changes had to be there.  We're just not seeing them.

> Q.   But by saying the same changes had to be there, that's an assumption, correct?

> A.   It is but it's informed by my clinical experience.

*Id.* at 76:2-16.  Biomet specifically seeks to exclude Gannon's opinion that inflammation "had to be" present in Mary's right hip, even though he did not observe it in the right-hip tissue he examined.  Biomet argues that this opinion is mere speculation, and therefore inadmissible under Rule 702.  The Court disagrees.

"As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Bonner v. ISP Tech., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001).  As noted, Gannon observed two of the three markers of ARMD in Mary's right hip.  He testified that ARMD is a "systemic immunologic reaction to localized damage."  Doc. 103-3 at 76:2-16.  He also testified that the presence of metal-laden macrophages in Mary's right-hip tissue indicated active immune response in the right hip.  Doc. 159-2 at 60:1-11.  Inflammation is characteristic of active immune response.  Thus, Gannon's opinion that inflammation "had to be" present in the right hip is a logical inference rather than mere speculation, supported by his observations and based on his clinical experience.  Biomet may cross-examine Gannon regarding

4

the absence of inflammation in the available right-hip tissue.  But the Court does not find

Gannon's opinion "so fundamentally unsupported that it can offer no assistance to the jury."

*Synergetics, Inc. v. Hurst*, 477 F.3d 949, 956 (8th Cir. 2007).

### 2.     Gannon's opinions regarding Mary's subsequent clinical course

Biomet also seeks to exclude Gannon from offering any opinion regarding Mary's

clinical course after the time her tissue samples were taken.  Thus, Biomet seeks exclusion of

Gannon's opinions regarding the clinical course of Mary's left hip after March 30, 2011 and of

her right hip after July 8, 2014—because her respective tissue samples were taken on those dates.

In his rebuttal report, Gannon opined that "Mrs. Bayes experienced an adverse reaction to metal

debris" leading to "subsequent tissue destruction and numerous dislocations and revision

surgeries."  Doc. 103-1.  Biomet argues that the Court should not permit Gannon to opine about

the cause of any dislocations or revision surgeries after the time her samples were taken.  The

Court disagrees.

During his deposition, Gannon testified that the necrosis (tissue death) caused by ARMD

is permanent.  Doc. 138-2 at 83:5-19.  Thus, Gannon attributed Mary's dislocations *after* her

tissue samples were taken to the ARMD process, based on his "general medical and pathology

training":

> Q.     And when you're referring to Ms. Bayes' numerous dislocations, are you
> referring to dislocations that happened after [March 30, 2011]?
>
> A.     I'm referring to both.
>
> Q.     But if you're offering an opinion . . . based on slides that you reviewed,
> then how are you tying an opinion related to the cause of dislocation after
> those slides were taken as being connected?
>
> A.     So that's my—that's my general medical and pathology training.  The hip
> has a very complicated and regulated support system to keep our hip in the
> joint.  When any of that is damaged . . . the body can't remake skeletal

5

> muscle or tendons or ligaments.  So once the dislocation process starts as a
> result [of tissue death], those tissues are gone.

Doc. 103-3 at 82:8-83:1.  Biomet does not attempt to refute Gannon's testimony that tissue death caused by ARMD is permanent.  Gannon further testified that the ARMD process continues in the body even after removal of the metal-on-metal implant.  Doc. 138-2 at 80:12-15.  Gannon expressly based his opinion that ARMD caused Mary's subsequent dislocations and revision surgeries on the fact that the associated tissue death is permanent.  "Trained experts commonly extrapolate from existing data."  *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  The Court finds Biomet's criticism of Gannon's opinions goes to weight, rather than admissibility.  *Bonner*, 259 F.3d at 929.  Biomet may cross-examine Gannon regarding the basis of his subsequent clinical-course opinions, including the lack of tissue taken at the time of subsequent revision surgeries.  Biomet may also present any evidence—including tissue-pathology evidence—that contradicts Gannon's opinions.  But at this "gatekeeping" stage, the Court denies Biomet's motion to exclude Gannon's opinions regarding Mary's subsequent clinical course.

