UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MARY BAYES AND PHILIP      )
BAYES,                     )
                           )
    Defendants,            )
                           )
    v.                     )   No. 4:13-CV-00800-SRC
                           )
BIOMET, INC., BIOMET       )
ORTHOPEDICS, LLC, BIOMET   )
U.S. RECONSTRUCTION, LLC,  )
BIOMET MANUFACTURING, LLC  )
F/K/A BIOMET MANUFACTURING )
CORP.,                     )
                           )
    Defendants.            )


PRETRIAL CONFERENCE
BEFORE THE HONORABLE STEPHEN R. CLARK
UNITED STATES DISTRICT JUDGE

SEPTEMBER 24, 2020

APPEARANCES:
For Plaintiffs:        John Christopher Elliott, Esq.
                       Darin L. Schanker, Esq.
                       Melanie R. Sulkin, Esq.
                       BACHUS & SCHANKER, LLC
                       101 West Colfax, Suite 650
                       Denver, CO 80202

                       Zachary Wool, Esq.
                       BARRIOS KINGSDORF, LLP
                       701 Poydras Street, Suite 3650
                       New Orleans, LA 70139

REPORTED BY:           REAGAN A. FIORINO, RMR, CRR, CSR, CRC, CCR
                       Official Court Reporter
                       United States District Court
                       111 South Tenth Street, Third Floor
                       St. Louis, MO 63102 | (314)244-7989

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION

APPEARANCES CONTINUED:


For Defendants:          Troy A. Bozarth, Esq.
                         HEPLER BROOM, LLC
                         130 N. Main Street
                         Edwardsville, IL 62025

                         John P. Mandler, Esq.
                         FAEGRE DRINKER, LLP
                         2200 Wells Fargo Center
                         90 S. Seventh Street
                         Minneapolis, MN 55402

                         Andrew L. Campbell, Esq.
                         Adrienne Busby, Esq.
                         FAEGRE DRINKER, LLP
                         300 N. Meridian Street, Suite 2500
                         Indianapolis, IN 64204

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

```
 1                    SEPTEMBER 24, 2020
 2          (The proceedings commenced at 2:06 p.m.)
 3          THE COURT:  Good afternoon, everyone.  It's nice to
 4   see you all in person as opposed to on video.
 5              We are here in the case of Bayes v. Biomet
 6   No. 4:13-CV-800-SRC.  We have a full courtroom, so I am going
 7   to have the lawyers introduce themselves starting with the
 8   lawyers for the plaintiff.
 9          MR. SCHANKER:  Good afternoon, Your Honor.  My name
10   is Darin Schanker and I represent the Bayes, Mary and Philip.
11   I have the rest of my team here.  And I'll let them, with your
12   permission, go ahead and introduce themselves.
13          THE COURT:  Very well.
14          MR. WOOL:  Good afternoon, Your Honor.  Zachary
15   Wool, W-O-O-L, for the plaintiffs.
16          MR. ELLIOTT:  Chris Elliott, Your Honor, for the
17   plaintiffs.
18          THE COURT:  Thank you, Mr. Elliott.
19          MS. PEREZ:  Good afternoon, Your Honor.  Jessica
20   Perez Reynolds for the plaintiffs.
21          MS. SULKIN:  Good afternoon, Your Honor.  Melanie
22   Sulkin for the plaintiffs.
23          MR. SCHANKER:  Your Honor, I have staff here too.
24   I'm not sure if you want --
25          THE COURT:  Please.
```

1      **MR. SCHANKER:**  Jennifer Dougherty.  And that's it

2  here, Your Honor.

3      **THE COURT:**  Very good.  Thank you.

4      All right.  For the defendants.

5      **MR. MANDLER:**  Good afternoon, Your Honor.  My name

6  is John Mandler, representing the Biomet defendants, and I am

7  here with the team.  I will let them likewise introduce

8  themselves.

9      **THE COURT:**  Very good.  Thank you, Mr. Mandler.

10      **MS. BUSBY:**  Good afternoon, Your Honor.  Adrienne

11  Busby for the Biomet defendants.

12      **MR. CAMPBELL:**  Good afternoon, Judge.  Andrew

13  Campbell for Biomet.

14      **MR. BOZARTH:**  Troy Bozarth, Your Honor.  Good

15  afternoon.

16      **THE COURT:**  All right.  Very good.

17      We've got a lot to cover today, so I'm just going to

18  start working through my list.

19      I understand you have all had an opportunity to meet

20  with our court staff and to work through a number of issues

21  with essentially the layout of the court.  And conference

22  rooms, I understand you have been informed which conference

23  rooms you are going to have outside the courtroom and the

24  like.  And if not, I will cover that.

25      One other person I should introduce is David Dean,

1    my law clerk here, sitting in the jury box.

2            So when you are speaking today, I'm going to ask you

3    to actually pull down your masks because that will make it

4    easier for Reagan, my court reporter, to get down everything

5    you're saying.  And when we get to the point where I'm talking

6    about jury selection, I will explain a bit about that and how

7    we are going to need to make a clear record.  It's going to be

8    a little bit of a challenge with all of the venire people

9    wearing masks, so I will -- like I said, I will explain that.

10           That said, I am going to cover trial logistics,

11   motions *in limine*, some other substantive issues and then I

12   have kind of an other "other" category of kind of

13   miscellaneous issues.

14           I have incorporated all of your requested items into

15   my list here.  I am not addressing them necessarily in the

16   order in which you presented them to me.  But I will get to

17   all of them and if I somehow miss one, I'm sure you all will

18   remind me.  So we will go from there.

19           All right.  So first *voir dire*.  We are going to use

20   not this courtroom for *voir dire* but courtroom 3 North.  It

21   will be open for you to go down there today and see it.  It's

22   a larger courtroom.  And the reason we are using that is

23   because we can fit 35 venire people down there and then eight

24   people per side.  So you will have counsel tables down there

25   and you will have two counsel tables each.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          So, for example, Plaintiffs, if you intend to have

2     Mr. and Mrs. Bayes there, they can be there, right.  It's who

3     you have as your eight is up to you.  But just know that you

4     get eight on the plaintiffs' side and you get eight on the

5     defendants' side.  Same with you, who you have there is up to

6     you.  But we are doing it down there and then we'll obviously

7     come up here for trial.

8          The procedure for questioning is I will ask the

9     questions.  I will do all the preliminary kind of standard

10    basic questions.  I'm going to have you submit to me, by no

11    later than 5:00 p.m. on September 30, questions -- proposed

12    questions that you'd like me to consider.  I will then just

13    determine which of them I'm going to use or not or I may use

14    slightly different versions of what you have submitted.  But I

15    will have all of essentially the basics, if you will.

16         And then also I need you to submit by the same date

17    and time a brief statement of the case, a joint statement that

18    you've agreed upon that I can read to the jury during

19    *voir dire* to explain essentially what the case is about.

20         So that should be, like I said, brief.  I had you

21    give me a brief one for the questionnaire.  And when I told

22    you, for the questionnaire, that was not going to be the one I

23    was necessarily going to use for *voir dire*, then if you are

24    all in agreement with that one, that's fine with me.  It's

25    not -- it's not that big of an issue from my perspective.  I

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1  just want an agreed statement.  I don't want it to be very

2  long.  One page double-spaced max.  That's it.

3         And then after I get through my questioning, I will

4  allow each side 20 minutes.  So Plaintiff will get 20 minutes.

5  Defendant will get 20 minutes.

6         Then -- and we are there now, so I am going to tell

7  you in terms of making the record clear, so Reagan, my court

8  reporter, is going to be up in the witness stand, actually,

9  down in 3 North.  So when you go down there, look at that and

10  be sensitive to where Reagan is going to be sitting.  All

11  right.  So that's number one.

12         Number two, it's going to be very difficult for

13  Reagan to hear venire people who are answering questions, you

14  know, especially from the back of the room.  It's a large

15  courtroom.  And we are going to have additional microphones in

16  there.  But when you are asking questions, I need you to

17  essentially focus on one group at a time.  So those folks who

18  are in the box down there, and then the folks that are -- next

19  move to the group that's in the next set of pews in the

20  courtroom, so to speak, and then to the next section and then

21  the next section, so that you are not kind of broadly

22  blanketing and having somebody in the far left corner and then

23  somebody in the far right corner speaking right after or,

24  worse yet, on top of each other.

25         So in other words, you really have to proceed in a

1  very logical fashion and then ask the questions in the fashion

2  essentially that I will be asking.  You know, does anybody

3  know plaintiffs' counsel.  Okay.  Folks in the jury box.

4  Okay.  Somebody raises their hand.  Then I will ask that

5  person, tell me who you know and what's your relationship with

6  them.

7          So same way for you.  That's how I expect you to be

8  conducting it so that Reagan can be getting that down.  If

9  Reagan has a problem, she's either going to interrupt you or I

10  am going to interrupt you during your questioning.  I'm sure

11  neither side wants that.  I don't want to do it, but I am more

12  concerned with making a good record.

13          So make sure that you are doing that.  And if you

14  have any questions about it that morning or if you have any

15  questions about it today, you are free to talk with Reagan

16  about that.  Okay?

17          And then the manner in which all of this will go, in

18  terms of strikes and strikes for cause, I will entertain after

19  you all have done your questions.  And I will make my

20  proposals of folks to strike for cause as well.  We will

21  address that obviously outside of the presence of the venire

22  panel.

23          And then once we have determined those for cause,

24  then you can -- you will make your peremptory strikes.  You

25  will get three per side.  What I have you do is you just do

1  them based on the list.

2          And you can -- what we do in this court, you will

3  have a jury list that you will get that morning and then you

4  can make your strikes on that list and then I will read into

5  the record who is on and who is off and who struck whom so we

6  have a full record in the transcript of who struck whom.

7          But in terms of your strikes for cause, I don't -- I

8  am not going to sit on the bench and have you tell me them.

9  I'm just going to have you work through the list together.  I

10  don't expect it's going to take long and -- I'm sorry -- your

11  peremptory challenges.  And you will do those after we do the

12  strikes for cause.

13          I think that covers all the issues I had on

14  *voir dire*.  Any questions on voir dire, Mr. Schanker?

15          **MR. SCHANKER:**  Yes, Your Honor, if I may.  A couple

16  of months ago you were kind enough to let us have a sort of

17  pre-pretrial conference, Zoom, and at that time, as I was

18  reviewing the record in preparation for this, you had

19  indicated that you would give us 30 minutes for questioning.

20  And I just -- and today you said 20.  I wanted to see, with

21  the Court's permission, if we could have the additional time.

22  Obviously only if it's needed.  Not use it if it's not needed.

23          **THE COURT:**  Well, right.  I recall saying that and I

24  know you want your time back.  I did a criminal trial last

25  week and I gave each side 20 minutes.  We were selecting more

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   jurors for that case than we are for this and it was a

2   criminal trial where somebody's liberty was at stake.  Neither

3   side used the full 20 minutes.  So I am going to stick with

4   20 minutes here.

5          We have a lot of things to do in this case and we

6   have a holiday as one of the days during this trial and so I

7   am going to keep the case moving along.  Every -- that's

8   really a total of 20 minutes, right, ten for you and ten for

9   you.  That all is going to count.

10         So I am going to go back to 20 minutes on that.

11         **MR. SCHANKER:**  Thank you for clarifying, Your Honor.

12  Is that 20 minutes per side or --

13         **THE COURT:**  Yes.  Plaintiffs will get 20 minutes;

14  Defendants will get 20 minutes.

15         **MR. SCHANKER:**  Then just a couple other questions

16  concerning hardships.  Are you going to deal with hardships

17  prior to for-cause challenges just to make sure we vet those

18  out -- or prior to questioning -- so that we are not, you

19  know, spinning our wheels or how does Your Honor like to deal

20  with that?

21         **THE COURT:**  I am going to deal with that essentially

22  during the selection and then for cause.  You know, one of the

23  questions I'll ask is:  Does anybody have any other reason

24  that I haven't already addressed why you should not serve on

25  this jury in this case?

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1      In my criminal trial, I had a woman struggle to

2  stand up and she said, well, yesterday, Judge, I tore

3  ligaments in my leg and I'm in a boot and I'm on pain meds and

4  I'm on crutches and I am in excruciating pain and I don't

5  really think I can come through this trial.  So I excused her

6  on the basis of a hardship.  But I didn't do it right then and

7  there.  I waited until cause.  So it will -- that will be

8  developed during the *voir dire* questioning.

