UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MARY BAYES and PHILIP BAYES, | ) | |
| Plaintiffs, | ) ) ) | |
| vs. | ) ) | Case No. 4:13-cv-00800-SRC |
| BIOMET, INC., et al., | ) ) | |
| Defendants. | ) ) | |

### Memorandum and Order

Over seven years ago, Mary and Philip Bayes filed this product-liability case, seeking compensation for what she claims is a defective hip-implant system that resulted in multiple revision surgeries. The case was consolidated in multi-district litigation, and the extensive MDL discovery spanned more than five years. Since remand from the MDL, the parties have conducted two more years of case-specific discovery. Now—over seven years into the case—Biomet filed a motion to disqualify lead counsel for the Bayeses. Doc. 111. Two days later, Biomet filed a motion to continue the trial date. Doc. 127. Keeping this long-running case moving forward, the Court denied both motions, issuing a summary order on the motion to disqualify but promising a more detailed order to follow. Docs. 163, 169. This is the more detailed order.

Since the summary order, the Court has ruled on multiple motions, setting forth in detail the facts of the case. *See* Docs. 225, 251, 252. The Court also bifurcated the trial, and conducted phase one from October 5, 2020 to October 22, 2020, with the jury reaching verdict in favor of the Bayeses and awarding substantial actual damages. *See* Docs. 294, 363. Before any of that occurred, however, the Court however performed a detailed analysis of the motion to disqualify

(Doc. 111) and, as noted, denied the motion.  Doc. 163.  None of these subsequent events has had any bearing on the Court's analysis of the motion to disqualify, and Defendants have not suggested they should.

## I.    Background

Jaclyn Thompson is an associate at Bachus & Schanker, LLC.  Attorneys from Bachus & Schanker are lead trial counsel for Plaintiffs in this case.  Years before Thompson joined Bachus & Schanker, she began her legal career at Faegre Drinker Biddle & Reath LLP ("Faegre").  While at Faegre, Thompson represented Zimmer Holdings, Inc. in products liability actions involving Zimmer's Durom Cup hip implant.  This case involves Biomet's Inc.'s M2a Magnum hip implant.  When Thompson started at Faegre, Zimmer and Biomet were direct competitors.  Eventually, Zimmer acquired Biomet and changed its name to Zimmer Biomet.  Two years *after* Thompson left Faegre, Faegre became lead counsel for Biomet in this case.  Biomet argues that Thompson's former representation of Zimmer Biomet disqualifies Bachus & Schanker from representing Plaintiffs in the present case.

### A.    Procedural history

In November 2018, this Court set the case for trial in May of 2020.  Doc. 24.  Some months later, the parties jointly requested a modification to the schedule, but represented that "[t]he requested extension will not require removing this case from the May 11, 2020 [trial] docket."  Doc. 38 at ¶ 6.  Because the schedule proposed by the parties did not allow the Court sufficient time to rule on dispositive and expert motions, the Court granted the extension and re-set the trial for September 14, 2020.  Doc. 39.  In July 2019, the parties again requested an amendment to the schedule, representing that "[t]he requested extension will not require removing this case from the September 14, 2020 [trial] docket."  Doc. 46 at ¶ 7.

2

In March 2020, the parties jointly requested yet more time to complete discovery and file motions, but this time they disagreed about whether to continue the September 2020 trial date. Doc. 74.  Plaintiffs stated that "[a]t this time, Plaintiffs are certain that they will be fully prepared for trial on September 14, 2020." Doc. 74 at p. 6.  For a variety of reasons, Biomet sought to postpone the trial to early 2021.  *Id.*  In its Fourth Amended Case Management Order (i.e. the *fifth* CMO in the case), the Court granted the parties additional time to complete discovery but kept the September 14, 2020 trial date.  Doc. 77.