In sum, the Court denies Biomet's motion to exclude Gannon's opinions and testimony.

## IV.    Plaintiffs' expert Mari Truman

Plaintiffs' expert Mari Truman is a biomechanical engineer with 36 years of experience in the biomechanics and orthopedics fields.  Biomechanics is a sub-specialty field of bioengineering and involves the application of principles of engineering mechanics to understanding the structure and function of bone and other skeletal tissues.  Truman holds nine patents for orthopedic devices and is a member of the American College of Sports Medicine, the American Society of Mechanical Engineers, the International Society of Biomechanics, and the Orthopedic Research Society.  Truman's experience includes designing orthopedic devices as well as performing laboratory evaluation of orthopedic implant-system performance.

### A.   Truman's opinions

Truman provided a common-issue expert report in the MDL.  Biomet moved to exclude portions of Truman's common-issue report under Rule 702, and the MDL judge denied the motion in its entirety.  In the present case, Plaintiffs retained Truman to provide a rebuttal report in response to Biomet's case-specific expert reports.

### B.   Defendants' motion to exclude

Biomet moves under Rule 702 to exclude certain opinions in Truman's rebuttal report. First, Biomet moves to exclude common-issue opinions disclosed for the first time in Truman's rebuttal report.  Second, Biomet asks the Court to exclude Truman's opinions regarding the cause of wear in Mary's left hip implant and the cause of adverse metal reaction in Mary's right hip.  Finally, Biomet moves to exclude Truman's opinions regarding medical causation.

### 1.   Truman's common-issue opinions

Biomet argues that the Court should prohibit Truman from offering any common-issue opinion not previously disclosed in her MDL report.  The Court agrees.  In his remand order, the MDL judge stated "[t]he admissibility under Rule 702 of opinions and testimony for all generic (meaning not case-specific) experts to be used at trial [has] been heard and ruled upon in the MDL."  Doc. 17 at 9.  The MDL judge ruled "common issue discovery complete in the M2a Magnum and M2a-38 hip implant system cases" and further stated that such ruling constitutes the "law of the case."  Doc. 79-1 at 4, 9.  This Court will not permit the parties to re-litigate the scope of common-issue discovery.  Biomet filed a Rule 702 motion to exclude opinions in Truman's common-issue report and the MDL judge denied that motion in its entirety.  *See* Doc. 17 at 8.  Thus, to the extent Biomet seeks to exclude common-issue opinions included in Truman's MDL report, the Court denies the motion.  Conversely, to the extent Truman's rebuttal

report includes new or different common-issue opinions *not* included in her MDL report, the Court grants Biomet's motion to exclude those opinions.

Biomet and Plaintiffs dispute whether certain opinions in Truman's rebuttal report are common-issue or case-specific.  First, Biomet argues that the portions of Truman's rebuttal report regarding taper corrosion are common-issue opinions not included in her MDL report. "Taper corrosion" is the gradual breakdown of the taper insert component of a hip implant by chemical processes.  Taper corrosion is exacerbated by friction so most frequently occurs at the junction between the taper and the femoral head.  Truman's rebuttal report includes multiple references to taper corrosion.  However, during her deposition, Truman testified: "What I'm not able to conclude is that there's any significant amount of taper corrosion [in Mary's case]. . . . I just can't tell you that it's a significant amount or clinically significant amount."  Doc. 123-2 at 150:6-25.  Because Truman cannot offer any case-specific conclusions regarding taper corrosion, the Court grants Biomet's motion to exclude the portions of Truman's rebuttal report and testimony regarding taper corrosion.