9      **MR. SCHANKER:**  Excellent.  And then you were kind

10  enough to let us submit potential questions for the

11  questionnaire that you sent out to the prospective jurors.  I

12  just was wondering is that something we are going to be able

13  to view at all or how does that play out?  Or was that just

14  for your purposes to vet through jurors on the --

15      **THE COURT:**  Yeah, I thought I mentioned I'm going to

16  have you submit, by no later than the close of business on

17  Wednesday at 5:00, your proposed *voir dire* questions.  I'm

18  going to look at them, I'm going to consider them, and I'm

19  going to use which ones I want or modified versions of which

20  ones I want.  We're not going to argue about them.

21      **MR. SCHANKER:**  I'm sorry.  My question wasn't clear.

22  I was talking about the mailing that you sent out that jurors

23  responded to.

24      **THE COURT:**  Oh, that's already been taken care of.

25  I mean, the folks that, based on that, were not able to serve

1    are not coming.  The purpose of that was to reduce the number

2    of people coming into the courthouse in one sense and to

3    reduce the potential for anybody who has COVID issues, whether

4    it's themselves or they're caring for someone or what have

5    you.

6             **MR. SCHANKER:**  Then just one more question on

7    for-cause challenges, which you explained.  You said that

8    those will be dealt with after.  Does that mean after both the

9    plaintiff and the defense have questioned, then you will take

10   the for-cause challenges at that point either -- and you'll

11   have a system set up, presumably not sidebar, we go in a

12   different room, we sit outside the presence of the jury and

13   we'll just figure that out at the time?

14            **THE COURT:**  Right.

15            **MR. SCHANKER:**  Thank you.

16            **THE COURT:**  Thank you.  Mr. Mandler, any questions?

17            **MR. MANDLER:**  A couple, Your Honor.  I know we may

18   have raised this in the earlier pretrial.  And I didn't do my

19   homework, apparently, as well as Mr. Schanker because I don't

20   remember the answer.

21            What is your practice as far as the order of the

22   strikes?  Do Plaintiffs do all of theirs and then the

23   defendants do all of theirs or is it an either/other one?

24            **THE COURT:**  On your peremptory challenges?

25            **MR. MANDLER:**  Yes, Your Honor.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          **THE COURT:**  Yeah.  Really the way it works in this

2    district is you all typically kind of work that out.  But if

3    you want me to -- to me it makes sense just every other one.

4    That's the default rule, unless you work something else out.

5    Okay?

6          **MR. MANDLER:**  As long as I know the rule, we can

7    figure it out.  Thank you, Your Honor.

8          **THE COURT:**  All right.  Sounds good.

9          **MR. MANDLER:**  Couple of other questions.  We did --

10   I think the parties did already submit a joint statement of

11   the case.  So I want to make -- I was hoping to find the

12   docket number while I was sitting here but I couldn't put my

13   finger on it.  So is that something different that you want

14   or --

15         **THE COURT:**  Well, you did, but the one you did

16   submit was for the purposes of the questionnaire, for the jury

17   questionnaire that we sent out.

18         **MR. MANDLER:**  I think we did both, but I'll --

19         **THE COURT:**  If you have done another one, you know,

20   believe me, you filed enough that I can't say that I remember

21   everything, that I've committed each one to memory by docket

22   number.  So if you have one, that's fine.  You don't need to

23   send --

24         **MR. MANDLER:**  Then in essence the same question on

25   our proposed instructions for you, not for the questionnaire

1  but I think we've -- at least the defendants have already

2  submitted something.  We will take a look at it and if it's

3  okay, we'll -- if we have more, we will do it by the deadline.

4  Otherwise, we will stand on what we already gave you.

5          **THE COURT:**  Well, I am not looking for more.  If

6  you've already submitted, you've already submitted them.

7          **MR. MANDLER:**  Thank you, Your Honor.

8          **THE COURT:**  All right.  Thank you.  So we talked

9  about in the -- the number of folks in the courtroom down

10  on 3.  The number of folks in the courtroom here, you've

11  already gone over, I believe, with Ms. Miller Young and

12  Ms. Olliges.

13          One question that I think arose was how many

14  people -- Plaintiffs, are you going to be able to have Mr. and

15  Mrs. Bayes there with you at counsel table?  You may have four

16  at the two counsel tables.  You know, the main counsel table

17  here that you're at, Mr. Schanker, and the main counsel table

18  you are at, Mr. Mandler.  The table in the middle, one each,

19  you know, one per side.

20          So we will put up additional plexiglass on these

21  tables to accommodate four people.  I know you have four

22  people that are now today on the defendants' side.  And

23  that's -- that will inform how many people you have elsewhere

24  in the courtroom.

25          Once we get all the jurors seated, we will have 12

1   extra spaces, if you will, in the courtroom.  So what I am

2   going to do is allocate four of those to Plaintiff, four of

3   those to Defendant and four for the public.  And we are going

4   to keep the four for the public open as long as we need to

5   keep them open.

6          If it turns out that there's nobody coming in and

7   out of here, the public, I may say, okay, well, each side may

8   have one more or something like that.  But I am not going to

9   prejudge that today.  If there's, for example, somebody who is

10  going to be coming every day, the public is entitled.  This is

11  a public proceeding.

12         Then the other piece of that puzzle is in the

13  conference rooms.  There's three conference rooms immediately

14  outside my courtroom, three conference rooms outside of Judge

15  Schelp's courtroom, which is Courtroom 14 South, so the one

16  immediately opposite me.  And so the plaintiff, you will get

17  the three conference rooms on my side, on the 14 North side.

18  Defendants, you get the three conference rooms on the 14 South

19  side.

20         And we are going to -- because I suspect you are

21  going to have part of your trial teams in those rooms, we are

22  going to allow folks in those rooms but on those rooms only to

23  observe the trial by Zoom.  They need to have their mics off

24  and their cameras off.  I don't really want to see what's

25  going on in their rooms, frankly, and -- but that's it in

1  terms of who is going to be observing the trial by Zoom.

2          They will also have realtime transcripts, realtime

3  transcription going or rolling reporting in those rooms as

4  well.  But again only those rooms.

5          And I -- it kind of raises to me another issue,

6  which is sequestration of witnesses.  I assume one or both

7  sides are going to be seeking sequestration of witnesses; is

8  that right?

9          **MR. SCHANKER:**  I'm sure, Your Honor, that will come

10  up.  I would imagine that's going to be the case.

11          **MR. MANDLER:**  Yes, Your Honor.  Fact witnesses.

12          **THE COURT:**  Okay.  So with that, that's the other

13  concern I have about, you know, having the others participate

14  by Zoom because it just gets a little unwieldy.  So what you

15  are going to need to do then, I assume you are going to use

16  one of the rooms for witness prep, so you're going to need to

17  set up one of those rooms and not have Zoom going in that room

18  so you can use that as your witness prep room.

19          **MR. MANDLER:**  That makes sense, Your Honor.  One

20  other question on those, simply, if I may, Your Honor.

21          **THE COURT:**  Yes.

22          **MR. MANDLER:**  If we bring it in ourselves, are we

23  permitted to bring in a printer for one of those rooms?

24          **THE COURT:**  Yes.  I think somebody asked about

25  bringing in a copier.  That's fine.  Just coordinate with

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    Ms. Miller Young on those kind of things because you'll need

2    to get those through security.  Because if you walk into

3    security with a big box, you know, and haven't precleared it,

4    that's going to be a problem.  You don't want to have that

5    problem.

6            And I think someone had asked if you are going to be

7    able to set things up in the courtroom and in the conference

8    rooms the week before.  That's fine.  You can start coming in.

9    I think -- Lori, did we talk about doing that on -- allowing

10   them to come in starting on Thursday?

11           **MS. MILLER YOUNG:**  Yes, they can -- I'll e-mail the

12   attorneys in the case and then they can just let me know when

13   they want to come in.

14           **THE DEPUTY CLERK:**  They are coming in Monday for a

15   dry run and they asked if they could bring some things in the

16   courtroom and I said what they are going to set up for IT.  I

17   said that was okay because you don't have anything.

18           **THE COURT:**  That's fine.  I don't have anything

19   scheduled in my courtroom next week.  So Chelsea O. was just

20   telling me that somebody is coming in Monday for some things

21   and you are going to bring things in then.  That's fine.  Get

22   your things set up.  I want you ready to go on Monday,

23   October 5.  So have everything set up best you can before --

24   before Monday, October 5, frankly.

25           And just continue to work with Chelsea O. and

1    Ms. Miller Young on this.  Okay?  The reason I'm calling

2    Chelsea O. "Chelsea O." is my paralegal is Chelsea L. and she

3    is back in chambers right now.  So there's two Chelseas.  So

4    that said, like I said, continue to work with them.

5           This is kind of a practical issue, but breaks are

6    going to be a little longer.  Usually we take a ten-, maybe

7    15-minute break midmorning and ten-, maybe 15-minute break

8    midafternoon, but they are probably going to be closer to

9    20 minutes, maybe even a couple minutes longer than that.  The

10   reason is that half the jury is going to be using my jury room

11   as their break room.  The other half of the jury is going to

12   be using Judge Schelp's jury room as their break room.  So

13   Chelsea O. is going to have to get one group, bring them in,

14   go get the other group, bring them in.  It just takes a little

15   longer, right?

16          So that said, in terms of -- to the extent we have

17   business that we need to take care of outside of the presence

18   of the jury during those breaks, we are going to do it

19   immediately after the jury leaves the courtroom as opposed to

20   waiting until the end of the break and then bringing them back

21   in.  So we will address those, you know, outside the presence

22   of the jury issues immediately after the jury leaves the

23   courtroom.

24          Is that clear?

25          **MR. MANDLER:**  Yes, Your Honor.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          **THE COURT:**  Okay.  Very good.

2          Plaintiffs, you had requested an overflow courtroom.

3    I'm unable to do that, so I've given you kind of what I am

4    doing, so that should cover it.

5          **MR. SCHANKER:**  Thank you.

6          **THE COURT:**  And then I think you asked about leaving

7    things in the conference rooms and in the courtroom.  You may

8    do so.  We take no responsibility for ensuring the safety and

9    security of it.  The courtroom and the conference rooms will

10   be locked in the evening by the courthouse security officers,

11   so they will be locked.  And obviously it's a very limited

12   access building.  But I am not the guarantor of the safety and

13   nor is the federal judiciary the guarantor of the safety and

14   the security of your items that you leave behind.  So I'll

15   leave it to your discretion what you want to leave behind.

16   But you may do that.

17         Then with respect to the number of jurors, I expect

18   to seat ten jurors.  And if all ten of those jurors make it

19   all through the trial, all ten of them will deliberate.

20         With respect to opening statements and closing

21   arguments, my rule is 20 minutes per side.  I don't recall

22   seeing a request by either side for additional time on that,

23   but that's possibly --

24         **MR. MANDLER:**  I think we did request.  I think we

25   asked for 40 minutes per side if I remember right.

1          **THE COURT:**  Now that you say that, I do recall

2     seeing that.

3          **MR. SCHANKER:**  And I just reviewed the transcript,

4     Your Honor.  And you had indicated -- we had actually asked

5     for 45 and you had said that was -- you were comfortable with

6     that in this case.

7          **THE COURT:**  Okay.  So I will give you 45 minutes per

8     side, but I will tell you this.  I will hold you strictly to

9     it.  And when your 45 is up, your 45 is up.  And you are going

10    to be sitting down and you are going to be finished whether

11    you are finished with what you want to say or not.  So I have

12    to hold you to tight timelines on this.

13         **MR. MANDLER:**  Thank you, Your Honor.

14         **THE COURT:**  I do that regardless.

15         All right.  Mr. Schanker, you requested a deadline

16    for the exchange of opening statement visuals.  I think that

17    makes sense.  Have you all discussed that and agreed on

18    anything?

19         **MR. SCHANKER:**  Your Honor, we have discussed that.

20    And you also made sort of a proposal or an idea with -- based

21    on you didn't know at the time whether the trial would start

22    on a Monday or a Friday.  I believe that what the proposal was

23    and then kind of what our thought process was that you

24    indicated if we got -- hopefully we can work everything out

25    and there won't be anything to submit to you.  But if there

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    was, that we could get it to you on the Thursday before trial,

2    perhaps by noon.

3          And then Friday if we could have back from you your

4    thumbs up, thumbs down on those issues so that we could have

5    the weekend understanding what the opening statement would be,

6    which then would back up to us just having to submit those to

7    each other, you know, ahead of time so that if there's any

8    disputes, Your Honor, we submit those to you on the Thursday

9    prior to trial to be resolved by the Friday prior to trial.