Just two days after filing this motion to disqualify, Biomet filed a motion to continue the trial date, on the basis of concerns over COVID-19, its ability to complete trial preparation, and, ironically, its concern that granting the motion to disqualify lead counsel for the Bayes would work a hardship on Mr. and Mrs. Bayes and their trial lawyers.  Doc. 127.  Mr. and Mrs. Bayes opposed continuing the trial, stating: "Plaintiffs are fully prepared for the September trial."  Doc. 134 at p. 2.

      **B.**      **Durom Cup, M2a Magnum, and creation of MDLs**

In the early 2000s, Biomet developed its M2a-Magnum metal-on-metal hip implant system.  At the time, Zimmer Holdings, Inc. was one of Biomet's main competitors.  Zimmer marketed and sold its own metal-on-metal hip implant system, the Durom Cup.  Zimmer discontinued marketing and production of the Durom Cup in 2008.  In June 2010, the Judicial Panel on Multidistrict Litigation established an MDL in New Jersey to address the increasing number of product-liability claims related to Zimmer's Durom Cup.  MDL No. 2158 (D.N.J). Faegre was lead defense counsel for Zimmer in the Durom Cup MDL.  Two years later, in October 2012, the Judicial Panel established a separate MDL for Biomet's M2a-Magnum in the

3

Northern District of Indiana. MDL No. 2391 (N.D. Ind.). At that time, Faegre of course did not represent Zimmer's competitor Biomet in the M2a-Magnum MDL.

### C. Thompson's employment at Faegre

Faegre hired Thompson as an entry-level associate in September 2014. Thompson worked for Faegre for a little over two years. During that time, Thompson worked primarily on Zimmer Durom Cup products-liability cases, billing approximately 2000 hours to Durom Cup matters. Thompson recalls doing typical entry-level work at Faegre, including legal research and drafting motions in limine. Doc. 132-1. Biomet offers a declaration from Faegre partner J. Joseph Tanner stating that Thompson, while working on Durom Cup matters, "prepared witness outlines for direct and cross examinations, prepared exhibit lists, attended trial team strategy meetings, analyzed expert witness opinions, prepared motions to exclude expert opinions, and prepared settlement analysis memorandum [sic]." Doc. 112-4. Tanner further states that Thompson received training on Zimmer's methods for "valuing [metal-on-metal] plaintiffs' claims as part of a settlement structure" and then performed valuation assessments for approximately 15 plaintiffs as part of settlement negotiations. Thompson attended a single Durom Cup trial in 2016, where her principal task was to summarize the public events of the day for the trial team.

Biomet offers no evidence that Thompson participated in the development of (or was even privy to) Zimmer's overall strategy for defense of Durom Cup cases. Likewise, Biomet offers no evidence that Thompson ever participated in meetings or conference calls with Zimmer's in-house counsel or legal department. Tanner states that Thompson "prepared or contributed to memoranda" to Zimmer's in-house counsel, but Biomet has not submitted any such memoranda for the Court's *in camera* review. In fact, Biomet has not submitted *any*

4

exemplars of Thompson's Faegre work-product for *in camera* review.  In sum, Biomet offers no evidence that Thompson's work on Durom Cup matters was anything other than routine case-specific work of an entry-level associate on a substantial team of multiple lawyers.

### D. Size of Zimmer and Biomet's litigation teams

To put the role that Thompson played in context, the Court provides a glimpse into the sheer number of lawyers representing Biomet in its hip-implant litigation.  The battery of lawyers appearing for Biomet on this Court's docket reveals the substantial size of the trial team handling this case.  *See* Docket generally, showing 18 attorneys presently representing Biomet, leaving aside multiple entries and withdrawals over the course of the case.  The docket in the M2a-Magnum MDL Court also reveals a number of lawyers representing Biomet in its hip-implant litigation.  *See Biomet M2A Magnum Hip Implant Products Liability Litigation*, No. 3:12-md-02391-RLM-MGG (N.D. Ind.), showing seven attorneys presently designated as Biomet's "liaison counsel," not including additional attorneys representing Biomet in the hundreds of individual MDL cases.  The Durom Cup MDL docket sheet shows similarly large teams of lawyers representing Zimmer.  *See Miller v Zimmer Holdings, Inc.*, No. 2:09-cv-04414-SDW-LDW (D.N.J.).  Amidst this bevy of lawyers, the Court must assess the role that Thompson played and whether under applicable law including the *Carey* factors, she—as an entry-level associate fresh out of law school—had information requiring disqualification.