Biomet also argues Truman's opinions regarding "clinical cold welding" are common-issue opinions.  The term "clinical cold welding" describes taper corrosion so severe that the taper insert and femoral head components of a hip implant become permanently fused together. Truman's rebuttal report includes numerous references to clinical cold welding.  Yet Truman repeatedly acknowledges in her report that "Mary Bayes . . . did not have [clinical cold welding]."  Doc. 123-1 at 9, 10.  If Mary did not have clinical cold welding, then Truman's case-specific opinions regarding clinical cold welding are not relevant to any fact at issue.  Thus, the Court finds these opinions will not assist the jury to "understand the evidence or to determine a

fact in issue." Fed. R. Evid. 702.  The Court grants Biomet's motion to exclude the portions of Truman's rebuttal report and testimony regarding clinical cold welding.

### 2.    Truman's opinions regarding cause of wear in the left hip

Biomet also seeks to preclude Truman from opining on the cause of wear in Mary's left hip implant.  In her rebuttal report, Truman describes two processes that can cause increased wear in hip implants.  "Third-body wear" occurs when foreign particles are deposited on the articulating (moving) surfaces of the hip implant.  These particles can cause scratching and increased friction between the articulating surfaces.  Head separation occurs when the femoral head component of a hip implant is not properly seated in the cup.  This can result in increased friction and wear at the rim of the acetabular cup, known as "edge-loading." Truman opines that both third-body wear and edge loading likely occurred in Mary's left hip implant, resulting in "greater than advertised or expected wear and greater than advertised or expected local metal ion levels."  Doc. 123-1 at 9.  In her deposition, Truman testified that the left hip implant was placed in an appropriate position, that it migrated, that "there was most likely some head separation going on, and . . . some third body particles getting in there," and "maybe we even have some edge loading as it's coming in when we're hearing this clicking." Doc. 123-2 at 110:2-111:14. Truman based her opinion that the left hip implant migrated on a comparison of abduction angles at the time of implantation with abduction angles measured later.  *Id.* at 186:1-6.  Biomet argues that Truman's opinions are speculative because the left hip implant was not preserved for testing, so Truman could not "confirm" third-body wear or head separation.  The Court disagrees.

Although Truman acknowledged that examination of the implant is the only means to definitively confirm third-body wear or head separation, she testified it was "more likely than not" each of these occurred in Mary's left hip.  *Id.* at 117:6-17; 125:4-23.  Truman based her

opinion that third-body wear occurred on her training and experience and on the severity of

Mary's metallosis. *Id.* at 117:6-17. Truman based her opinion that head separation occurred on

the severity of Mary's metallosis and tissue destruction, and the fact Mary observed a "clicking"

noise in her left hip:

> She described having some clicking and noise, which is, again, consistent with
> [head separation]. . . . [A]ll of the signs point to the fact that she did have some
> head separation, especially due to that metallosis and the damage we know,
> massive destruction to her tissue.

Doc. 123-2 at 125:15-126:11. In this case, *both* parties seek to explain the metallosis in Mary's

left hip on the basis of incomplete evidence, i.e., without having the left hip implant available for

inspection. Biomet's experts opine that the M2a Magnum was implanted at an improper angle,

leading to increased wear. Truman opines that the M2a Magnum was implanted correctly but

subsequently migrated and that third-body wear and head separation "more likely than not"

occurred. Truman based her opinions on the available evidence. That Truman did not (and

could not) confirm these opinions with testing of the implant goes to the weight, rather than the

admissibility, of her opinions. Accordingly, the Court denies Biomet's motion to exclude

Truman's opinions regarding the cause of wear in Mary's left hip.