10   So we would need to confer on this next week.

11         **THE COURT:**  All right.  Do you have any thoughts on

12   that now, Mr. Mandler?

13         **MR. MANDLER:**  I thought I was following it until we

14   got to the end and then I'm not certain what the first part

15   is.  I thought the proposal was that on Thursday at noon, so

16   it would be the 1st, we would exchange and then if there's

17   issues, we would bring them to your attention the following

18   day if you're available and resolve them prior to opening.

19         So I wasn't certain what's happening before that in

20   Mr. Schanker --

21         **MR. SCHANKER:**  All I wanted to do was give His Honor

22   some time to resolve so that if there were any disputes, we

23   give them to you on a Thursday and then they can be resolved

24   by Friday was the only distinction that I --

25         **MR. MANDLER:**  The Thursday and Friday before trial,

1   so the 1st and the 2nd?

2          **THE COURT:**  Right.  So from my perspective, it would

3   be preferable if you submitted them by Wednesday, the 30th at

4   noon.

5          **MR. SCHANKER:**  We will do that.

6          **THE COURT:**  And then by Friday I can give you my

7   ruling on any issues that are disputed, if there are.

8   Hopefully you can work them all out.  But let's make that by

9   noon on Wednesday, the 30th.

10         **MR. SCHANKER:**  That works.

11         **MR. MANDLER:**  To submit them to the Court so we'll

12  have to work out amongst ourselves how much in advance we give

13  them to each other?

14         **MR. SCHANKER:**  Correct.

15         **THE COURT:**  Right.  That will be up to you.

16         **MR. MANDLER:**  Just because I believe in clarity, I

17  want to make sure what it is that we are exchanging.  So for

18  my opening I use slides.  What I propose we exchange are those

19  that are demonstratives, that are showing something.  But my

20  slides where it's bullet points of what I'm saying, I would

21  propose we don't exchange those because that's basically

22  saying what my opening is.

23         And I just don't want there to be any complaints or

24  confusion later.  Anything that is a demonstrative that's

25  showing something we'll exchange.

1      **MR. SCHANKER:**  That's fair enough.

2      **MR. MANDLER:**  Thank you.

3      **THE COURT:**  So it shall be.

4           All right.  For the -- here's what I expect at this

5      point in terms of kind of start time, finish times, things.

6      But this is in part subject to what the jury wants to do.  You

7      know, when we have trials down in our courthouse in Cape

8      Girardeau, a lot of times the jurors want to stay until

9      6:00 or 7:00 to keep going because a lot of them have to drive

10     over an hour to get to the courthouse.  We don't have that as

11     much here.

12          But, you know, if I have somebody who has got quite

13     a lengthy drive, you know, we'll have to address that and deal

14     with it.  But my anticipation is that we will start with the

15     jury at 9:00 a.m. and conclude somewhere between 5:00 and 5:30

16     and then -- so in terms of your arrival time, though,

17     Mr. Schanker and Mr. Mandler, I am going to need you here by

18     8:15 every morning ready to go, talk to me.  Not in here

19     getting set up, but ready to talk to me about anything we need

20     to talk about.

21          And I will say that's the general rule, except for

22     when I say otherwise.  And I may say otherwise depending upon

23     what we do and when we start about your objections to the

24     deposition testimony, you will understand where I'm going with

25     that.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1           But that said, on Monday, October 5, though, I need
2    both of you here and ready to talk to me at 8:00 because I
3    suspect we will have some issues that we need to cover then
4    and probably a few more than usual.

5           Kind of, I guess, a fair warning for you all, I tend
6    to be up with the crows and so I don't mind getting here
7    earlier than that.  So I may -- I'll just tell you I may have
8    you get here at 7:00 some mornings.  So just be prepared to
9    set your alarm clocks accordingly.  And believe me, I know
10   what it's like when you're trying cases.  You generally don't
11   get a lot of sleep and I'm certainly not trying to deprive you
12   of more sleep because having sleep-deprived lawyers is
13   generally not a good thing.  But, you know, "we have a long
14   way to go and a short time to get there," as they say, and we
15   are going to make sure it all gets done.

16           **MR. MANDLER:**  Thank you, Your Honor.

17           **THE COURT:**  I suspect, as I mentioned to you at the
18   August 27 conference, that we are going to take some witnesses
19   out of order because now the trial is starting on October 5
20   and because of COVID.  And I know there's an issue with
21   Mr. Schroeder in Switzerland, and we will talk about that in a
22   few minutes.  But tell me from the plaintiffs' perspective, do
23   you have witnesses that are going to go out of order?

24           **MR. SCHANKER:**  No, Your Honor.  We don't believe
25   that any will need to go out of order.

1          **THE COURT:**  All right.  Very good.  How about you,

2     Mr. Mandler?

3          **MR. MANDLER:**  Well, we have some witnesses with

4     scheduling issues.  Whether that means they are out of order

5     or not will kind of depend on if they are being called in

6     Plaintiffs' case.  And we had started those discussions with

7     Plaintiffs.  I think they had subpoenaed at least one of our

8     witnesses, Jing Xie, J-I-N-G, X-I-E, to testify during their

9     case and there will be some scheduling things we have to work

10    out with them.

11         **THE COURT:**  Okay.  So talk with each other.  And

12    when we talk about the deposition testimony issue, I will tell

13    you a little bit more about that, but my intention is that

14    each witness is only going to be called to the stand once.  So

15    I don't anticipate witnesses coming back to the stand multiple

16    times.

17         So if one of the defendants' witnesses is called

18    during Plaintiffs' case, then you put on whatever other

19    evidence through that witness you intend to put on and get

20    that witness on and off the stand.  I mean, from a trial

21    management standpoint, from a reducing the number of people

22    coming in and out of the courthouse standpoint, that's to me

23    the best way to do it.

24         **MR. MANDLER:**  Yes, Your Honor.

25         **THE COURT:**  Okay.  Now, the -- I've got -- what I'm

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   about to say is kind of subject to further consideration
2   because there's some courthouse security issues involved in
3   this, but there's two issues.  One is disclosure of witnesses.
4   Disclose your witnesses to each other two business days in
5   advance by 8:15 a.m.  So your witnesses for Wednesday
6   disclosed by Monday at 8:15 p.m.

7          Now, obviously your witnesses for the first day of
8   trial and the second day of trial you are going to need to
9   disclose before trial begins, you know, the week before.  And
10  then disclose also whether the witness is appearing in person
11  or by Zoom and the related issue, which I will address now, is
12  the deposition designations.  You've designated a whole bunch
13  of deposition testimony that you intend to submit at trial.

14         I think the question was also posed, and I believe
15  we addressed this a little bit at one of the other pretrial
16  conferences, and that is, is the witness going to be permitted
17  to testify both by deposition and live and the answer is no.
18  A witness may testify once and only once as I've said and it's
19  not -- you are not going to be able to do both.

20         The other issue is the objections.  And frankly, I
21  am disappointed with what you gave me because it's a list of
22  hundreds and hundreds and hundreds and hundreds of objections.
23  And I'm not sure exactly what you expected me to do with that
24  in advance of trial.  If you thought I was going to be able to
25  sit down and go through each one of them and rule on them,

 1   that's not going to happen.

 2            So two things, Mr. Schanker and Mr. Mandler, knowing

 3   how these things work in big trial teams, my guess is neither

 4   of you pored over that list in great detail.  If I'm wrong,

 5   I'm wrong.  I don't need you to tell me I'm wrong, that's

 6   fine.  Regardless, I'm ordering the two of you to meet and

 7   confer on that and work out those objections.  And I'm going

 8   to give you an incentive to work out those objections.

 9            And that incentive is this:  If you don't work them

10   out, the ones you don't work out, we are going to have to deal

11   with each evening after trial concludes, after the jury goes.

12   And I am going to take a break, so it's not going to be right

13   after and we're going to need to hash through all of them for

14   those witnesses.  And initially I was thinking we would just

15   do it -- you know, tomorrow's witnesses we will do today, but

16   I don't think that's going to work because if you are going to

17   present them by video and you need to do some video editing,

18   you are going to need a little time.

19            So what I was thinking was essentially, again, two

20   business days ahead.  So on Monday evening, we are going to

21   address any witnesses that are going to be presented by

22   deposition or any deposition testimony that's going to be

23   presented for Wednesday.

24            And we are just going to have to kind of go through

25   that.  Now, that's why I said there's one issue with that with

1   courthouse security.  So I may have to do that kind of -- I'm

2   going to have to figure out exactly when and how much time we

3   are going to have to do that each evening.  And then the other

4   alternative is we start early in the morning and do it.

5   Again, two days before.  And that may be where we need to be

6   here at 7:00 a.m.

7          So I haven't figured that out yet exactly when

8   that's going to happen, you know, is it necessarily going to

9   be each evening or is it going to have to be some evenings and

10  some mornings.  I don't know yet.  But it's going to be --

11  it's not going to be before trial essentially, it's going to

12  be during trial on a rolling basis.

13         Also I realize that as trial goes on, you may decide

14  some witnesses you're not going to need or you don't want to

15  testify.  So I'm not going to spend a whole lot of time and

16  burn a lot of calories on issues that I may not need to deal

17  with.

18         But as I say, my incentive to you is to work that

19  out.  That will save you some time during the trial days or

20  trial evenings so you can go be preparing for the next day.

21         And so let me ask you, Mr. Schanker:  Do you

22  anticipate within the first two days of trial that any of your

23  testimony is going to be presented by deposition?

24         **MR. SCHANKER:**  Yes, Your Honor, we do.

25         **THE COURT:**  Okay.  So then you need to have that

1   worked out.  Work through as many of those and boil down to

2   the essential objections you want me to rule on before trial.

3   So have that submitted to me and that one I'll do by noon on

4   October 1.  And I will -- I can't tell you -- make a

5   commitment right now as to when I'm going to rule on those

6   issues, but I will get your rulings before you have to present

7   those witnesses or present that evidence.

8           **MR. SCHANKER:**  We will do that, Your Honor.

9           **THE COURT:**  The other issue on that is -- some of

10  these things are in my judge's requirements, so I'm just

11  amplifying a few of these.  But the -- so Reagan, my court

12  reporter, does not transcribe video depositions as you are

13  either reading or playing them, so you need to, at the end of

14  each day, submit a document stating these are the pages and

15  lines of the transcript of this witness that were presented to

16  the jury and then you need to, along with that, file that

17  witness' -- certified copy of the witness' deposition

18  transcript so that it's in the record.

19          And if you want to file just the excerpt of the

20  deposition transcript, that's fine.  I don't care about that,

21  whether it's the whole transcript or the excerpts.  It's

22  really a question of making sure that we have those two

23  things, number one, a listing of what portions of the

24  transcript are in the record and, number two, then the actual

25  transcript so that it is in the record for purposes of the

1   completeness of the record.

2           Does that all make sense?

3           **MR. SCHANKER:**  Yes, Your Honor.

4           **MR. MANDLER:**  Yes, Your Honor.  In the last trial I

5   had in the Eastern District in front of Judge Limbaugh, we

6   filed what were basically clip reports.  Each side shared

7   them, signed off on them and then once they were agreed,

8   that's what was filed.  It's the actual thing that was read.

9           **THE COURT:**  I've seen those, yeah.  So that's fine.

10  That works for me.  Like I said, as long as what's in the

11  record is at a minimum what was presented, you know, to the

12  jury, that's fine.  If more is presented, then I just need a

13  clear record on what portions of the more were presented to

14  the jury and, you know, kind of by negative inference what

15  weren't.

16          **MR. MANDLER:**  Thank you, Your Honor.

17          **THE COURT:**  All right.

18          **MR. SCHANKER:**  Your Honor, if I may.  And if this is

19  not the right time, I will ask later.  Just a brief

20  clarification question on the use of video deposition

21  testimony.

22          Some of these witnesses, not many, but just a few of

23  them were 30(b)(6) deponents and then also taken in a personal

24  capacity.  And if it is a 30(b)(6) video, are we permitted to

25  show that 30(b) -- I'm assuming we are permitted to show the

1   30(b)(6) video pursuant to the Federal Rules of Civil

2   Procedure even if that witness is coming in live to testify

3   because it's obviously the distinction between speaking on

4   behalf of the corporation versus individual.

5          **THE COURT:**  I know your argument is that Rule 30

6   permits for any purpose and -- but I haven't seen anything

7   that says Federal Rule of Evidence 611 does not trump Rule 30

8   of the Federal Rules of Civil Procedure and Federal Rules of

9   Evidence 611 gives me discretion as to the order and

10  presentation of witnesses and I'm not going to allow you to

11  present video of a witness who is going to be here live.