### E. Zimmer's acquisition of Biomet

In June 2015, Zimmer Holdings, Inc. acquired Biomet's parent company.  In connection with this acquisition, Zimmer Holdings, Inc. changed its name to Zimmer Biomet Holdings, Inc. ("Zimmer Biomet").  Doc. 112-2.  Zimmer Biomet and its subsidiaries (including Biomet, Inc.) now share a common board of directors and a common management team.  *Id.*  Further, since the

acquisition, the same Zimmer Biomet legal department is responsible for managing the legal affairs of Zimmer Biomet and all its subsidiaries (including Biomet, Inc.). *Id.* Zimmer Biomet's legal department issues guidelines to its outside counsel for the handling of product liability litigation that apply uniformly to all Zimmer Biomet subsidiaries. *Id.* After the merger, Thompson entered an appearance on behalf of Biomet, Inc. in one matter in Utah state court. Doc. 112-6. However, unlike the present case, that matter was not a product liability case and did not involve allegations of defective design, failure to warn, or misrepresentation. Doc. 132-2. Rather, the plaintiff alleged that a Biomet sales representative negligently brought an incorrectly-sized implant to a hip-replacement surgery and the doctor implanted it. *Id.* Further, the case involved a different Biomet product than at issue here. *Id.*

F.      **Thompson's departure from Faegre and employment at Bachus & Schanker**

Thompson resigned from Faegre in January 2017. Almost two years later, in September 2018, Faegre entered as counsel for Biomet in the M2a-Magnum MDL. In October and November of 2018, the MDL judge remanded this case to this Court and Faegre entered as counsel for Biomet. Docs. 18, 25. Around a year later, Bachus & Shanker hired Thompson as a litigation associate. Doc. 132-1. When she was hired, Thompson disclosed to Bachus & Schanker the Zimmer Biomet cases she worked on at Faegre as part of a conflicts check. Bachus & Schanker assigned Thompson to its personal injury department, where she handles negligence, motor vehicle accident, and premises liability matters. *Id.*

When Thompson was applying to work at Bachus & Schanker, she asked a friend who was a low-level associate in a different department at Faegre to serve as a character reference, and later told him that she got the job. Thompson also requested a reference from Rhyddid Watkins, a former Faegre partner who had supervised her on Zimmer matters. By the time

6

Thompson asked Watkins for a reference, he had left Faegre for a new firm. Finally, shortly before Thompson joined Bachus & Schanker, she "connected" with a Faegre partner on the social networking platform LinkedIn.

In May 2020, a Faegre partner saw Thompson's biography on the Bachus & Schanker website. Doc. 112-4. The biography states, in part:

> Before joining Bachus & Schanker, LLC, [Thompson] began her legal career working for an international law firm … [and] was an integral part of a defense team that secured several jury verdicts for one of the world's largest orthopedic medical device manufacturers. Having worked on the defense side, [Thompson] is excited to use that experience to help clients navigate the legal world and achieve justice for themselves and their families.

Doc. 112-1. The following month, Faegre notified Bachus & Schanker of the alleged conflict and filed the present motion to disqualify. Doc. 111. Faegre filed similar motions to disqualify Bachus & Schanker from separate M2a-Magnum cases in this Court and in Colorado, but did not move to disqualify Bachus & Schanker from its role on the Plaintiffs' Steering Committee in the M2a-Magnum MDL. *See Bartis v. Biomet, Inc., et al.*, 4:13-cv-00657-JAR (E.D. Mo) at Doc. 58; *Homel v. Biomet, Inc., et al.*, No. 19-cv-00631-WJM-KLM (D. Colo) at Doc. 93.