### 3. Truman's opinions regarding adverse metal reaction in right hip

Biomet also seeks to exclude Truman's opinions regarding adverse metal reaction in

Mary's right hip. In her rebuttal report, Truman opines that the Biomet M2a Magnum device

implanted in her right hip was "unreasonably dangerous and defective in a manner that caused

premature failure including . . . elevated serum metal ions and adverse local tissue reactions

(ALTR)" requiring revision surgery. Doc. 123-1 at 6. Biomet argues this opinion should be

excluded as speculative because no evidence exists of adverse local tissue reaction in Mary's

right hip. The Court disagrees. In her deposition, Truman testified that she understood that

10

Mary had a "small amount of adverse reaction" based on her review of Mary's medical records and other expert materials.  Doc. 123-2 at 129:1-20.  Truman's rebuttal report states that tissue necrosis is a form of ALTR.  Doc. 123-1 at 5.  During her right-hip revision, the surgeon observed a small amount of metallosis in Mary's right hip.  Doc. 108-12.  As discussed above, Gannon opined that he found markers of ARMD, including necrosis, in Mary's right hip.  Truman may permissibly rely on the medical records and on Gannon's opinion.  Fed. R. Evid. 703.  The Court thus denies Biomet's motion to exclude Truman's opinion regarding adverse local tissue reaction in Mary's right hip.

### 4.    Truman's medical causation opinions

Finally, Biomet seeks to exclude Truman from offering any opinion regarding medical causation.  Truman is an engineer, not a medical doctor.  Accordingly, the Court will not permit Truman to opine on the medical causation of Mary's injuries.  *See In re Biomet M2a Magnum Hip Implant Prods. Liab. Litig.*, No. 3:12-MD-02391, 2017 WL 10845178, at *15 (N.D. Ind. Dec. 21, 2017) (finding "Ms. Truman can't testify as an expert on the clinical effects of metal ions"); *Saacsk v. Privilege Underwriters Reciprocal Exch.*, 2017 WL 3867761, at *2 (E.D. La. Feb. 2, 2017) (concluding Truman "shall not testify regarding causation—that is better left to the medical doctors"); *Torbit v. Ryder Sys., Inc.*, No. 4:00-CV-00618, 2001 WL 36164711, at *2 (E.D. Mo. Sept. 24, 2001) (finding biomechanics expert "lacks the medical expertise" to opine on medical causation); *Horrillo v. Cook Inc.*, No. 08-60931-CIV, 2014 WL 2708544, at *3–4 (S.D. Fla. June 6, 2014) (finding biomedical engineer "precluded from offering any medical opinions").  The Court grants Biomet's motion to preclude Truman from opining on medical causation.

11

In sum, the Court grants in part, and denies in part, Biomet's motion to exclude Truman's opinions, as set forth in detail above.

## V.      Plaintiffs' expert Victor Zuccarello

Plaintiffs' expert Victor Zuccarello is a licensed occupational therapist.  He has 35 years of experience as an occupational therapist and is board certified in occupational therapy by the National Board for Certification in Occupational Therapy.  Plaintiffs retained Zuccarello to perform a functional capacity evaluation (FCE) for Mary.  An FCE measures an individual's physical abilities and limitations in various circumstances, most often employment.  Zuccarello has performed FCEs since 1987, and has taught other occupational therapists how to perform FCEs.

### A.      Zuccarello's opinions

Zuccarello performed an FCE for Mary and determined that she has decreased capacity in certain physical functions, including walking, bending, and squatting.  Doc. 110-2.  Zuccarello assessed Mary's "present safe level of function" in the "Sedentary-Light Work Demand Level," meaning that Mary can safely perform work tasks requiring sedentary or light physical demands. *Id.*  Plaintiffs seek to offer Zuccarello's opinions as evidence of Plaintiffs' non-economic damages.  Doc. 136 at 2.

### B.      Defendants' motion to exclude

Biomet does not challenge Zuccarello's qualifications as an occupational therapist. Instead, Biomet moves under Rule 702 to exclude Zuccarello's opinions for two reasons. Biomet first contends that Zuccarello's opinions are not the product of a reliable methodology. Biomet also argues that Zuccarello's opinions are irrelevant and will not aid the jury in deciding any fact at issue.