12         So if it's somebody who's coming -- you know, John

13  Doe is coming and he testified as a corporate representative,

14  if he is testifying live, you are not going to also play his

15  corporate representative testimony.  You're going to elicit

16  from him on the stand what evidence you intend to elicit from

17  him.

18         **MR. SCHANKER:**  Thank you.

19         **THE COURT:**  Okay.  So on the topic of witnesses,

20  remote witnesses by Zoom, how many witnesses do you anticipate

21  and how frequently do you anticipate witnesses testifying

22  remotely?  Mr. Schanker first.

23         **MR. SCHANKER:**  We may have one or two by Zoom, but

24  we believe the rest will be coming in person, Your Honor.  And

25  I did have one question concerning those Zoom witnesses.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1            As you referenced earlier in the time period of the

2    notification of live versus Zoom and the only question I had

3    concerning that is if we don't know if a witness is testifying

4    via Zoom or live and we want to have that witness with some

5    documents there with them to be reviewing, I am just concerned

6    that not knowing a witness is testifying via Zoom until that

7    late day will cause a significant problem with the

8    presentation.

9            **THE COURT:**  So what are you suggesting?

10           **MR. SCHANKER:**  Wondering if we can bump that from --

11   I believe it was 48 hours, if we can move that back a few more

12   days?

13           **THE COURT:**  Two business days.  So that weekends you

14   are not dealing with it that way.

15           **MR. SCHANKER:**  Sure.  Right.

16           **THE COURT:**  Mr. Mandler, what do you think about

17   that?

18           **MR. MANDLER:**  I think that's fine.  I think we are

19   ready to disclose the ones we are doing by Zoom right now.

20   I'm happy to share those with counsel so there's no surprise.

21           **THE COURT:**  If you want to disclose them all in

22   advance, that's fine with me.  Are you prepared to do that,

23   Mr. Schanker?

24           **MR. SCHANKER:**  We will talk about it and set some

25   dates.  Again, it's not about tricks or anything like that.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

 1  It's just making sure that we can run the trial smoothly.

 2       **THE COURT:**  If you agree on disclosing things to

 3  each other sooner than I've ordered you to do so, you may do

 4  so.  That's fine with me.

 5       **MR. SCHANKER:**  Thank you.  That's not what I'm

 6  concerned about.  I just want to make sure those witnesses

 7  have the documents they need so we can --

 8       **THE COURT:**  I get it.  No, I get it.  Obviously when

 9  somebody is here in person, you can just deal with the

10  exhibits.  When they are not, you have to make other

11  arrangements.  I get it.

12       **MR. SCHANKER:**  Well, thank you, Mr. Mandler.  We

13  will work that out.

14       **MR. MANDLER:**  One other question on the Zoom

15  testimony.

16       **THE COURT:**  Sure.

17       **MR. MANDLER:**  We had been planning on having an

18  attorney with the remote Zoom person, not the person who is

19  questioning who will question from here.  And that person

20  wouldn't be doing anything other than sitting there and making

21  sure the technology so is okay and making sure that the

22  exhibits are okay and -- you know, for example, one will have

23  to testify from one of our remote offices, but we want to make

24  sure there's no objections to that.

25       **MR. SCHANKER:**  No, Your Honor.  Obviously, you know,

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   same rules apply.  We assume we both will follow those as far

2   as sequestration and everything else.

3          **THE COURT:**  All right.  Very good.

4          Couple more quick things I want to hit on and then I

5   want to take a quick break.  Is it David Schroeder or

6   Schroeder?

7          **MR. MANDLER:**  Schroeder, Your Honor.

8          **THE COURT:**  He is in Switzerland.  And you all have

9   asked for two business days' notice of when -- if the

10  plaintiff is going to call him, two business days so you can

11  make arrangements with time change and all of the things you

12  need to.  That's fine with me.  I think that's a reasonable

13  request.  If you can work that out more days, great.  I think

14  the more the better.

15         I will say this as just a blanket statement with

16  respect to any witness who is appearing by video

17  teleconference, make sure you test and test and test the

18  technology beforehand and vet that it works.

19         And Chelsea O. will be, I'm sure, more than happy to

20  work with you on that, obviously outside of trial time, but

21  make sure -- or we will have somebody else in the court who

22  does that instead of Chelsea O.  But make sure you do that.

23  Because I really don't want any glitches.  And I know they may

24  happen, but the more you test and the more you vet it and make

25  sure it works, the better off we are all going to be and the

*Bayes, et al. v. Biomet, Inc., et al.* | *4:13-CV-00800*

 1   more smoothly this is going to go.  Okay.

 2            All right.  I'm going to take a quick break and I

 3   will be back.  So five minutes.  Okay.  So five minutes and we

 4   will be back.

 5            Court will be in recess.  Thank you.

 6            (At this time, the Court declares a recess.)

 7            **THE COURT:**  All right.  Thanks, everybody.  We

 8   realized that we didn't have the Zoom set up and told we'd

 9   have some Zoom.  So welcome to the folks that are appearing by

10   Zoom.

11            All right.  So picking right up, we were talking

12   about a number of things.  I was starting to get to exhibits.

13   So just probably something you're already used to, but the

14   exhibits are not going to be published to the jury until they

15   have been admitted into evidence or until you've stipulated to

16   them.

17            So the -- I assume you are primarily going to be

18   using electronic exhibits and displaying them via laptops or

19   what have you as opposed to using the evidence camera; is that

20   right?

21            **MR. MANDLER:**  Yes, Your Honor.

22            **MR. SCHANKER:**  Yes, Your Honor.

23            **THE COURT:**  All right.  To the extend you need to

24   use the evidence camera, if you do, it's going to be available

25   for you.  It's actually tucked in under on the lecturn there

 1    and it pulls out.  If you use it, then we will have wipes in

 2    here, but you are going to be responsible for cleaning it

 3    before your use and after your use and what have you.

 4            I want to circle back to another thing.  The jury

 5    list, what I addressed to your question, Mr. Schanker, was the

 6    issue of prescreening people out for COVID, but then there's

 7    another screen that you all will do.  And so I am going to

 8    need you to come in on Tuesday the 29th and meet with

 9    Ms. Miller Young.  And so you can make arrangements with her

10    as to what time you are going to do this and then you go

11    through and on that list you will ultimately come up with a

12    list, hopefully an agreed upon list, of people you believe

13    ought to be excused.  And then I will review that and then I

14    will make those determinations by Thursday.

15            You won't necessarily know who and you're not going

16    to know names on that when you see it.  You're not going to

17    have names or addresses.  You're simply going to have what the

18    issue is.  Then I am going to excuse those people so that by

19    Thursday, they can be notified that they don't have to come

20    down to the courthouse.

21            All right.  Technology.  You've already all, I

22    think, been working towards this in terms of training and kind

23    of making arrangements and logistics and all of that.  You

24    have this dry run scheduled, one of you does.  That's fine

25    with me.  Just keep in mind -- I think you were going to --

*Bayes, et al. v. Biomet, Inc., et al.* | *4:13-CV-00800*

1   some of you were going to have your tech people with you for

2   that.  That's great.  Our people will be here to kind of

3   facilitate any issues on our end of things.  But, you know,

4   obviously, as you know, we are not responsible for any of your

5   technology issues.  So -- but as you work through that, just

6   keep that in mind of essentially where that line is between

7   what our staff will be doing and what your folks will be

8   doing.

9           All right.  I'm going to cover the motions *in limine*

10  now and give you my rulings.  I have rulings on most of them.

11  A couple of them I'm going to be asking for supplemental

12  briefing on.  But I'm just going to give you my ruling and

13  then to the extent necessary a brief bit of explanation and

14  that's it.  I'm not looking for argument on these.

15          So -- and I'm going in the order of the numbers in

16  which they appear in your respective motion papers.  So with

17  respect to Defendants' motions *in limine*, motion No. 1, which

18  essentially is other complaint files, claims and lawsuits, I

19  deny that motion *in limine* without prejudice and I'm requiring

20  an offer of proof that the prior incidences were substantially

21  similar.  And then I am going to reserve ruling on the number

22  of prior incidents that would be admissible on the basis of

23  unfair prejudice or cumulative or the like.

24          In terms of when we do that offer of proof, that

25  is -- I think that's a timing issue that I need some guidance

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   from you on and I am not sure exactly what the best time to do

2   that is.  If either of you has thoughts on that now or if you

3   want to confer on that.  Would you prefer to confer on it,

4   Mr. Schanker?

5          **MR. SCHANKER:**  Yeah, I think we should.  Let us

6   confer and then we can let you know if we can't reach --

7          **MR. MANDLER:**  That's fine, Your Honor.

8          **THE COURT:**  Very good.  All right.  So Defendants'

9   No. 2, the M2a-Magnum marketing materials.  So assuming that

10  the plaintiffs offer evidence that Biomet knew the M2a-Magnum

11  was dangerous or defective, marketing materials touting the

12  product safety or efficacy would go to show a conscious

13  disregard for public safety.  So I am denying it as a blanket

14  prohibition on those materials, but I'll grant it insofar as

15  there is relevance to as -- insofar as there is no relevance

16  to punitive damages.

17         So to the extent you are seeking to offer that

18  material, Mr. Schanker, you are going to have to connect it up

19  to how it connects to punitive damages.  Because obviously the

20  failure to warn claim is out of this case.

21         Defendants' No. 3, events, documents and statements

22  that postdate implantation.  To the extent the proffered

23  evidence constitutes subsequent remedial measures, I grant the

24  motion to exclude that evidence.  There's one exception.  And

25  that is to the remedial measures undertaken because they are

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    required by a governmental authority.  That evidence is

2    admissible.

3              With respect to the evidence after Mrs. Bayes or

4    Mary's implantation shows that the design of the M2a-Magnum

5    was unreasonably dangerous and, again, providing there were no

6    intervening design changes, I ruled that it's admissible to

7    show strict liability defective design.

8              Now, on that, a limiting instruction may be

9    necessary as to the negligent design claim.  So that -- meet

10   and confer on that as well with respect to the limiting

11   instruction issue.  And if you can agree on a proper limiting

12   instruction, that will save us all some time.

13             No. 4, Biomet's deferred prosecution agreements with

14   the Department of Justice.  I grant that motion *in limine*.

15   It's simply too attenuated from Plaintiffs' claims in this

16   case.

17             No. 5, the alleged risk of the M2a-Magnum that the

18   plaintiff did not experience.  I need supplemental briefing on

19   this issue.  As I get to the end of this, I will tell you when

20   and how much supplemental briefing because there are one or

21   two others that I need some supplemental briefing on.

22             No. 6, foreign regulatory actions, presentations and

23   communications.  I grant the motion *in limine* as to foreign

24   regulatory actions.  There's different legal standards in

25   other countries and that just simply invites jury confusion.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   I denied the motion without prejudice as to presentations and

2   communications.  That evidence is potentially relevant to the

3   existence of a strict liability design defect, but I really

4   have to see the evidence to actually make a final

5   determination on that.  So if the communications or

6   presentations only go to notice, they are irrelevant if they

7   occurred long after Mary's surgeries as an example of that.

8          No. 7, DePuy Orthopedic documents.  That one I need

9   supplemental briefing on as well.  And there's -- like I said,

10   I will get to the timing of the supplemental briefing at the

11   conclusion.

12          No. 8, Kantor's testimony about Dr. Lewallen's

13   relationship with Biomet.  I grant that motion *in limine*.  The

14   appropriate mechanism for this evidence is to cross-examine

15   Dr. Lewallen as if he testifies or offered direct evidence of

16   a financial conflict of interest.  And opinion expert from an

17   opinion such as this would be inappropriate.

18          So that said, if Biomet opens the door by asking

19   Kantor about Dr. Lewallen's medical findings, then you are

20   probably going to open the door to this type of evidence.

21          No. 9, the pretrial discovery disputes,

22   confidentiality designations, attorney-client privilege

23   designations.  I grant the motion *in limine* as to the

24   attorney-client privilege designations and confidentiality

25   designations that have been made in this case.  In other

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    words, to the extent you have designated something

2    confidential under the protective order, in this case I am

3    granting that.

4            And then I'm going to issue a general instruction

5    that the jurors should disregard the redactions.

6            No. 10, Zimmer's merger with Biomet and related

7    payments.  I grant that motion *in limine* other than to the

8    extent it's necessary for context.  So, for example, if a

9    witness has identified him or herself in a video deposition

10   and you are playing that video deposition and they say, who do

11   you work for, I work for Zimmer Biomet, that's -- to explain

12   why they are doing that, you can explain that, that evidence

13   of the merger.  But otherwise, the evidence of the merger is

14   too attenuated from the issues in this case.