**II.  Analysis**

"[T]he district court bears responsibility for supervision of the members of its bar." *Jenkins by Agyei v. State of Mo.*, 931 F.2d 470, 484 (8th Cir. 1991). Accordingly, "the decision to grant or deny a motion to disqualify an attorney rests in the discretion of the district court." *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1154 (8th Cir. 1999). Two sources of authority are relevant in determining whether to disqualify Plaintiffs' counsel. *Dalton v. Painters Dist. Council No. 2*, No. 4:10CV01090 AGF, 2011 WL 1344120, at *4 (E.D. Mo. Apr. 8, 2011). First, this Court follows the Rules of Professional Conduct adopted by the Missouri Supreme Court. *See* E.D.Mo. Local R. 12.02. The Missouri Supreme Court, in turn, adopts the Rules of

7

Professional Conduct of the American Bar Association.  *See* Mo. S. Ct. R. 4; Petrovic, 200 F.3d at 1154.  Second, "because motions to disqualify counsel in federal proceedings are substantive motions affecting the rights of the parties, they are decided by applying standards developed under federal law."  *Dalton*, 2011 WL 1344120, at *4.  In this Circuit, "[b]ecause of the potential for abuse by opposing counsel," motions to disqualify are "subjected to particularly strict scrutiny."  *Macheca Transp. Co. v. Philadelphia Indem. Co.*, 463 F.3d 827, 833 (8th Cir. 2006) (quoting *Harker v. Commissioner*, 82 F.3d 806, 808 (8th Cir. 1996).  The Eighth Circuit has recognized that a "party's right to select its own counsel is an important public right and a vital freedom that should be preserved," and cautioned that "the extreme measure of disqualifying a party's counsel of choice should be imposed only when absolutely necessary."  *Id.*

Biomet contends that Thompson's former representation of Zimmer Biomet creates a disqualifying conflict of interest in Bachus & Schanker's representation of Plaintiffs in their case against Biomet.  The Missouri Rules of Professional Conduct distinguish between the duties owed by an attorney to current and former clients.  *See* Mo. S.Ct. R. 4-1.7(a); 4-1.9(a).  Rule 4-1.7(a) prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest.  Mo. S.Ct. R. 4-1.7(a).  Regarding former clients, Rule 4-1.9 prohibits an attorney "who has formerly represented a client in a matter" from representing a materially-adverse party "in the same or a substantially related matter," unless the former client consents in writing.  Mo. S.Ct. R. 4-1.9(a).  Further, Rule 4-1.10 provides that a conflict of interest as to any attorney in a law firm is imputed to all attorneys in the firm.  Mo. S.Ct. R. 4-1.10.  Thus, Biomet argues—and Plaintiffs do not meaningfully dispute—that any conflict of interest as to Thompson applies equally to the Bachus & Schanker firm as a whole.

8

### A. Biomet did not waive any conflict of interest.

The Court must first consider Plaintiffs' argument that Biomet waived any alleged conflict by failing to timely object when it learned of Thompson's employment with Bachus & Schanker. "A party who knowingly refrains from asserting a prompt objection to opposing counsel is deemed to have waived the objection." *Polish Roman Catholic St. Stanislaus Parish v. Hettenbach*, 303 S.W.3d 591, 599 (Mo. App. 2010). The Court finds no waiver in the present case. Biomet represents that it first learned of Thompson's employment at Bachus & Schanker in May 2020 and filed its motion to disqualify (after notifying counsel of the alleged conflict) a month later. Doc. 112-4. On this record, the Court finds one month a reasonable delay that does not constitute waiver. *See Central Milk Producers Coop. v. Sentry Food Stores, Inc.*, 573 F.2d 988, 992 (8th Cir. 1978) (finding waiver where party waited more than two years after learning of conflict to file motion to disqualify).