### 1.    Zuccarello's methodology

Biomet argues that Zuccarello's testing methodology is unreliable in two respects.  First, Biomet claims that Zuccarello's methodology is unreliable because he "had no valid comparison data against which to assess [Mary's] testing results given her age."  Doc. 110 at 5.  At his deposition, Zuccarello testified:

> Q:    Have you ever performed a Functional Capacity Evaluation on a totally-healthy 70-year-old prior to Ms. Bayes?
>
> A:    I – I – Boy, a totally healthy – how does – how does one determine that? I – I wouldn't know.

Doc. 110-3 at 41:14-20.  Zuccarello further testified that he could not say whether the sedentary-to-light work demand level was "common or uncommon" among 70-year-olds.  *Id.* at 54:24-55:2.  Based on this testimony, Biomet asserts that Zuccarello lacks "any basis to characterize [Mary] as having reduced capacity, which is the inference that Plaintiffs attempt to raise."  Doc. 110 at 6.

Biomet mischaracterizes—or perhaps misunderstands—what an FCE purports to measure.  An FCE is not a comparison of an individual's capacity against her own prior capacity, or against a "totally healthy" individual of the same age (whatever that term means).  Rather, an FCE purports only to be an objective measurement of an individual's present physical capacity, e.g., how long can she stand, how much can she lift, etc.  Zuccarello testified to this explicitly: "I'm assessing someone's function on that given day. That's all I do."  Doc. 110-3 at 40:1-3. Biomet is correct that Zuccarello's opinion cannot, *on its own*, show that Mary's capacity diminished relative to some prior baseline.  (Plaintiffs of course may establish Mary's prior capacity by other means, including her own testimony.)  But the fact Zuccarello's FCE cannot show something it never purported to show does not in this context make his methodology unreliable.

Biomet also argues that Zuccarello's methodology is unreliable because he did not adequately consider other factors that may have contributed to Mary's physical capacity limitations, such as her arthritis, and because his opinion was prepared solely for the purpose of litigation.  To the extent these criticisms bear at all on Zuccarello's methodology, the Court finds they go to the weight, rather than the admissibility, of his testimony.

### 2.    Relevance and helpfulness of Zuccarello's opinions

Biomet also argues the Court should exclude Zuccarello's opinions because they are irrelevant and will not aid the jury in resolving any factual dispute.  Doc. 110 at 8.  To be admissible, an expert's opinion testimony must "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  Biomet first contends that Zuccarello's FCE will offer no assistance to the jury because he offers no opinions regarding causation.  Zuccarello testified that, as an occupational therapist, he is not qualified to "offer opinions as to the causation of an injury."  Doc. 110-3 at 30:20-24.  Plaintiffs represent that they offer Zuccarello's testimony to "assist the jury in assessing [Mary's] non-economic damages."  Doc. 136 at 2.

The Court finds that Zuccarello's FCE will help the jury understand the evidence or determine a fact in issue.  Zuccarello need not opine on causation for his testimony to be relevant or helpful to the jury.  Plaintiffs' other experts will opine that the M2a Magnum caused Mary's metallosis and the failure of her hip implants.  Zuccarello's testimony will help the jury understand Mary's current physical limitations.  This is relevant both to Mary's claim for non-economic damages, and to Philip's loss of consortium claim.  *See Wright v. Barr*, 62 S.W.3d 509, 537 (Mo. Ct. App. 2001) (loss of consortium claim "encompasses the other spouse's loss of affection, care, companionship, and services").

Biomet also argues Zuccarello's opinions are a bad "fit" for this case because FCEs are typically used to measure a person's physical capacity for *employment*, and Mary had already been retired for nine years at the time of evaluation.  Based on his evaluation, Zuccarello determined that Mary's present safe level of function is in the "sedentary-light" work demand level.  The U.S. Department of Labor publishes a Dictionary of Occupational Titles, which classifies the physical demands of various occupations on a scale from "sedentary" to "very heavy."  Doc. 110-2 at 8.  Zuccarello testified that he relied on the Dictionary of Occupational Titles to determine that the work demand level for "homemaker" is medium.  Doc. 110-3 at 56:2-25.  Since Mary was retired at the time of his evaluation, Zuccarello decided that "homemaker" was an appropriate comparison:

> I pretty much geared a number of general tests toward what would be involved in a homemaker because homemakers have to perform all basic functions of movement, of lifting and carrying, pushing and pulling, and so that seemed to be an appropriate comparison.