15           Defendants' No. 11, compensation paid to Biomet's

16   experts in other cases.  I deny that motion *in limine*.  The

17   plaintiffs should be allowed to cross-examine the experts

18   regarding any pecuniary interest.

19           So that covers all of the defendants' motions.  I

20   will get the plaintiffs' motions next.

21           Plaintiffs' motion *in limine* No. 1, with respect to

22   state of the art.  I deny that motion *in limine*.  The state of

23   the art is relevant to Biomet's standard of care for the

24   negligent design claim.

25           Further, the plaintiffs could open the door to the

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   state of the art evidence even for the strict liability claim

2   by suggesting that Biomet should have incorporated safety

3   features that were not available or feasible at the time.  And

4   as basis for my ruling I cite Adams v. Fuqua, F-U-Q-U-A,

5   Industries, 820 F.2d 271.

6          Plaintiffs' motion No. 2, improper expert opinion.

7   So that had two components to it.  A, expert testimony by

8   treating physicians not specifically disclosed as expert.  I

9   need supplemental briefing on that in two ways.  Number one,

10  with respect to -- I need some cases on point.  The cases you

11  cited me on that are on similar issues, but I don't have

12  one -- nobody cited a case, and I can't believe that this

13  issue has not come up before, where the disclosure was, all

14  right, I am disclosing the other side's treating physicians as

15  experts and then nothing further in terms of what the opinion

16  is or what have you.  If there are cases out there, I want you

17  to find them for me and get them on the facts of this.  But I

18  looked at the cases you cited and they just weren't right on.

19         Then the other issue on that is the issue of

20  prejudice.  And is there a prejudice by virtue of -- assuming

21  there was an improper or insufficient disclosure, was there

22  prejudice.  So I need you to address that for me, too.

23         So Plaintiffs' motion *in limine* No. 2, B as in

24  bravo, testimony regarding alternative causes of Plaintiffs'

25  injuries not supported by expert testimony.  I rule that

*Bayes, et al. v. Biomet, Inc., et al.* | *4:13-CV-00800*

1  Biomet's experts are allowed to opine on alternative
2  causation.  So I deny that motion.

3        No. 3, Mary's conduct post surgery and evidence of
4  Dr. Martin's placement of cup.  I deny the motion as to Mary's
5  post-surgery conduct.  And then with respect to the
6  implantation or the alleged implantation of the hip
7  replacement cup at an improper angle, I deny that motion
8  *in limine* as well.  Biomet is allowed to present evidence and
9  argument that Dr. Martin's improper or alleged improper
10  placement of the cup was the sole cause of Mary's injuries.

11        Motion *in limine* -- Plaintiffs' motion *in limine*
12  No. 4, Mary's Facebook message blaming Dr. Martin.  I deny
13  that motion *in limine*.  The Facebook post is admissible as a
14  statement of a party-opponent and it's relevant to witness
15  credibility and to the extent Mary now attributes her injuries
16  to something else, i.e., a design effect.

17        Plaintiffs' motion *in limine* No. 5, the failure to
18  preserve the left implant.  I deny that motion *in limine*.
19  Biomet should be able to ask Plaintiff why the implant was not
20  preserved.  Likewise, Plaintiff should be allowed to ask
21  Biomet why Biomet did not preserve the implant.

22        It's my understanding that Biomet -- when there's a
23  revision surgery, Biomet is given notice of that in advance
24  and has the opportunity to have someone present.  So I think
25  it goes both ways on that.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          No. 6, motion No. 6, allegations of malpractice

2    without determination of fault.  I grant the motion *in limine*

3    to the extent there's unproven malpractice allegations that

4    would be used as character evidence.  I will allow testimony

5    for purposes of impeachment but exclude any reference to the

6    fact that the testimony came in a malpractice action.  I

7    believe this is only with respect to Dr. Lux, but if it's with

8    respect to others, same thing.

9          Unless there was a malpractice verdict, because I

10   think if you have an issue of a claim of malpractice against a

11   doctor, there's lawsuits filed and then lawsuit is settled,

12   well, that's not necessarily evidence that there was

13   malpractice.  But if there's a verdict and that verdict is

14   affirmed on appeal that there is malpractice, that's a

15   different situation.

16         So if we are talking about a verdict situation on

17   malpractice, I need you to explain that to me.  At the time we

18   can discuss that, that's one of those issues in the morning we

19   can discuss.  Because my guess is that none of them involves a

20   verdict that was of malpractice and so it may be a nonissue.

21   But if there is such a situation, then we will address that

22   one of the mornings before trial.

23         Plaintiffs' motion *in limine* No. 7, Biomet's good

24   deeds or corporate philanthropy.  I deny that motion *in limine*

25   without prejudice.  The corporate deeds evidence is admissible

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    only to the extent it relates to the M2a-Magnum and not to

2    show general good character.

3              No. 8, healthcare costs and insurance as a

4    collateral source.  I deny that motion *in limine* as Missouri

5    Revised Statute 490.715 provides -- 715.5 provides that the

6    parties may introduce evidence of the actual cost of the

7    medical care or treatment rendered to the plaintiff or patient

8    whose care is at issue and so therefore the -- that evidence

9    is admissible.

10             I find that that statute is procedural and therefore

11   can be applied retroactively and cite for the record a couple

12   of cases on that.

13             J.B., B as in Bravo, by and through Bullock v.

14   Missouri Baptist Hospital of Sullivan, which is

15   No. 4:16-CV-1394-ERW, 2018 Westlaw 746302.  And *Norman v.*

16   *Textron, Inc.*, it's 2018 Westlaw 3199496.

17             No. 9, the litigation crisis, the one motion

18   *in limine* you all agreed on.  So thank you for that.  I grant

19   the unopposed motion.

20             No. 10, the effect of the FDA clearance.  I've

21   ordered additional briefing on that issue already, so I'm

22   going to defer the ruling on that motion until I've reviewed

23   that additional briefing.

24             No. 11, the adequacy of the label on Dr. Martin's

25   readings of the instructions for use.  So I'm granting this in

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    part and denying it in part.  I am going to allow Biomet to

2    introduce the surgical technique, but I am granting the motion

3    *in limine* as to any evidence that Dr. Martin did not read the

4    instructions for use.

5           I grant the motion *in limine* as to evidence or

6    testimony regarding the adequacy or inadequacy of the

7    warnings.  Biomet should be allowed to introduce the warnings

8    to rebut the conscious disregard issue for purpose of punitive

9    damages.

10          So that's all the rulings on those.  So to the

11   extent I've asked for supplemental briefing, other than with

12   respect to the FDA clearance because I already gave you a

13   deadline for the FDA clearance, I need supplemental briefing

14   of no more than a total of seven pages per side, not per issue

15   but per side.  So, Plaintiff, yours is going to be a total of

16   seven pages.  Defendants, yours is going to be a total of

17   seven pages, submitted simultaneously by the close of

18   business, or 5:00 p.m. rather, on September 28 of 2020.

19          So that's motions *in limine*.

20          Next up, jury instructions.  So you've agreed on

21   some jury instructions.  Thank you.  I appreciate that.

22          In light of the rulings on today's motion *in limine*,

23   I think there's probably opportunity for further agreement on

24   the jury instructions.  So I order you to meet and confer.

25          I think, Mr. Schanker and Mr. Mandler, you know that

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   when I am ordering you to meet and confer, I'm ordering the

2   two of you to talk and not just delegate this to others, to

3   submit a joint statement on any additional agreed instructions

4   and to provide separate proposed instructions where

5   disagreements remain.  And I need that by 5:00 on

6   September 30.  5:00 p.m. that is.

7          And then I'll address issues with respect to areas

8   of disagreement on jury instructions, to the extent there are

9   any, for the initial instructions to the jury, not for the

10  final instructions, but for the initial instructions to the

11  jury, at our conference at 8:00 a.m. on October 5.

12         Exhibits.  So speaking of meeting and conferring,

13  you will be meeting and conferring a bit more.  I am

14  disappointed again by the volume of objections to the trial

15  exhibits.  Again, hundreds and hundreds of exhibits to which

16  there are objections and then the objections are -- they are a

17  myriad of objections to each of these exhibits.  And they are

18  just kind of one-word or two-word objections.  Okay.  That's

19  fine, if we were in the courtroom in front of the jury, those

20  are what you would do but not particularly informative for me

21  to rule on them.  And there are simply too many of them still

22  hanging out there for me to deal with in an orderly fashion

23  before trial.

24         So, Mr. Schanker, Mr. Mandler, you are the lucky

25  winners of another meet and confer on those to get those

1  resolved.  And resolve as many of them as you can and get them

2  down to their essence of which exhibits are you really

3  objecting to and what is the basis or the bases on which you

4  are actually objecting to those exhibits.

5        My sense is that -- and you don't have to answer

6  this, but my sense is that someone or some groups of people on

7  each side was tasked with coming up with as many exhibits as

8  you could come -- or as many objections as you could come up

9  with to the other side's exhibits and then that's what I got.

10  I got these long lists of objections to exhibits.  So that's

11  not going to work.

12        So again, on that, work together on that.  And

13  the -- from my perspective, I would love to see you agree on

14  all of them, but -- and I am an optimist and a glass-half-full

15  person, so I am hopeful that you can.  But in the event that

16  you can't, then we're going to have to figure out how we're

17  going to deal with these.

18        And again, if there are a whole bunch of them, we're

19  just going to have to deal with them kind of on a rolling

20  basis, you know, either the morning of trial or the night

21  before or two nights before, however it works out.

22        So as part of your meet and confer, to the extent

23  you have any remaining objections, and again, you don't have

24  to have any remaining objections, but to the extent you do

25  have them, talk amongst yourselves on a proposed mechanism or

1  proposed order for -- not order as in a court order but a

2  proposed fashion for me to deal with those.

3          And, you know, you are both more familiar with which

4  exhibits you are going to actually use and when you're

5  actually going to use them and what is an orderly way to do

6  that and -- because if I tell you something now, my concern is

7  I'm going to tell you something that's not workable and then

8  you're going to be bending over backwards to do something that

9  really doesn't make a lot of sense to do when you already have

10 probably hundreds of things on your to-do list for trial prep

11 anyway.  So I'll figure you can figure that out.

12          The deposition designations, we already talked about

13 that.  Is there anything further I need to address now from

14 your perspectives on the deposition designations and how I

15 expect you to deal with them and how I expect to deal with

16 them?

17          **MR. SCHANKER:**  Nothing from the plaintiffs, Your

18 Honor.

19          **MR. MANDLER:**  No, Your Honor.  Thank you.

20          **THE COURT:**  Very good.  Punitive damages, we will

21 talk about that a little bit.  So we've got -- my ruling

22 denying Biomet's summary judgment motion on the punitive

23 damages is now out, and that's essentially, okay, you --

24 that's still potentially a live issue in the case.  But

25 there's also an issue of the choice of substantive law on that

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    and whether it's going to be Indiana law or Missouri law.  And

2    because this court sits in Missouri, we apply Missouri's

3    choice-of-law rules and Missouri choice-of-law rules is the

4    most significant relationship test which considers four

5    factors, which I will discuss in a moment.  But I will state

6    as a preliminary matter, Missouri's formulation is essentially

7    that it establishes a presumption that the state with the most

8    significant relationship is the state where the injury

9    occurred.

10           So keeping that in mind, the four factors are,

11   No. 1, the place of injury.  I assume you are in agreement

12   that the place of injury is Missouri.  Is that right,

13   Mr. Schanker and Mr. Mandler?

14           **MR. MANDLER:**  Yes, Your Honor.

15           **MR. SCHANKER:**  Yes, Your Honor.

16           **THE COURT:**  Okay.  No. 2, the place where the

17   conduct-causing injury occurred, I am going to put a pin in

18   that and come back to it.

19           No. 3, the domicile, residence, nationality, place

20   of incorporation and place of business of the parties.  I

21   understand that the Biomet entities that are in this case,

22   their principal place of business is in Warsaw, Indiana,

23   right?

24           **MR. MANDLER:**  That's correct, Your Honor.

25           **THE COURT:**  Okay.  So the other piece I need to know

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   on that is the state of incorporation or the state of

2   organization.  I know you have some corporations and some LLCs

3   in here, so I need to know that.

4   　　　　　How quickly can you get me that?  Is that something

5   you could have somebody look at here today and get that to me

6   before we conclude today?