Plaintiffs argue that Biomet's counsel learned of Thompson's employment much earlier, but the Court disagrees. Plaintiffs offer an affidavit from Thompson stating that she notified two former colleagues from Faegre, Rhyddid Watkins and Sean Metherell, when Bachus & Schanker hired her in 2019. Doc. 132-1. But Mr. Metherell is an entry-level associate at Faegre in a different practice group who has never performed any work for Zimmer Biomet. Doc. 135-1. Thompson contacted him in a personal capacity to request a reference and never informed him that Bachus & Schanker represents plaintiffs adverse to Zimmer Biomet. *Id.* No evidence suggests that Metherell could have known of a possible conflict. Thompson also notified Mr. Watkins of her employment at Bachus & Schanker, but did so months *after* Watkins left Faegre for another firm. As Biomet correctly notes, Plaintiffs provide "no legal authority for the notion that knowledge of former partners can somehow be imputed to Faegre." Doc. 144 at 4. Finally,

9

Thompson avers that she "connected" with Faegre partner Patrick Reilly on the social-networking platform LinkedIn, and that her profile "prominently displays that [she] works at Bachus & Schanker." Doc. 132-1. Again, Plaintiffs cite no authority for the proposition that a law firm is imputed with knowledge of conflicts based on the LinkedIn connections of all its partners. Regardless, Reilly avers that he had no actual knowledge of Thompson's employment at Bachus & Schanker until June 2020. Doc. 144-2. In sum, Plaintiffs have not shown that Biomet or its counsel had any knowledge of Thompson's employment at Bachus & Schanker until May 2020. Accordingly, Biomet did not waive any alleged conflict.

### B. The present and former representations are not substantially related.

As noted above, the present motion alleges a conflict of interest created by Thompson's *former* representation of Zimmer Biomet, so Rule 4-1.9 controls. "To establish a conflict of interest under Rule 4–1.9, a movant must prove that: (1) the attorney had a former attorney-client relationship with the movant; (2) the interests of the attorney's current client are materially adverse to the movant's interests; and (3) the current representation involves the same or a substantially related matter as the attorney's former representation of the movant." *Zerger & Mauer LLP v. City of Greenwood*, 751 F.3d 928, 932 (8th Cir. 2014) (quoting *Hettenbach*, 303 S.W.3d at 600–01; Mo. S.Ct. R. 4-1.9(a). The Court finds the first two elements satisfied. Thompson entered an appearance on behalf of and represented Biomet, Inc. in at least one matter while at Faegre. And Plaintiffs' interests in this case are materially adverse to Biomet—a named defendant. *See Zerger*, 751 F.3d at 933 (materially adverse interests "not a difficult question" where new client sues a former client). Thus, Biomet's motion to disqualify turns on the third element, i.e., whether "the current representation involves a substantially related matter as the attorney's former representation of the movant." *Id.* at 932. The party seeking disqualification

10

bears the burden of proving that the present and prior representations are substantially related. *A.J. by L.B. v. Kierst*, 56 F.3d 849, 859 (8th Cir. 1995).

The Missouri Supreme Court examines a non-exclusive list of six factors in determining whether the representations are substantially related. The factors are:

> (1) the case involved the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct; (2) the lawyer had interviewed a witness who was key in both cases; (3) the lawyer's knowledge of a former client's negotiation strategies was relevant; (4) the commonality of witnesses, legal theories, business practices of the client, and location of the client were significant; (5) a common subject matter, issues and causes of action existed; and (6) information existed on the former client's ability to satisfy debts and its possible defense and negotiation strategies.

*In re Carey*, 89 S.W.3d 477, 494 (Mo. 2002). Upon consideration of the *Carey* factors here, the Court finds that the present and former representations were not substantially related.

The first *Carey* factor is "whether the case involved the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct." 89 S.W.3d at 494. Here, Thompson formerly represented Biomet, Inc. in a single matter in Utah state court. However, the Court finds that the Utah matter was not substantially related to the present representation. Unlike this case, it did not involve claims of design defect, product liability, failure to warn, or misrepresentation. It was a pure negligence claim involving an entirely different product. Further, Biomet offers no evidence at all regarding the type or extent of Thompson's involvement in that representation.