*Id.* at 43:16-21.  The Court finds Zuccarello's testimony may assist the jury to understand the evidence regarding Mary's physical limitations, and how they may affect her daily life as a retired homemaker.

Finally, Biomet argues that Zuccarello's testimony should be excluded because it is unnecessary and duplicative, since "[Mary] will have opportunity to describe her own physical limitations and the effect on her daily activities."  Doc. 110 at 11.  The Court disagrees. Certainly, Mary may testify at trial about her physical limitations.  But Zuccarello's FCE is not unnecessarily duplicative because it offers information and context that Mary cannot.  For example, Zuccarello opines in the FCE that the "test results are a valid representation of [Mary's] functional abilities based on client demonstrating consistent effort."  Doc. 110-2 at 1.  In other words, in Zuccarello's professional opinion, Mary was not "faking it" during his examination.

15

This opinion may assist the jury in deciding whether Mary's own testimony about her physical limitations is reliable.

In sum, the Court denies Biomet's motion to exclude Zuccarello's opinions and testimony.

## VI.     Plaintiffs' expert Aubrey Corwin

Plaintiffs retained Aubrey Corwin to provide an opinion regarding a "life-care plan" for Mary.  A life-care plan is an assessment of a person's future medical needs (and associated costs).  Thus, Plaintiffs offer Corwin's opinions as evidence of damages.  Corwin is a Certified Rehabilitation Counselor (CRC) by the Commission on Rehabilitation Certification and a Certified Life Care Planner (CLCP) by the International Commission on Health Care Certification.  She is a member of the International Academy of Life Care Planning (IALCP) Section of the International Association of Rehabilitation Professionals.  She has practiced life-care planning for ten years.  Corwin has completed hundreds of life-care plans in that time.

### A.     Corwin's opinions

Corwin's expert report has three parts: an "assessment of future care needs," a life-care plan, and a summary of charges.  The assessment of future care needs describes Corwin's credentials, methodology and reliance materials.  Corwin and her staff reviewed Mary's medical records, Zuccarello's functional capacity evaluation, and transcript of Mary's deposition.  Heidee White, a nurse and life-care specialist on Corwin's staff interviewed Mary, and conducted a phone consultation with Dr. Paul Lux, one of Mary's treating physicians and a retained expert in this case.  Based on the foregoing, Corwin opines regarding Mary's future care needs, including surgical interventions, medications, and medical equipment.  Corwin synthesizes this assessment in a life-care plan, which summarizes Mary's future care needs along with a cost range

16

calculated by Corwin.  Finally, the summary of charges itemizes and totals all of the costs in the life-care plan.

**B.    Defendants' motion to exclude**

Biomet moves under Rule 702 to exclude Corwin's opinions.  First, Biomet moves to exclude the entirety of Corwin's report and testimony, arguing that her opinions are not based on a reliable methodology.  Biomet also moves to exclude Corwin's specific opinions regarding Mary's future medical needs to the extent unsupported by a medical professional's independent recommendation.  Biomet argues Corwin's opinion that Mary will need future revision surgeries is not supported by Lux's testimony.  Finally, Biomet argues in the alternative that the Court should preclude Corwin from testifying regarding any cost until a qualified witness has testified with the requisite medical foundation.

**1.    Corwin's methodology**

Expert opinion testimony is not admissible unless "the testimony is the product of reliable principles and methods."  Fed. R. Evid. 702.  Biomet argues that Corwin did not base her opinions on reliable methodology.  Biomet argues that Corwin's methodology lacks indicia of reliability, including a known rate of error, the ability to be tested, and subjection to peer review. *Daubert*, 509 U.S. at 593–94.  In effect, Biomet challenges the validity of life-care planning generally.