7   　　　　　**MR. MANDLER:**  We can try.  If not, certainly by

8   midday tomorrow.

9   　　　　　**THE COURT:**  Okay.  If you can get it today, great.

10  If not, by midday tomorrow is fine.

11  　　　　　Then the place where the relationship between the

12  parties is centered, are you in agreement that that is

13  Missouri?

14  　　　　　**MR. SCHANKER:**  Yes, Your Honor.

15  　　　　　**MR. MANDLER:**  I'm sorry, I missed that.  I don't

16  think so, Your Honor.  I would have to double check our

17  briefing, but I think we are disputing that.

18  　　　　　**THE COURT:**  Okay.  I skimmed through your trial

19  brief again on that, Mr. Mandler, and it's not jumping out at

20  me.  But have one of your folks check on that.

21  　　　　　**MR. MANDLER:**  I will take a look while we are

22  sitting here, Your Honor.

23  　　　　　**THE COURT:**  So the place where the conduct causing

24  the injury occurred, I think there's -- as I look at it,

25  there's three issues there.  One is where Mrs. Bayes was

 1    injured, which I think is undisputed that that's Missouri; is

 2    that right?

 3           **MR. SCHANKER:**  That's correct.

 4           **MR. MANDLER:**  Correct, Your Honor.

 5           **THE COURT:**  Okay.  Then the second issue is where

 6    the conduct causing the injury occurred.  And as I see that,

 7    that has two subparts to it.  So that's why I say three

 8    issues.

 9           So subpart A is where the decisions were made as to

10    the design of the product.  And so that's one.  And then the

11    other is her actual injuries.  And maybe there's a third

12    subpart, which is the conduct causing the injury includes,

13    from Defendants' perspective, the improper implantation angle

14    by the surgeon.  So that occurred in Missouri, right?  Where

15    the surgeon implanted it is in Missouri?

16           **MR. MANDLER:**  Correct.

17           **THE COURT:**  Right?  There's no dispute about that.

18    So then the -- with respect to where the conduct occurred with

19    respect to the design, as I understand your argument, you are

20    saying, well, that all occurred in Warsaw, Indiana because

21    that's where the corporate headquarters are.  Is there going

22    to be evidence from either side that those decisions were made

23    or conduct leading to those decisions occurred elsewhere?  For

24    example, Biomet used labs in Texas and Idaho and Iowa and a

25    whole bunch of other places or experts in a whole bunch of

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   different places to make those decisions.

2          Is there anybody -- going to be any evidence as to

3   that or is it simply that it occurred -- those decisions

4   occurred in Indiana?

5          **MR. SCHANKER:**  Yes, there is evidence, Your Honor,

6   they occurred in a variety of places.  For example, one of the

7   designers, Dr. Cuckler, his residence is in Florida and his

8   office was in Alabama.  And there's several others were

9   involved in the design of the hip that are not located in

10  Indiana.

11         **MR. MANDLER:**  But the design data information he

12  gave was delivered to Indiana, it was considered in Indiana.

13  He came to meetings in Indiana.  All of the design actually

14  took place in Warsaw, Indiana.

15         **THE COURT:**  All right.  So your argument is that

16  wherever it all happened, it all funneled up to Indiana and

17  that's ultimately where the decisions were made?

18         **MR. MANDLER:**  Yes, Your Honor.

19         **THE COURT:**  Okay.  I understand.  Mr. Mandler, when

20  you have answers on the questions I asked, let me know.

21         **MR. MANDLER:**  Okay.

22         **THE COURT:**  Very good.  There's another question

23  with respect to punitive damages, the net worth.  And I

24  already held that with respect to Biomet's net worth, it will

25  be admitted only if during Plaintiffs' presentation I

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   determine that a submissible case for punitive damages has

2   been made.  You then ask the question, okay, if I am going to

3   allow that, when and how am I going to allow that.  I have not

4   yet determined that.  So that one I am still taking under

5   advisement.

6            **MR. SCHANKER:**  Thank you.

7            **THE COURT:**  The next issue I have is spoliation of

8   evidence.  There's a -- there's the failure to preserve issue

9   and I think I've addressed that already in a sense in terms of

10  the motion *in limine*.

11           Is there a further issue on spoliation?  I know I

12  already ruled on the issue of the affirmative defense and

13  ultimately Biomet agreed that it is not an affirmative

14  defense, so there is no affirmative defense on that.

15           So where are we on that issue otherwise aside from

16  what I've ruled on the motion *in limine*?  I will look to you

17  first, Mr. Mandler.

18           **MR. MANDLER:**  Yeah, we'll present the evidence on

19  the issue as Your Honor outlined earlier when you denied the

20  motion *in limine* on it and then we will ask for an instruction

21  once the evidence is in front of the Court.

22           **MR. WOOL:**  Your Honor, Zachary Wool on this issue.

23  Because of the posture, Biomet has already put forth its best

24  evidence that Mrs. Bayes intentionally destroyed or did not

25  preserve the hip with an intent to deprive Biomet the device.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1             And in the cases that we cited in our papers, the

2       court has discussed that there's an attempt to brand her as a

3       bad actor, as a spoliator.  If Biomet fails to do that,

4       Your Honor, does not instruct them on the spoliation

5       instruction, the jury will have then heard all of this

6       evidence about her lack of preserving the hip that might not

7       be able to be cured by an instruction, a curative instruction,

8       Your Honor, to disregard that evidence that's been heard.  You

9       can't unring the bell.

10            And since the evidence has already been put forward

11      because of the posture they originally raised as an

12      affirmative defense, we briefed the summary judgment motion on

13      it, Your Honor has the evidence, the best evidence of intent

14      in front of the Court and should be able to decide the issue.

15          **MR. MANDLER:**  That's just a repeat of the argument

16      on their motion *in limine* that you've denied.  You said both

17      sides get to ask the opposing side why didn't she keep it.  We

18      will explore that.  I mean, there's even more evidence that we

19      have now that Your Honor has ruled that the Facebook page can

20      come in.

21            We can ask Dr. Lux if he talked to Mrs. Bayes about

22      the Facebook page.  That might be a reason they didn't keep it

23      because they thought they already knew the reason that it was

24      because it was put in an abducted position.

25          **THE COURT:**  As I understand this issue, it's a

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    little bit like the scarecrow in the Wizard of Oz and each

2    side is pointing at the other and saying, well, no, you failed

3    to preserve it, no, you failed to preserve it.

4            So I certainly understand your point, Mr. Wool, but

5    I think that what you have argued is subsumed in my motion

6    *in limine* ruling on that.  So I don't -- I'm not going to

7    further address it at this point in the case.  And then if we

8    get to the point of an instruction on it, we will talk about

9    it then and you will submit to me your positions on it at that

10   point.

11           Okay.  Other similar incident evidence.  I talked

12   about this a little bit earlier.  So the Eighth Circuit

13   standard is that it's substantially similar and I mentioned

14   that there's going to be offer of proof.  Obviously that's

15   going to be outside of the presence of the jury on that.

16           Are there any questions on that at this point?

17           **MR. MANDLER:**  No, Your Honor.

18           **THE COURT:**  Mr. Schanker?

19           **MR. SCHANKER:**  No, sir.

20           **THE COURT:**  All right.  I already talked about the

21   relevance of warnings and marketing materials.

22           Routine communications and business records, the

23   hearsay exception.  This is something I believe the defendants

24   asked about in their submission.  And it was:  Do all routine

25   communications, routine e-mails fall within the business

1   records hearsay exception?

2          Mr. Mandler, just briefly give me a little bit more

3   on that issue.

4          **MR. MANDLER:**  We are also -- if it would be at all

5   helpful, we can do a supplemental brief or include it in our

6   briefing because we have a pocket brief on it.

7          The leading case on it is from the Chinese drywall

8   litigation down in Louisiana.  In essence what the judge ruled

9   there is just because it's an e-mail doesn't make it a

10  business record.  It's -- an e-mail is no different than if I

11  walked down the hall and talked to Andy.  That doesn't make it

12  a business record.  Still it's a way of communication just

13  because it's written.

14         It still has to meet the criteria that it's kept in

15  the regular course of business to show some regular activity

16  of the witness.  So the fact that you're e-mailing back and

17  forth doesn't, per se, make it a business record.  You still

18  have to meet the other elements to get around hearsay for that

19  communication.

20         **THE COURT:**  Right.  So why don't you address that in

21  your supplemental briefs, both of you.

22         **MR. MANDLER:**  We will, Your Honor.

23         **THE COURT:**  Is there -- before I say that, let me

24  ask Mr. Schanker.  Is there an issue as to this?

25         **MR. SCHANKER:**  Yes, Your Honor.  I think it should

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    be addressed.

2          **THE COURT:**   Okay.  Then do it in the supplemental

3    briefs.

4          Okay.  The implied warranty claim is the next thing

5    I want to talk about.  That's still a claim in the case.  It

6    really was not addressed terribly robustly, I'll say, in the

7    summary judgment briefing on this and -- or really in the

8    trial briefs.  I know you've submitted proposed jury

9    instructions on that.  Is that issue still in the case and if

10   so, is it -- is it -- am I correct to read that it's an

11   implied warranty of merchantability?

12         **MR. SCHANKER:**   That is correct, Your Honor.  It's

13   still a cause of action that we are pursuing.

14         **THE COURT:**   Okay.  All right.  The collateral source

15   rule, I addressed that in the motion *in limine* rulings.  I

16   think in one of the -- in your joint submission, you mentioned

17   that you were working out a stipulation on that.  I probably

18   should have asked you at that point.

19         But have you reached a stipulation on that issue?

20   And if not, will my motion *in limine* ruling on that facilitate

21   the reaching of a stipulation on that?

22         **MR. MANDLER:**   The second one.

23         **MR. SCHANKER:**   I think your ruling will certainly

24   assist, Your Honor.

25         **THE COURT:**   Okay.  Very good.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          And then in your trial brief, Mr. Mandler, you spend

2    quite a bit of time on reptile tactics.  But as I see it,

3    there was no motion on that.

4          **MR. MANDLER:**  Well, we only -- we were limited to

5    15 pages of omnibus motion and so we chose our topics wisely.

6    I think our thought is to inform the Court on those issues and

7    we will object at trial if we need to and the Court can take

8    them up unless you want to address it in some other manner.

9          **MR. SCHANKER:**  Your Honor, we plan on following the

10   rules of evidence.

11         **THE COURT:**  Yeah, and I expect you to follow the

12   rules of evidence.  And to the extent, if at all, you are

13   going to argue or question about kind of vague standards that

14   aren't the law of this case, I am not going to allow that.  So

15   I'm not going to prejudge whether you're doing that or not,

16   but so you know, I'm not going to allow that.

17         The evidence that's going to be admissible in this

18   case, the questioning that's going to be permissible in this

19   case is going to be based on the Federal Rules of Evidence and

20   the facts of the case --

21         **MR. SCHANKER:**  Absolutely.

22         **THE COURT:**  -- and the legal standards that apply to

23   this case.

24         **MR. SCHANKER:**  Absolutely.

25         **THE COURT:**  All right.  My list of miscellaneous

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   issues.  The use of video depositions for impeachment.  So I

2   talked with you at one of the pretrial conferences about if

3   you are going to have video testimony, have it ready to go,

4   push a button, right.

5          So with respect to video deposition, use of video

6   depositions for impeachment, I recognize it's a little

7   different than just -- than presenting a witness by video and

8   there's little different dynamics and you need a little bit of

9   time.  But by where you are in this case, I expect that you

10  pretty much know where you think you are going to get

11  something impeachable or not.  And of course, one never knows

12  when a witness is going to say something that is impeachable.

13         But on the use of video for impeachment as opposed

14  to use of the paper transcript, I am going to apply a

15  20-second rule.  And that is if you can get your video up

16  within 20 seconds, great, you can use it for impeachment.  If

17  you cannot get it up within 20 seconds, then you need to use

18  the paper transcript.  And again, have that ready to go.

19         So the next issue I had is the left hip tissue

20  slide.  And I believe Biomet, you're asking for the -- access

21  to Mary's left hip slide for scanning to use with presentation

22  software.

23         Has this issue been resolved?

24         **MR. MANDLER:**  It has not.  We were unable to resolve

25  it.  We talked about it several times, Your Honor.  And as I

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    understand the plaintiffs' concern is that they do not want

2    Dr. Bauer to issue any new expert opinions.  We absolutely

3    agree.  We stipulated it's not for new opinions.  It's merely

4    for presentation to the jury.