Biomet does not meaningfully argue that the Utah matter was substantially related to this representation. Instead, Biomet argues that Thompson's former representation of Zimmer, especially in Durom Cup cases, is substantially related to the present case. Biomet argues that, because of the 2015 merger, Zimmer and Biomet are the same "client." Since the merger, Zimmer and Biomet share a common board of directors, management team, and legal

11

department.  In *Commonwealth Land Title Ins. Co. v. St. Johns Bank & Tr. Co.*, No. 408CV1433CAS, 2009 WL 3069101 (E.D. Mo. Sept. 22, 2009), this Court found that a law firm's prior representation of a company "and its sister companies" created a conflict of interest in part because the companies shared a common corporate parent that "centralized oversight of litigation involving its affiliate companies according to a common set of established procedures and practices."  *Id.* at *5-6.  Biomet argues that Thompson's former representation of Zimmer creates a conflict of interest for the same reason, i.e., Zimmer Biomet's guidelines for handling product liability matters apply uniformly to all Zimmer Biomet entities, including—post-merger—Biomet, Inc.

The Court finds *Commonwealth* factually distinguishable for at least two reasons.  First, *Commonwealth* involved a concurrent conflict of interest, so the Court's discussion of prior representation was ultimately unnecessary to its decision.  *Id.* at *5.  Second, in *Commonwealth* the law firm previously represented both the same client and its sister companies in substantially related matters.  *Id.* at *6.  Here, Biomet *only* argues that Thompson's prior representation of the "sister company" (Zimmer) is substantially related to the current case involving Biomet, Inc.  Nevertheless, the Court assumes without deciding that Zimmer and Biomet, Inc. are the "same client" for purposes of the *Carey* analysis.

This only begins the Court's analysis of the first *Carey* factor.  Again, the first factor is "whether the case involved the same client and the matters or transactions in question are relatively interconnected or reveal the client's pattern of conduct."  89 S.W.3d at 494.  The Court finds the matters in question not relatively interconnected.  Thompson's representation of Zimmer in Durom Cup matters involved an entirely different product, manufactured and sold by Zimmer when it was a direct competitor of Biomet, Inc.  Had Zimmer not subsequently acquired

Biomet's parent company (many years after Zimmer discontinued the Durom Cup), there would be no question of interconnectedness. Further, although the Durom Cup and M2a Magnum are both metal-on-metal hip implants, Biomet has consistently taken the position that the devices are different and cannot be lumped together. For example, Biomet opposed MDL centralization arguing that "the Magnum actions, which involve a broad array of components that share the Magnum name, are not comparable to the Durom actions." Doc. 132-4 at 13. Thus, this case is distinguishable from *Carey*, where the defendant offered evidence that the former and present representations were "virtually identical in the way the company handle[d] them." 89 S.W.3d at 495.

The last consideration in this factor is whether the former representation "reveal[ed] the client's pattern of conduct." *Id.* at 494. Biomet represents that it has adopted, post-merger, the litigation strategy that Zimmer used in Durom Cup matters. Doc. 112. But no evidence suggests that Thompson or Bachus & Schanker knew that Biomet adopted the Zimmer strategy until Biomet voluntarily disclosed that information as part of its motion to disqualify. Doc. 132-1. In sum, the Court finds the present case not relatively interconnected to the Durom Cup matters and further finds that any revelation of the client's pattern of conduct is due to Biomet's voluntary disclosure, rather than the prior representation. Accordingly, the Court finds the first *Carey* factor neutral at best.

The second *Carey* factor is whether the lawyer interviewed a witness who was key in both cases. In short, Biomet offers no evidence that Thompson ever interviewed *any* witness in any Zimmer or Biomet matter, much less any "key" witness. Again, this distinguishes the present case from *Carey*, where the conflicted attorneys personally "interviewed or deposed a number of expert witnesses." 89 S.W.3d at 495. Thus, this factor strongly favors Plaintiffs.