The Supreme Court has made clear that "*Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  Many courts—including this one—have permitted testimony from life-care planning experts.  *See, e.g., Sorrells v. ADT, LLC*, No. 4:14CV00378 AGF, 2015 WL 4887988, at *4 (E.D. Mo. Aug. 17, 2015); *Block v. Woo Young Med. Co.*, 937 F.

Supp. 2d 1028, 1048 (D. Minn. 2013); *Marcano Rivera v. Turabo Med. Ctr. P'ship*, 415 F.3d

162, 171 (1st Cir. 2005); *Roach v. Hughes*, No. 4:13-CV-00136-JHM, 2015 WL 3970739, at *4

(W.D. Ky. June 30, 2015) ("Life care planners reasonably rely on information from medical

records, plaintiffs' treating physicians, and meetings with plaintiffs.").

The Court finds Corwin's methodology in this case sufficiently reliable.  Basically, Lux

provided recommendations regarding Mary's future medical needs, and Corwin provided a

calculation of the associated costs, based on her knowledge, experience, and research.  Corwin

permissibly relied on Lux's medical opinion.  Fed. R. Evid. 703; *see also Roach*, 2015 WL

3970739, at *4.  Thus, the Court denies Biomet's motion to exclude the entirety of Corwin's

opinions as the product of unreliable methodology.

### 2.     Corwin's opinions regarding Mary's future medical care

Biomet also seeks to exclude certain specific opinions in Corwin's life-care plan

unsupported by any independent recommendation from a medical professional.  As noted above,

most of the future medical care needs identified in Corwin's life-care plan are based on specific

recommendations from Lux.  For example, the life-care plan includes a "power scooter" for the

purpose of "long distance and community mobility," and lists Lux as the recommender.  Doc.

122-3 at 11.  However, a few items in the life-care plan list Corwin as the recommender, rather

than Lux.  Biomet argues that Corwin lacks the requisite qualifications to offer these opinions on

Mary's future medical needs because she is not a medical professional.

The life-care plan includes only three items that list Corwin as the recommender rather

than Lux: a primary care physician, a power scooter lift, and power scooter maintenance.  Lux

recommended the power scooter for Mary but did not separately recommend the lift or

maintenance.  When asked about this, Corwin testified:

> I don't believe that I had asked [Lux] about the lift, but it's standard that it needs
> to have a lift so you can mobilize it.  So I recommended that.  And then the
> maintenance, we all know scooters need to be maintained once a year.

Doc. 122-1 at 114:10-14.  Biomet argues that Corwin is unqualified to offer these opinions.  The

Court disagrees.  Corwin is not a medical professional and cannot independently assess Mary's

medical needs.  But she has not done so.  Lux recommended the power scooter.  Relying on that

medical assessment, Corwin calculated the necessary costs to effectuate Lux's recommendation,

including a lift and maintenance.

Corwin did not thereby intrude into the realm of medical judgment.  Rather, the Court

finds this is precisely the type of opinion that may make a life-care planner's testimony helpful to

the jury—i.e., providing an assessment of the real-world costs of a physician's care

recommendations.  If Biomet has evidence that scooter lifts and maintenance are unnecessary, it

may certainly cross-examine Corwin on that basis.  But the Court will allow Corwin to offer her

opinion that these costs are necessary.  Finally, regarding the primary care physician, Corwin

attributed no separate cost to this item because Mary "has other health conditions for which she

also sees her [primary care physician]."  Doc. 122-3 at 5.  Thus, Biomet's request to exclude this

item in the life-care plan is baseless.

### 3.    Corwin's opinions regarding future revision surgeries

Biomet also seeks to exclude opinions in Corwin's life-care plan regarding Mary's need

for future revision surgeries (and the associated costs).  During his consult with Corwin's staff,

Lux opined "to a reasonable degree of medical certainty," that Mary "will experience on average

an episode of left hip dislocation every 5 years for the remainder of her life expectancy."  Doc.