5          Because of his restrictions at his hospital, he is

6    going to be testifying remotely.  He has a software package.

7    When they sent the slides initially, he took a scan of the

8    right.  He just simply forgot or neglected to take one of the

9    left so we could show it to the jury.  We asked, we said, if

10   you overnight it to us, we'll pay both directions, we'll send

11   it back within 36 hours.  It's just so he can scan it so he

12   can explain his testimony to the jury.  Nothing more.

13         **THE COURT:**  I understand.  Mr. Schanker.

14         **MR. SCHANKER:**  Your Honor, Dr. Bauer has the

15   photographs that he utilized to render his opinions at the

16   time, his expert opinions including of the left hip.  And

17   that's the information he should be relying on.

18         The concern in this situation is now he wants

19   additional information that apparently was not -- it wasn't

20   part of his expert report in this case and clearly can enhance

21   his expert testimony at this point in time.  And so it's

22   simply our position that he needs to ride with the horse he

23   was on at the time he did his expert designation.

24         **THE COURT:**  Well, he's not going to be able to offer

25   new opinions on anything he hasn't already opined on.  I'm

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1  certainly not going to allow that.  And if, in fact -- you

2  know, if he testifies that he simply forgot to take pictures

3  of this, I need to allow him to use it and then allow you to

4  cross-examine him on that, well, why didn't you take pictures,

5  you know, whatever you are going to do cross-examination wise

6  on that.  If you believe it somehow impeaches his credibility,

7  you can use that.  But I'm going to allow it.  So now the

8  question is how, how do we facilitate this?

9        **MR. SCHANKER:**  Your Honor, I think I did a poor job

10  of explaining.  We had a chance to cross-examine him in the

11  form of a deposition on these very pictures, the pictures that

12  he relied upon at the time.  We don't have that chance -- and

13  then to prepare accordingly.  Now he's going to have new

14  pictures, enhanced pictures.

15        And these are very complex issues that any

16  layperson, we can't understand when you -- you've seen

17  pathology presumably, Your Honor, and to try to make heads or

18  tails of it.  And so there is no way that we can have our

19  experts prepare us for this and so it's truly trial by ambush.

20        We had our opportunity to take his deposition and to

21  go through this and now they get a second bite at the apple

22  and, quite frankly, there's a potential for extreme prejudice

23  here.

24        **MR. MANDLER:**  Your Honor, these aren't new pictures.

25  It's the exact same slide.  There's a single slide.  All it is

1  is to present that slide.  Mr. Schanker has had that slide

2  whatever -- since it was taken at the time of the surgery

3  since 2011.  We've had -- Dr. Bauer had it for a matter of

4  days.  He just didn't scan it.

5          There's a single slide.  It has nothing to do with

6  pictures or taking pictures or opinions.  He wants to load the

7  slide into his presentation software.  Nothing more.

8          **THE COURT:**  Okay.  I'm going to allow it, so the

9  question is -- and allow you to cross-examine him on it,

10  Plaintiff.  How are we going to facilitate this?

11          **MR. MANDLER:**  I think we can meet and confer and

12  work it out.  We will give them a FedEx number and they can

13  ship it.

14          **THE COURT:**  Okay.  All right.  Mr. Schanker, you

15  asked about the use of an easel.  And then I think there was

16  something about remote witnesses needing to see it.  To me

17  there's an issue of the remote witnesses being able to see it.

18  So tell me what the issue is.

19          **MR. SCHANKER:**  It was just sort of teeing up issues

20  that you've already covered, Your Honor.  And as much as --

21  practically speaking with the jury back here, probably isn't

22  going to be practicable to be using an easel with jurors

23  everywhere and a witness up here.  So we will just work

24  through those issues.

25          And then similarly with our tech folks, if we use

 1   the ELMO and we have a remote witness on Zoom, I think there's

 2   technology that can take that into account.  Those will be

 3   issues just practically that we will work through with the

 4   technology.

 5           So I don't have any particular question concerning

 6   that unless my comments raise some for you that you would like

 7   me to address.

 8           **THE COURT:**  No.

 9           **MR. SCHANKER:**  Okay.

10           **MR. MANDLER:**  Nothing more, Your Honor.

11           **THE COURT:**  All right.  And I have to give my

12   apologies to L. Frank Baum because I believe it was the

13   scarecrow, not the tin man.

14           All right.  Mr. Mandler, were you able to get the

15   places of incorporation or organization of the entities?

16           **MR. MANDLER:**  Okay.  I believe so, with the

17   exception of there's an LLC they are still trying to track

18   down if you want the actual members of the LLC, but --

19           **THE COURT:**  Well, what I need on the LLC is the

20   place of organization of the LLC.  Is it an Indiana LLC?  Is

21   it a Delaware LLC?  Is it a somewhere-else LLC?  I don't know

22   that I need the members.

23           **MR. MANDLER:**  Okay.  So I will give you that then,

24   if you are ready.

25           **THE COURT:**  Yeah, I am ready.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1          **MR. MANDLER:**  Biomet, Inc., the principal office is

2    in Warsaw.  The jurisdiction of formation is Indiana.

3          Biomet Orthopedics, LLC, the principal office is in

4    Warsaw, Indiana.  The jurisdiction of formation is Indiana.

5          Biomet U.S. Reconstruction, the principal office is

6    Warsaw, Indiana and the jurisdiction of formation is Indiana.

7          Biomet Manufacturing Corp, the principal office is

8    Warsaw and the jurisdiction of formation is Indiana.

9          I'm told the source of the information is the

10   Indiana State Secretary of State, the registration there.

11          **THE COURT:**  All right.  Very good.

12          Mr. Schanker, if for some reason you believe that

13   information is inaccurate, I expect you will point that out to

14   me by no later than when -- you have something due on 5:00 on

15   Monday, right?  So I'll have you do that by no later than

16   5:00 on this coming Monday.

17          So that -- I think that other piece is then the

18   place where the relationship between the parties is centered.

19   So you are going to address that for me.

20          **MR. MANDLER:**  I looked at the briefing.  I didn't

21   find anything, as you didn't, quickly in the briefing.  I

22   would just argue that it's a mutual exchange between all the

23   Biomet defendants who are centered in Indiana and Mrs. Bayes

24   and her doctor who are centered in Missouri.

25          So it's -- the relationship is the development of

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   the product and the sale of the product to her, so it's

2   somewhere between those two states.  So I don't think it's

3   definitive one way or the other and that's why I didn't agree

4   with Your Honor when you said it's only Missouri.  I think the

5   relationship is centered between those two states.

6           **THE COURT:**  I don't think I really need to get into

7   the supply chain of this, but -- so, yeah, Biomet is in

8   Indiana.  Dr. Martin is in Missouri; right?

9           **MR. MANDLER:**  Right.

10          **THE COURT:**  And the implant surgery occurred in

11  Missouri.  So the product ultimately makes its way to Missouri

12  before it's implanted in Mrs. Bayes; right?

13          **MR. MANDLER:**  Correct.

14          **THE COURT:**  Okay.  And whether it comes from Indiana

15  or not, I don't know if that's real material because it may

16  not -- is it manufactured in Indiana?  Your colleague is

17  shaking her head.

18          **MR. MANDLER:**  I understand that it is, yeah.  Their

19  primary manufacturing facilities are in Indiana.

20          **THE COURT:**  All right.  So it's manufactured in

21  Indiana.  It's shipped to Missouri.  I assume these are

22  shipped directly to the hospital where the implantation is

23  occurring.

24          **MR. MANDLER:**  Correct.  And there's a buyer/seller

25  relationship between Biomet in Indiana and the doctor or the

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    hospital in Missouri.

2         **THE COURT:**  Right.  And then there's a sales rep,

3    right, a Biomet sales rep?

4         **MR. MANDLER:**  Correct.

5         **THE COURT:**  Right?  And that person, I don't know

6    whether that person is stationed in Indiana or Missouri or

7    somewhere else.

8         **MR. MANDLER:**  They all have a territory and it

9    doesn't necessarily equate to one state or one geography.  It

10   will depend.  We'd have to look up the facts.  I don't know

11   the facts of this particular sales rep.

12        **THE COURT:**  Right.  It's like the circuits within

13   the United States; they just kind of are what they are.

14   Right?

15        **MR. MANDLER:**  Yes.

16        **THE COURT:**  So -- but there's a sales rep and the

17   sales rep meets with Dr. Martin.  I read a number of things

18   that the sales rep had met with Dr. Martin several times.

19        **MR. MANDLER:**  Correct.  The sales rep doesn't --

20   it's not someone where they take ownership of -- it's not like

21   a dealer.  They don't take ownership of a -- they are just

22   repping the product.

23        **THE COURT:**  I understand how medical sales reps

24   work.  They go call on the doctors and say, here's my product

25   and here's what you should use, whether it's a pharmaceutical

1    or whether it's a medical device, and they try to get the

2    doctor to either prescribe it or to use it, right?  But they

3    are calling on the doctor.

4            Is there any evidence in this case that Dr. Martin

5    had any interaction with Biomet other than in Missouri?  For

6    example, did Biomet bring Dr. Martin to product conferences or

7    what have you, whether those were in Indiana or in Tahiti for

8    that matter?

9            **MR. MANDLER:**  Not that I'm aware of, Your Honor.

10           **THE COURT:**  Is there any other evidence with respect

11   to relationship, meetings, etc., contacts between Biomet and

12   Dr. Martin that occurred anywhere other than in Missouri?

13           **MR. MANDLER:**  Not that I'm aware of.

14           **THE COURT:**  All right.  I'm obviously taking that

15   issue under advisement.  I'm giving you the opportunity just

16   to address the issue of those places of incorporation and

17   organization and the principal places of business.  I think

18   the principal places of business are not disputed, if I

19   understand that.  I think that's -- nobody disputes that it's

20   in Warsaw, Indiana; right?

21           **MR. SCHANKER:**  Correct, Your Honor.

22           **THE COURT:**  All right.  Now, that, I believe, is all

23   the issues I have.  And I believe I've addressed all of the

24   issues that you presented to me in your joint submission.  But

25   if I missed something in that regard, I'm sure you are going

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   to tell me that.

2           So that said, Mr. Schanker, A, did I miss any issue

3   that you presented to me in your joint submission?

4           **MR. SCHANKER:**  Your Honor, I'm just checking.  I

5   believe you got all the issues that we had in our joint

6   submission, so thank you for that.

7           I just have one other point of clarification and

8   that was concerning the disclosure of exhibits for anticipated

9   witness, and you clarified 48 hours for the witness and then

10  we --

11          **THE COURT:**  Well, two business days.

12          **MR. SCHANKER:**  Yes.

13          **THE COURT:**  Make sure we're clear on that.  Because

14  I don't want the weekends to be kind of following that up.  So

15  it's two business days.

16          **MR. SCHANKER:**  Thank you for the clarification.

17          And then there had been discussion previously about

18  time for exhibits and disclosure of the exhibits that we are

19  going to use with that witness.  And obviously being flexible

20  and adaptable, we understand that we will follow that rule.

21          And just practically speaking, we brought this up

22  before.  As you know, the testimony today changes what happens

23  to my witness tomorrow morning, even though I prepared for

24  that witness and disclosed him or her a day and a half ago.

25  And so it doesn't seem practicable to be disclosing exhibits

 1   far ahead.

 2           And we would propose that those exhibits be

 3   disclosed -- as we've done in previous trials just like this,

 4   that those exhibits be disclosed at 8:00 p.m. the evening

 5   before and then they can be addressed -- we are fine with

 6   bright and early, too, Your Honor, they can be addressed

 7   before court if there's any objections.

 8           **THE COURT:**  Yeah, we talked about that before at the

 9   pretrial conference and one of the things I told you was the

10   rule of reason applies on some of these things, right, and we

11   have to be reasonable with each other and with me, of course.

12           Mr. Mandler, looked like you wanted to say

13   something, so go ahead.

14           **MR. MANDLER:**  We did address that and you did rule,

15   Your Honor.  You said it was going to be 24 hours.  We

16   actually built that into one of our stipulations with the

17   may-use exhibits.  You were disappointed that we had that many

18   objections to the will-use exhibits.

19           One of the reasons there weren't more objections is

20   we carved out the may-use exhibits separately and said we will

21   deal with those 24 hours in advance.  So at a minimum, I would

22   ask the Court to keep with your original ruling of 24 hours.

23   I would be in favor of doing it 48 hours, but if counsel

24   doesn't think that's possible, at a minimum I would say let's

25   stay with the 24 hours.

1      **THE COURT:**  Well, the reality of it is no matter

2   which I do, I hope you are getting the picture that I am

3   strongly incentivizing you to get it resolved beforehand.