13

The third *Carey* factor is whether "the lawyer's knowledge of a former client's negotiation strategies was relevant." 89 S.W.3d at 494. Biomet offers evidence that Thompson received training on Zimmer's methods for valuing Durom Cup claims, performed valuation assessments for approximately 15 such claims, and prepared settlement analysis memoranda. Biomet offers no exemplars of these memoranda for the Court's *in camera* review, and while the Court cannot assess the degree to which they show meaningful knowledge of Zimmer's negotiation strategies, the Court infers that they wouldn't reveal much. Further, Biomet offers no evidence that Thompson ever personally participated in settlement negotiations with plaintiffs or plaintiffs' counsel in the Durom Cup matters. This is significantly less evidence of knowledge of the former client's negotiation strategies than the Missouri Supreme Court found in *Carey*. There, the attorneys personally "helped *formulate* the decision matrix" used by the former client in defending similar suits. *Id.* at 495 (emphasis added). Finally, as noted above, nothing suggests that Thompson and Bachus & Schanker knew that Biomet adopted Zimmer's litigation or negotiation strategies until Biomet voluntarily disclosed that information here.

Although the Court is skeptical that Thompson's knowledge or contribution to Zimmer's negotiation strategies was significant as an entry-level associate working in a large MDL defense team, the Court assumes for purposes of the *Carey* analysis that Thompson's knowledge of Zimmer's Durom Cup claim valuation strategy has at least some relevance to the present representation. Accordingly, the Court finds that this factor may slightly favor disqualification.

The fourth *Carey* factor assesses "the commonality of witnesses, legal theories, business practices of the client, and location of the client." 89 S.W.3d at 494. Regarding the commonality of witnesses, Biomet makes much of the fact that Thompson represented Zimmer in two matters in which Plaintiffs' experts in this case, George Kantor and Mari Truman, were

14

retained by plaintiffs in claims against Zimmer. But Biomet offers no evidence that Thompson had any involvement in evaluating, deposing, or otherwise engaging with these expert witnesses at any time. The Court is not persuaded that Thompson's mere appearance for Zimmer in matters where these plaintiffs' experts were retained—absent evidence suggesting she learned anything about Zimmer's strategy regarding these experts—is a reason for disqualification. Biomet offers no evidence regarding commonality of fact witnesses. Nor could it, since the Durom Cup and M2a Magnum were designed by Zimmer and Biomet, respectively, when they were separate companies and competitors.

As to commonality of "legal theories, business practices of the client, and location of the client," the Court again notes that any commonality is *post hoc*, and solely attributable to Zimmer's 2015 acquisition of Biomet. If not for the merger, this *Carey* factor would strongly favor Plaintiffs. The merger moves this factor closer to neutral. Zimmer and Biomet now share a common board and management team and the same litigation guidelines apply uniformly to all Zimmer Biomet subsidiaries—so some overlap likely exists in business practices and legal theories. However, any commonality here is of Zimmer Biomet's own making. In the Court's view, this distinguishes the present case from *Commonwealth Land Title Ins. Co. v. St. Johns Bank & Tr. Co.*

In *Commonwealth*, a law firm merger created the conflict of interest—resulting in the same firm representing adverse parties post-merger. 2009 WL 3069101, at *2. Thus, the *attorneys* created the conflict of interest in *Commonwealth*, but neither notified their clients nor sought a waiver. *Id.* at *3. Here, the merger was Zimmer Biomet's own doing, and occurred after Thompson had already begun working on Durom Cup cases. To disqualify Thompson (and, by extension, every law firm she will ever work for) because one of her clients acquired a

15

direct competitor would, in the Court's view, apply the Rules of Professional Conduct with the kind of "unqualified rigor" that the Comments discourage. *See* Rule 4-1.9, cmt. 4 ("If the concept of imputation were applied with unqualified rigor, the result would be radical curtailment of the opportunity of lawyers to move from one practice setting to another and of the opportunity of clients to change counsel."). Accordingly, the Court finds this factor weighs in favor of Plaintiffs.