137-1.  Lux further opined that, with each dislocation, Mary will need revision surgery to repair

her hip.  *Id.*  Relying on statistics published by the National Center of Health Statistics, Corwin

calculated Mary's remaining life expectancy at 16.5 years.  Doc. 122-2.  Thus, the life-care plan

anticipates a revision surgery "every five years for a total of 3 times over [Mary's] life expectancy." Doc. 122-3.

Although Corwin explicitly attributes her inclusion of revision surgeries (and other associated care) in the life-care plan to Lux's opinion, Biomet argues these opinions are medically unsupported because Lux offered conflicting testimony during his deposition, and because another of Mary's treating physicians, Dr. Lewallen, did not think future revision surgery would necessarily be required. When asked about Lewallen's assessment that Mary might not need future revision surgery, Lux testified:

> I think what Dr. Lewallen was saying, which is what I agree with, is that everything that can be done surgically has been done. That doesn't mean that if she doesn't dislocate it again that she is not going to have the hardware repaired. What he was basically saying to Mary is that: Mary, this is as good as it can be. . . . But that doesn't mean she may not need another surgery. She may need ten surgeries in the future. It just depends on how many times she dislocates. . . . So, yes, I agree with what Dr. Lewallen said, but, no, she may absolutely need further operations if she dislocates.

Doc. 122-1 at 108:7-109:14. Lux agreed he could not be "certain" Mary would need further surgeries, testifying her next dislocation "could be next month [or] could be never." *Id.*

The Court acknowledges some inconsistency between Lux's deposition testimony and the opinions he shared with Corwin. However, the Court finds this inconsistency goes to the weight, rather than the admissibility of Corwin's opinions. *See Sphere Drake Ins. PLC v. Trisko*, 226 F.3d 951, 955 (8th Cir. 2000) ("Attacks on the foundation for an expert's opinion . . . go to the weight rather than the admissibility of the expert's testimony."). Corwin relied on Lux's unambiguous opinion, expressed to a reasonable degree of medical certainty, that Mary would need future surgeries. Accordingly, the Court does not find Corwin's inclusion of future surgeries in her life-care plan "so fundamentally unsupported that it can offer no assistance to the jury." *Synergetics*, 477 F.3d at 956.

20

### 4.    Foundation for Corwin's testimony at trial

Finally, Biomet argues in the alternative that, even if Corwin's opinions are not *per se* inadmissible under Rule 702, she should be precluded from offering any testimony about the cost of future medical care until a qualified medical professional testifies at trial that such care is necessary.  This is not the law.  Federal Rule of Evidence 703 provides that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."  Fed. R. Evid. 703.  The facts or data "*need not be admissible* for the opinion to be admitted" provided they are of a kind reasonably relied on by experts in the field.  *Id.* (emphasis added).  Life-care planners reasonably rely on the recommendations of treating physicians. *Roach*, 2015 WL 3970739, at *4.  As discussed above, Corwin relied on Lux's recommendations in preparing her life-care plan.  Biomet's contention that the Court may not admit Corwin's opinions until and unless Lux specifically testifies to each of those recommendations at trial seeks to impose a greater burden than Rule 703 requires.

## VII.    Conclusion

The Court denies [102] Biomet's Motion to Exclude Opinions and Testimony of Dr. Francis Gannon, M.D.

The Court denies [109] Biomet's Motion to Exclude Plaintiffs' Expert Victor Zuccarello.

The Court grants, in part, and denies, in part, [115] Defendant's Motion to Exclude Certain Opinions of Mari Truman, as set forth in detail herein.

The Court denies [121] Biomet's Motion to Opinions and Testimony of Aubrey Corwin.

So Ordered this 18th day of September, 2020.

_SLR.CL_

_____

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**