4      **MR. MANDLER:**  We have the picture, Your Honor.

5      **THE COURT:**  Yeah.  So now I certainly understand

6   what you are saying, Mr. Schanker.  But at the time I wasn't

7   anticipating the number that I saw in terms of objections and

8   exhibits to which you objected.  So I'm going to stick with

9   the two business days that I've said here as opposed to the

10  24 hours that I had said some time ago before I understood

11  exactly what the volume of this was going to be.

12      You look puzzled.

13      **MR. SCHANKER:**  I am just trying to clarify.  Because

14  understand in a case like this where there were 3 million

15  exhibits, that we have gotten down to the number that we have

16  at this point in time and it will continue to funnel down and

17  tomorrow -- you know, during trial the next day with a

18  particular witness, we may need to use five to seven to 15

19  exhibits and there may be an objection to one or two of those.

20  And hopefully we can work those out.  And if not, we would

21  just be bringing you the morning of trial the handful, if any,

22  objections to exhibits.  That's practically the way that I see

23  it would work.

24      And again, I just reiterate to try to -- real life

25  of trying a case, 48 -- you know, two business days before

1   trial to have your entire direct scripted and to believe that

2   it's not going to change when live bullets start flying just

3   doesn't seem realistic.

4           **THE COURT:**  No, I think you've misunderstood me.

5           **MR. SCHANKER:**  Okay.

6           **THE COURT:**  I don't mean all of them two business

7   days before trial.  I mean two business days before the

8   anticipated use of the exhibits.

9           **MR. SCHANKER:**  Okay.  But for a particular witness,

10  if I am calling an expert -- what is today?  Today is

11  Thursday.  So if I am calling an expert tomorrow morning, is

12  there any -- am I correct there's no requirement that I

13  disclose the exhibits -- that I tell Mr. Mandler I am using

14  these exhibits with this witness tomorrow morning?

15          **THE COURT:**  What I am trying to get to is you have a

16  lot of objections to a lot of exhibits.  I mean, just a

17  massive volume, frankly.  And I am trying to get -- to

18  separate the wheat from the chaff, number one.  The trial is

19  going to evolve, right?  I know how that goes.  So what you

20  use as exhibits is going to change.  And it's going to change

21  not only 48 hours or two business days before, it's going to

22  change two minutes before --

23          **MR. SCHANKER:**  Correct.

24          **THE COURT:**  -- and during the testimony.  I get all

25  of that.  But what I am trying to do is deal with as many of

1   these objection issues outside of the presence of the jury so

2   we are not using the jury's time dealing with them.  And given

3   the volume that you have presented to me, that's simply not

4   going to be possible to do it on an exhibit-by-exhibit,

5   witness-by-witness basis during the trial.  We will be taking

6   up half the trial time dealing with objections to exhibits

7   based on what you've presented to me.

8            So I am trying to eliminate that.  And if not

9   eliminate, substantially minimize that.  So I understand what

10  you're saying, but on the other hand, exhibits aren't going to

11  be the only issues we are going to be dealing with in the

12  morning and the evening.  We have the depositions, we have,

13  you know, a whole host of other issues that will come up

14  during the course of trial; right?

15           **MR. SCHANKER:**  Right.

16           **THE COURT:**  So I'm simply trying to streamline the

17  process so that I can deal with them in a manageable fashion

18  and I'm trying to incentivize you all to agree on as many as

19  you can.  Like I said, the way I looked at the list is it

20  simply looked like somebody was tasked with just throw every

21  objection you can at this and put them in a list.  Well,

22  that's all well and good, but that doesn't work for me.

23           **MR. SCHANKER:**  So based on what you said, my

24  proposal would be if I have -- if I am calling a particular

25  expert tomorrow morning, we disclosed, pursuant to your

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

 1  48-hour rule, that particular expert, then at 8:00 p.m.

 2  tonight, I would furnish to Mr. Mandler the list of exhibits

 3  that I'm planning to use with that particular expert.  And if

 4  there happen to be any objections to those exhibits,

 5  Mr. Mandler's office can let us know.  We can probably work it

 6  all out.  If not worked out, at whatever time the next

 7  morning, Your Honor, if there's two or three exhibits that are

 8  still disputed, then we can work through that issue with you.

 9  I've done that in previous trials and it hasn't held it up one

10  bit and that's what I would be proposing.

11       **MR. MANDLER:**  Your Honor, what Mr. Schanker just

12  said is exactly what he proposed last time.  We objected to

13  it.  We wanted the exhibit list and you ruled 24 hours

14  previously for -- to designate the exhibits.

15       I mean, we have folks who are going to be testifying

16  in remote locations.  We have to make sure they get the

17  exhibits if they're going to be asked about them.  8:00 the

18  night before is just not going to work in a trial of this

19  nature.

20       **THE COURT:**  Yeah, two business days before.

21       **MR. SCHANKER:**  And just a point of clarification,

22  that does not include demonstratives that we would be using

23  with that particular witness, just the actual exhibits that

24  would be introduced; is that correct?

25       **THE COURT:**  Well, if it's a demonstrative that you

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    are going to seek to introduce into evidence, then yes.  If

2    it's a demonstrative you are simply using for demonstration

3    purposes and you don't seek to introduce it into evidence,

4    then no.

5           **MR. SCHANKER:**  Thank you, Your Honor.

6           **MR. MANDLER:**  Thank you, Your Honor.

7           **THE COURT:**  All right.  Did you have any other

8    issues, Mr. Schanker?

9           **MR. WOOL:**  Your Honor, if I may seek some

10   clarification on your ruling on motion *in limine* No. 2

11   regarding marketing materials.  On the defendants' proposed

12   agenda for today, it proposed -- they had some description of

13   marketing materials that was a little bit broader than the

14   motion *in limine* that was filed.

15          The motion *in limine* No. 2 deals with marketing

16   materials that the plaintiff never saw, that Dr. Martin never

17   saw.  And in their description agenda for today, they included

18   marketing sales training materials, which wouldn't have been

19   for public consumption.  And some of those, for example,

20   contained product characteristic statements like the hip is

21   supposed to last for 600 years.

22          So when Biomet is training its sales force on the

23   characteristics of the device, they represented to the sales

24   force that the product would last 600 years.  We believe that

25   would certainly be relevant.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1            To the design defect claims in the case, along with

2    their other statements in the market and training materials

3    that contain critiques of competitors for not having clinical

4    trial data to support their devices.  Those marketing training

5    materials we see as falling outside of this motion *in limine*

6    No. 2 and would certainly be relevant to the standard of care

7    that Biomet would have to use for the negligent design claim.

8    Excuse me, Your Honor.  Would certainly be relevant to the

9    negligent design claim.  If Biomet is critiquing an opponent

10   for not having clinical data to support a device, that should

11   be evidence -- that should be evidence that the jury hears for

12   the plaintiffs' negligent design claim.

13           And perhaps I poorly explained this.  But in the

14   agenda items that the defendant has put forth, there's a

15   broader category of marketing materials.

16           **THE COURT:**  Broader than what?

17           **MR. WOOL:**  Broader than what was raised in motion

18   *in limine* No. 2.  Our understanding of our reading, it's

19   publicly broadcast materials like magazine ads, TV ads,

20   materials to doctors.  But what they raised in their agenda is

21   a broader than that category of documents.  It's documents

22   used internally, marketing materials to train their sales

23   staff to go talk to doctors about their competitors and also

24   about their own products.

25           **MR. MANDLER:**  If I may, Your Honor?

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1       **THE COURT:**  Please.

2       **MR. MANDLER:**  First of all, the motion *in limine* was

3   filed before Your Honor's ruling on the summary judgment

4   motion and that's why we raised the additional item in our

5   agenda and it was one of the items that we thought, with some

6   guidance of the Court, to aid us in our meeting and conferring

7   and resolving the issues.

8           The long and short of it is without a failure to

9   warn claim, none of this stuff is relevant.  I understand your

10  ruling on the motion *in limine* and we will digest that and

11  we'll work with it, but I don't think we need any more

12  guidance other than that.

13          Marketing materials to the world or to whoever, if

14  Dr. Martin didn't read it, if he didn't rely on it, we don't

15  have a failure to warn claim, has no relevance in the case.

16      **THE COURT:**  I'm not going to make any further

17  rulings on that issue right now.  Like I said, you can look

18  at -- consider my motion *in limine* ruling.  If you, after

19  that, after you both, as Mr. Mandler says, have had a chance

20  the digest that, if there are still specific issues on that,

21  then bring them to my attention.  And the question I have is

22  when is that going to become relevant?  Is it going to become

23  relevant for your opening statements or is it going to become

24  relevant for your -- for your first witness, your tenth

25  witness, your 20th witness?  Is it going to be relevant the

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    second week of trial or is it going to be day one, opening

2    statement?

3        **MR. WOOL:**  Your Honor, we believe it's going to be

4    relevant for the opening statement and for some of the first

5    witnesses that we call by video.

6        **THE COURT:**  All right.  Well, then I need you to

7    meet and confer on this and figure out what the areas of

8    agreement are, hopefully there are many, and the areas of

9    disagreement are, hopefully there are few, and then -- I'm

10   reticent to ask for supplemental briefing on this.  I've

11   already piled on some supplemental briefing for you already.

12   But I know you want to know beforehand.

13       So why don't you file a joint statement by close of

14   business on -- if you want to do it on Monday, I will look at

15   it and get you something probably by Wednesday.  No guarantees

16   on that.  I've got a number of other things going on next

17   week, but I will look at it.  I know you need to know before

18   you start arguing to the jury.

19       So close of business Monday, submit a joint

20   statement on this issue of what you've agreed on and what the

21   issues of disagreement are and then each of you can -- if you

22   believe that there's additional case law you want me to

23   consider on that, you can cite the case law.  I don't want a

24   treatise on this.  I just want something concise.  You know,

25   no more than three pages total for the joint submission.

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1    Okay?

2              **MR. WOOL:**  Thank you, Your Honor.

3              **MR. MANDLER:**  Thank you, Your Honor.

4              **THE COURT:**  All right.  Anything else from

5    Plaintiffs' side?

6              **MR. SCHANKER:**  Nothing else we have at this time.

7    Thanks, Your Honor.

8              **THE COURT:**  Very good.  Thank you.  Mr. Mandler, how

9    about you from the defendants' side?

10             **MR. MANDLER:**  Nothing more, Your Honor.  Thank you.

11             **THE COURT:**  Very good.  All right.  So you all --

12   like I said, you can go down to the courtroom 3 North and look

13   at that, see how -- where we are going to be doing *voir dire*.

14   Again, keep in mind where Reagan is going to be sitting for

15   that and keep in mind the parameters I have given you for

16   making sure we make a very clear record and that Reagan can

17   hear everybody and that -- part of that is going to depend

18   upon how you address the panel and doing it again in sections

19   rather than just broad-based blanket.  Okay?

20             To the extent you have other technology and

21   logistics issues, again, continue to -- dealing with

22   Ms. Olliges and Ms. Miller Young and -- as you have been

23   doing.  I expect that next week there will be a fair amount of

24   activity here in the courthouse for you all to get everything

25   set up, so I wish you the best.  And I will see you next at

*Bayes, et al. v. Biomet, Inc., et al. | 4:13-CV-00800*

1   8:00 a.m. on Monday, October 5.

2           All right.  We will do that -- we will do that down

3   in 3 North because that's where everybody is going to be.

4   Reagan is going to need to be down there getting set up

5   anyway.  Next time I see you we will be down in 3 North at

6   8:00 a.m. on Monday, October 5.

7           Thank you.  Court is adjourned.

8           (The proceedings concluded at 4:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Bayes, et al. v. Biomet, Inc., et al.* | *4:13-CV-00800*

## CERTIFICATE

I, Reagan A. Fiorino, Registered Merit Reporter and Certified Realtime Reporter, hereby certify that I am a duly appointed Official Court Reporter of the United States District Court for the Eastern District of Missouri.

I further certify that the foregoing is a true and accurate transcript of the proceedings held in the above-entitled case and that said transcript is a true and correct transcription of my stenographic notes.

I further certify that this transcript contains pages 1 through 80 inclusive and was delivered electronically and that this reporter takes no responsibility for missing or damaged pages of this transcript when same transcript is copied by any party other than this reporter.

Dated at St. Louis, Missouri, this 24th day of September, 2020.


*/s/ Reagan A. Fiorino*
Reagan A. Fiorino, RDR, CRR, CRC, CCR
Official Court Reporter