The fifth *Carey* factor is whether "common subject matter, issues and causes of action existed." 89 S.W.3d at 494. In *Carey*, the court found common subject matter where the former and present representations involved different components of the same product (a Chrysler minivan). *Id.* at 495. Conversely, Thompson's representation of Zimmer in the Durom Cup cases involved a completely different product, designed and sold by Zimmer when it was a separate company and direct competitor to Biomet. Thus, facially, no common subject matter exists between the former and present representations. However, Biomet argues commonality of issues exists because both the Durom Cup and M2a Magnum are metal-on-metal hip implants and Biomet is using the same litigation strategy here that Zimmer used in Durom Cup cases. While the Court accepts, for purposes of this analysis, Biomet's representation that it has adopted Zimmer's litigation strategy, no evidence suggests that Thompson or Bachus & Schanker knew this until Biomet chose to disclose that fact in its motion to disqualify. Adopting Biomet's argument would allow a client to purposefully reveal confidential information in a termination letter to former counsel and then disqualify the former attorney on the basis of the letter. The Court finds this factor neutral at best, if not favoring Plaintiffs.

The sixth and final *Carey* factor is whether "information existed on the former client's ability to satisfy debts and its possible defense and negotiation strategies." 89 S.W.3d at 494.

16

Biomet offers no evidence that Thompson learned any information regarding Zimmer or Biomet's ability to satisfy debts, so that piece of this factor weighs completely against disqualification. In *Carey*, the attorneys "knew of and actually helped formulate Chrysler's defense and negotiation strategies." *Id.* at 495. Biomet offers no evidence that Thompson, as an entry-level associate, helped formulate strategy of any kind. Biomet does offer some evidence that Thompson learned information regarding Zimmer's strategies for defending and negotiating settlement of metal-on-metal claims through her work on Durom Cup matters. And, due to Biomet's voluntary disclosure that it has adopted Zimmer's strategies, that information is potentially relevant to the present case. On balance, the Court finds this factor neutral at best, if not favoring Plaintiffs.

In sum, the Court finds the first, fifth, and sixth *Carey* factors neutral at best, if not slightly favoring Plaintiffs and against disqualification. The second and fourth factors clearly weigh in favor of Plaintiffs and against disqualification. Only the third factor—Thompson's knowledge of Zimmer's negotiation strategies—weighs in favor of disqualification, and only slightly so. The Court does not find this factor sufficient, by itself, to establish that the former and present representations were substantially related. *See Carey*, 89 S.W.3d at 494 ("one factor, if significant enough, can establish that the subsequent case is substantially related"). Thus, the Court finds that the *Carey* factors, on balance, weigh heavily against a finding that the representations are substantially related. Rule 4-1.9 only prohibits an attorney (or her firm) from representing an adverse party against a former client in the same or a substantially related matter. Accordingly, because the Court finds the matters not substantially related, no conflict of interest exists and the Court denies Biomet's motion to disqualify.

**III.     Conclusion**

This motion to disqualify does not present a close call.  The Court finds that Defendants filed this motion not because of legitimate concerns with upholding the Rules of Professional conduct or preserving the integrity of attorney-client confidentiality but as tactical matter attempting to coerce a continuance of the trial date.  As the Court has previously admonished: "at the heart of this case lies the question of justice—a determination of whether Defendants are liable to compensate Mr. and Mrs. Bayes for their injuries, and if so, how much.  This is not a war, and certainly not a war of attrition."  Doc.  169.  For the reasons set forth above, the Court denies the motion.

Dated:  November 12, 2020.

                                                     *SLR.CR*

                                         **STEPHEN R. CLARK**
                                         **UNITED STATES DISTRICT JUDGE**