**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| MARY BAYES, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )    Case No. 4:13-cv-00800-SRC |
| | ) |
| BIOMET, INC., et al., | ) |
| | ) |
| Defendants. | ) |

**<u>Memorandum and Order</u>**

In its third and final post-trial motion, Biomet strenuously argues that the Court should order a new trial based on the numerous errors that occurred at trial and the "grossly excessive" verdict awarded by the jury. In the alternative, Biomet requests that the Court grant remittitur. After careful consideration of the record and all issues raised, the Court concludes that no prejudicial error occurred and denies the motion.

**I.      Background**

The Court provided the relevant background in its ruling on Biomet's Motion to Alter the Judgment, Doc. 461, and therefore declines to restate it in full here. Biomet filed a motion for judgment on the verdict, or in the alternative, for a mistrial at the close of evidence of the first phase of the trial, Doc. 379, raising many of the same grounds forwarded in the present motion. The Court denied that motion on the record. Doc. 416 at 5:24–14:16.

Pursuant to Rule 59, Biomet moves for a new trial, or, in the alternative, for remittitur. Doc. 440. Biomet argues that it is entitled to a new trial because the jury reached inconsistent verdicts, the verdict runs against the weight of the evidence, and purported errors at trial necessitate a new trial. Doc. 441. In the alternative, Biomet contends it deserves a new trial or remittitur because the $21 million in damages awarded by the jury constitutes an excessive

1

verdict. *Id.* After the parties had fully-briefed the motion, Plaintiffs filed a Notice of

Supplemental Authority. Doc. 459. Biomet then sought leave to reply to Plaintiffs' Notice of

Supplemental Authority, Doc. 460, which the Court grants. Taking into consideration all the

parties' filings on the motion, the Court first addresses Biomet's grounds for a new trial, before

evaluating whether the jury's damages award warrants remittitur.

## II.    New trial

### A.    Standard

"The court may, on motion, grant a new trial on all or some of the issues—and to any

party . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an

action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). Under Rule 59(a)(1)(A), "[a] new

trial is appropriate when the first trial, through a verdict against the weight of the evidence, an

excessive damage award, or legal errors at trial, resulted in a miscarriage of justice." *Gray v.

Bicknell*, 86 F.3d 1472, 1480 (8th Cir. 1996) (citations omitted). A miscarriage of justice does

not result whenever there are errors at trial; instead, the party seeking a new trial must

demonstrate that there was prejudicial error. *Buchholz v. Rockwell Int'l Corp.*, 120 F.3d 146, 148

(8th Cir. 1997). "Motions for new trials are generally disfavored and will be granted only where

a serious miscarriage of justice may have occurred." *United States v. Petroske*, 928 F.3d 767,

774 (8th Cir. 2019)*, cert. denied,* 140 S. Ct. 973 (2020) (quoting *United States v. Morris*, 817

F.3d 1116, 1121 (8th Cir. 2016)).

### B.    Inconsistent verdicts

As in other motions, Biomet again argues that the jury returned inconsistent verdicts,

which entitles it to a new trial. Doc. 441 at pp. 9–11. The Court has addressed this issue at

length in its orders on Biomet's Motion to Alter the Judgment and Renewed Motion for

2

Judgment as a Matter of Law.  Docs. 461, 462.   As explained there, the verdicts reached in this case did not result in a miscarriage of justice and the Court finds the verdicts can readily be harmonized.  Accordingly, Biomet is not entitled to a new trial based on the jury's verdicts.

### C.    Verdict as against the weight of the evidence

Biomet next argues that the Court should grant a new trial because the verdict reached by the jury on the negligent-design claim goes against the weight of the evidence and resulted in a miscarriage of justice.  Doc. 441 at p. 11.  The Court disagrees.

District courts have "great deference" in ruling on motions for a new trial.  *Wilson v. Lamp,* 995 F.3d 628, 631 (8th Cir. 2021) (citation omitted).  In fact, "[w]hen the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal."  *Lincoln Composites, Inc. v. Firetrace USA, LLC,* 825 F.3d 453, 459 (8th Cir. 2016) (quoting source omitted).  In determining whether the jury's verdict runs against the weight of the evidence, the Court "can rely on its own reading of the evidence—it can weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict."  *Id*. (quoting source and internal quotation marks omitted).  "The crucial determination 'is whether a new trial should have been granted to avoid a miscarriage of justice.'"  *PFS Distribution Co. v. Raduechel*, 574 F.3d 580, 589 (8th Cir. 2009) (quoting *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997).

In arguing that the verdict goes against the weight of the evidence, Biomet simply rehashes many of the same grounds it raised in its Renewed Motion for Judgment as a Matter of Law.  *See* Doc. 438.  The Court found these grounds meritless in denying that motion and does not repeat them here.  *See* Doc. 462.  Biomet cites other evidence to demonstrate that Plaintiffs offered insufficient evidence, *see* Doc. 441 at pp. 12–13, but this evidence merely supports that

3

the M2a Magnum constituted a high-end metal-on-metal hip implant and thus fails to address

that the jury could have found that the metal-on-metal design choice alone made the product

defective.  Moreover, the evidence offered by Biomet does not so strongly outweigh the evidence

presented by Plaintiffs, summarized by the Court in its prior order, *see* Doc. 462, such that a new

trial must be awarded to avoid a miscarriage of justice.  Therefore, based on the evidence offered

by Plaintiffs supporting their negligent-design claim, and upon consideration of the record as a

whole, the verdict reached on the negligent-design claim did not go against the weight of the

evidence.  Accordingly, the Court denies Biomet's Motion for New Trial on this ground.

### D.     Errors at trial

Biomet offers four errors at trial that independently, or in the alternative, cumulatively

warrant a new trial. The Court addresses each purported error in turn.

### 1.     Biomet's affirmative converse jury instruction

Biomet argues that the jury's inconsistent verdicts might have been prevented had the

Court instructed the jury with one of Biomet's proposed jury instructions.  Doc. 441 at p. 15.

Biomet asked the Court to instruct the jury as follows:

> On Plaintiffs' claim for negligence, your verdict must be for Biomet if you believe
> that Plaintiff Mary Bayes underwent revision surgeries and developed injuries as a
> result of causes unrelated to any alleged defect in her M2a Magnum devices.

Doc. 352-1 at p. 19.  Biomet submitted the same affirmative converse jury instruction on

causation for the strict-liability design-defect claim.  *Id*. at p. 15.  Biomet contends that had the

Court given these instructions, the jury would have understood that the causation elements of the

strict-liability and negligent-design defect claims were the same and might have avoided the

inconsistent verdicts reached in this case.  *Id*.  The Court already rejected this argument, Doc.

416 at 9:18–25, and does so again here.

4

First, Biomet's argument rests on the false premise that the jury reached inconsistent verdicts. As the Court explained above and in its prior orders, the jury did not reach inconsistent verdicts. *See* Docs. 461, 462. Second, as the Court has already ruled, the jury received instruction on the issue of causation and thus the affirmative converse instruction was unnecessary. *See* Doc. 362; Doc. 416 at 9:18-25; *Fid. & Deposit Co. of Maryland v. Fleischer*, 772 S.W.2d 809, 817 (Mo. Ct. App. 1989). Third, even if the jury had received the instruction, it only addresses causation and thus would not have addressed the differing elements between the two instructions from which the Court can easily harmonize the verdicts. *See* Doc. 461. For these reasons, the Court denies Biomet's Motion for New Trial on this ground.

### 2.      Misconduct by Plaintiffs' counsel and improper questioning

Biomet next argues that the misconduct of Darin Schanker, Plaintiffs' counsel, in exposing the jury to questioning and argument concerning other litigation involving Biomet as well as claims no longer included in the case, in defiance of this Court's orders, warrants a new trial. The Court already rejected this argument, Doc. 416 at 11:13–12:6, and does so again here.

Near the end of the first phase of the trial, the Court ruled orally from the bench and later issued a memorandum and order addressing Schanker's misconduct. Doc. 343 at 5:13–14:1; Doc. 354. At the hearing, the Court presented numerous examples of Schanker's misconduct, including eliciting testimony on the failure-to-warn claim that had been dismissed from the suit and testimony on medical causation from Mari Truman. Doc. 343 at 7:4–10:19. The Court did not impose sanctions, but informed Schanker that future misconduct would result in sanctions, including the termination of his participation in the case. *Id*. at 11:14–12:11. After providing its oral ruling, the Court gave Biomet the opportunity to be heard, but Biomet did not request any sanctions or a mistrial at that time. *Id*. at 13:10–13. As the Court noted in its initial ruling, Doc.

416 at 11:20–25, Biomet never argued before the jury reached its verdict that Schanker's conduct warranted a mistrial.

In determining whether to grant a new trial based on Schanker's misconduct, the Court considers whether: "(1) the remarks in question were . . . minor aberrations made in passing; (2) the district court took specific curative action; and (3) the size of the damage award . . . suggest[s] that counsel's comment had a prejudicial effect." *Ventura v. Kyle*, 825 F.3d 876, 885 (8th Cir. 2016) (quoting *Gilster v. Primebank*, 747 F.3d 1007, 1011–12 (8th Cir. 2014)) (alterations in original). "'[T]he weight of the evidence' is another relevant factor in determining 'whether the improper argument deprived a party of a fair trial.'" *Id*. at 885 (quoting source omitted).

Beginning with the first factor, Shanker's comments were not "minor aberrations made in passing." Schanker violated this Court's orders numerous times, sometimes shortly after receiving a direct ruling not to engage in such conduct. For example, to curb his conduct, the Court told Schanker he could not read from documents out loud, but he did so numerous times. Doc. 345 at 251:13–254:18; 260:16–23; 261:15–18; 266:5–13. Additionally, he referenced the other litigation involving the M2a Magnum immediately after the Court advised him not to. *Id*. at 183:6–186:19. These violations demonstrate that Schanker's comments were not "minor aberrations in passing" but instead were deliberate and thus the first factor weighs in favor of Biomet.

The second factor weighs in favor of Plaintiffs as the Court gave specific curative instructions. Following Schanker's questioning to Dr. Steven Kurtz about how much he was paid for testifying "not just in this case but in other cases," the Court admonished Schanker in front of the jury, stating "Mr. Schanker, that's a direct violation of what I just ordered you not to

get into.  Ladies and gentlemen of the jury, you are to disregard Mr. Schanker's statement." *Id*.

at 186:10–16.  Next, before closing arguments, the Court gave a specific instruction that

"Plaintiffs' failure to warn claim . . . [is] no longer part of this case, so you will not decide those

claims."  Doc. 362 at p. 7.  In sum, the Court escalated its curative instructions to the jury and

admonitions to Schanker commensurate with Schanker's misconduct.  "The specific curative

instructions in this case went beyond the simple 'reminder that counsel's arguments are not

evidence' that [the Eighth Circuit] ha[s] previously found insufficient."  *Dean v. Searcey*, 893

F.3d 504, 521 (8th Cir. 2018) (citing *Gilster*, 747 F.3d at 1012).  Therefore, the second factor

weighs in favor of Plaintiffs.

Third, the size of the damage award does not indicate prejudice.  When courts have

granted a new trial based on comments made by counsel, it often involves emotionally-laden

statements at closing that inflamed the passions of the jury.  *See Gilster*, 747 F.3d at 1012;

*Ventura*, 825 F.3d at 885.  Biomet points to no improper statements by Schanker during closing

arguments that would have inflamed the passions of the jury.  Additionally, given that it was one

question in a two-and-a-half week trial, the Court finds specious at best Biomet's argument that

Schanker's reference to other cases is closely tied to the jury's verdict on the negligent-design

claim such that it would prejudice the verdict.  Thus, the Court concludes that Schanker's

misconduct did not prejudice the jury's verdict.

Finally, as explained above, the Court cannot conclude that the verdict reached resulted

in "a miscarriage of justice" based on the evidence in this case.  *See Dean*, 893 F.3d at 521.  The

jury was not presented with a mere credibility contest, *see id*. (citing *Ventura*, 825 F.3d at 885);

rather it heard from numerous experts on a variety of issues that testified about numerous

medical devices, testing procedures, and documents.  Thus, sufficient evidence supports the

jury's verdict and, as explained in detail below in assessing whether the jury reached an excessive verdict, sufficient evidence in the record existed to support the damages awarded.

In sum, three of the four factors strongly support Plaintiffs, *see Dean,* 893 F.3d at 521, and Schanker's misconduct, while unprofessional, did not affect the substantial rights of Biomet, based on the record as a whole.  The Court concludes that no "miscarriage of justice" occurred and that Schanker's comments do not warrant a new trial.

### 3.    COVID-19 circumstances and positive juror test

Biomet argues that the Court should order a new trial due to juror number 10's positive COVID-19 test, but fails to show any prejudice from the juror's positive test.  Briefly stated, the positive test became known only to juror number 10 after the verdict, and pre-verdict, he did not share with the Court or anyone else that he had been tested, and he stated that he exhibited no obvious symptoms.  Doc. 373 at 6:20–22, 7:12–18; Doc. 370.  Thus, no basis exists from which an inference can be drawn that any other juror had any indication that juror number 10 was symptomatic, had tested, or posed any COVID-19 risk to others. The Court concludes that the circumstances do not require a new trial.

Biomet's chief argument is that the jury reached a rushed verdict due to the circumstances surrounding juror number 10's positive test.  Doc. 441 at p. 19.  The juror began experiencing a sore throat during the evening of October 19, 2020.  Doc. 373 at 5:8–13.  He received a COVID-19 test on October 20, 2020, *id*. at 6:15–24, the day before they jury began deliberations.  The jury deliberated for four hours and twenty-five minutes on October 21, 2020, and forty-five minutes on October 22, 2020, for a total of approximately five hours.  Docs. 356, 365.  The Eighth Circuit has found jury deliberations of four hours for a complex eleven-day trial a reasonable amount of time.  *See Bavlsik v. Gen. Motors, LLC.,* 870 F.3d 800, 811 (8th Cir.

2017).  Only after the Court read the verdict and released the jury for a lunch break did juror number 10 learn he tested positive.  Doc. 373 at 7:12–18.  The juror informed Court personnel that he had tested positive for COVID-19 and the undersigned asked the juror numerous questions (though consistent with Federal Rule of Evidence 606, did not elicit any prohibited testimony or other evidence).  Docs. 370, 373.  Juror number 10's responses to these questions demonstrate that no other jurors knew he had even tested, must less tested positive, for COVID-19, and he represented that the pending results of the test did not distract him, as he had been diagnosed with pharyngitis and was administered a COVID-19 test as an afterthought.  Doc. 373 at 6:20–22.  Thus, no evidence suggests that juror number 10's positive test impacted the verdict reached.

Biomet also argues that "the mere midtrial diagnosis of a juror with COVID-19 by itself, with the exposure to the virus of the other jurors, the attorneys, and others in the courtroom, independently requires a new trial here."  Doc. 441 at p. 20.  Biomet cites to other cases throughout the country where the court granted a mistrial or new trial due to COVID-19.  *See id*.  However, besides raising a general concern that COVID-19 "poses health risks" and "is unfair to the jurors and the parties and poses a real and imminent threat to the goal of justice[,]" Biomet fails to offer anything specific demonstrating how the COVID-19 circumstances prejudiced it.  *See Acuity v. Johnson*, 776 F.3d 588, 596 (8th Cir. 2015) ("[A] new trial is only an appropriate remedy when an aggrieved party proves prejudice, meaning that the result at trial would have been different if not for the district court's error." (citations omitted)).

Lastly, as the Court noted in its earlier ruling, it took "reasonable and appropriate precautions to ensure the safety of all parties, witnesses, attorneys and all court staff and all participating in the Court – in this court proceeding here in the courthouse."  Doc. 416 at 13:3-8.

Of the many people entering and exiting the courtroom throughout the three-week trial, only one

other person besides juror number 10 tested positive for COVID-19, which the Court's staff

physician concluded was "strong evidence that the procedures that the Court has implemented

are working and work well." *Id*. at 24:13–25:4.  Accordingly, the Court concludes that the

circumstances do not warrant a new trial.

### 4.    Press release

Biomet's next argues that a press release publicizing the verdict by an attorney with a

plaintiffs' firm representing plaintiffs in M2a Magnum litigation nationwide and present at trial

serves as another error that contributes to the cumulative errors that warrant a new trial.  Doc.

441 at pp. 21–22.  The Court does not find that the press release serves or contributes to a basis

to grant a new trial in any fashion.

First, as Biomet's counsel acknowledged at the time it was given, the Court's order

regarding publicizing the verdict applied only to the parties and their counsel.  Doc. 372 at 5:12–

20; 6:2–17.  As Biomet admits, the attorney who issued the press release did not represent

Plaintiffs and Plaintiffs' counsel complied with the Court's order.  Doc. 441 at p. 22.

Additionally, the verdict was read out loud in open court with members of the public present.

Most importantly, Biomet has not shown how the press release prejudiced it in any way.

### 5.    Cumulative effect

Lastly, Biomet argues that the cumulative effect of the circumstances requires a new trial

because the circumstances taken together "either increased the likelihood of the inconsistent

verdict or improperly attempted to influence the decision of the jury."  Doc. 441 at p. 22.  For the

Court to grant Biomet a new trial based on the cumulative effect of errors or circumstances,

Biomet must establish that it was "substantial[ly] prejudice[d]" by the cumulative effect of the

errors.  *Vogt v. State Farm Life Ins. Co*., 963 F.3d 753, 773 (8th Cir. 2020)*, cert denied*, No. 20-

1008, 2021 WL 1521013 (U.S. Apr. 19, 2021) (quoting source omitted).  With Biomet unable to show that any of the purported "errors" standing alone actually constituted error or caused any prejudice, the Court finds that Biomet cannot show that it was "substantial[ly] prejudice[d]" by the cumulative effect of the "errors."  Accordingly, the Court denies Biomet's Motion for New Trial on this ground.

## III.     New trial or remittitur for excessive verdict

In the alternative, Biomet argues that the jury reached an excessive verdict that warrants a new trial or remittitur.  The Court finds that the jury did not reach an excessive verdict and thus denies Biomet's motion.

### A.     Standard

A district court may remit a jury verdict or grant a new trial based on an excessive verdict "only when [the verdict] is so grossly excessive that there is plain injustice or a monstrous or shocking result."  *Eckerberg v. Inter-State Studio & Publ'g Co.*, 860 F.3d 1079, 1088 (8th Cir. 2017) (quoting *Hudson v. United Sys. of Arkansas, Inc*., 709 F.3d 700, 705 (8th Cir. 2013)).

The parties agree that Missouri law governs whether the jury reached an excessive verdict.  Doc. 441 at p. 23; Doc. 451 at p. 14; *see also Wright v. Byron Fin., LLC*, 877 F.3d 369, 374 (8th Cir. 2017) ("The law of the forum state governs when a verdict is excessive[.]").  Under Missouri law, a verdict is excessive when it exceeds "fair and reasonable compensation." *Wright*, 877 F.3d at 374 (first citing *Eckerberg*, 860 F.3d at 1088, then citing Mo. Rev. Stat. § 537.068).  "There are two general types of excessive verdicts: (1) a verdict that is disproportionate to the evidence of injury and results from an 'honest mistake' by the jury in assessing damages; and (2) a verdict that is excessive due to trial error that causes bias and prejudice by the jury."  *Stewart v. Partamian*, 465 S.W.3d 51, 56 (Mo. 2015) (citation omitted).

A finding that the verdict is excessive due to an "honest mistake" by the jury may be cured by ordering remittitur or granting a new trial. *Id.* (citation omitted).  However, if the excessive verdict resulted from trial error that caused jury prejudice, the Court must order a new trial. *Id.* (citation omitted).

"'There is no precise formula for determining whether a verdict is excessive,' but the 'ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained.'" *Est. of Snyder v. Julian*, 789 F.3d 883, 888 (8th Cir. 2015) (quoting *Graeff v. Baptist Temple of Springfield*, 576 S.W.2d 291, 309 (Mo. 1978)).  The "inquiry is fact-specific" and "[t]he range between an inadequate award and an excessive award for pain and suffering can be enormous and substantial disparity among juries as to what constitutes pain and suffering must be expected." *Payne v. Fiesta Corp.*, 543 S.W.3d 109, 131 (Mo. Ct. App. 2018) (citations omitted).

"In determining whether an award is excessive," Missouri courts consider a number of factors: "(1) loss of income, both present and future; (2) medical expenses; (3) plaintiff's age; (4) the nature and extent of plaintiff's injuries; (5) economic considerations; (6) awards given and approved in comparable cases; and (7) the superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages." *Emery v. Wal-Mart Stores, Inc.*, 976 S.W.2d 439, 448 (Mo. 1998) (citing *Tennis v. Gen. Motors Corp.,* 625 S.W.2d 218, 229 (Mo. Ct. App. 1981)).  Additionally, a "judgment may be based in part on 'certain intangibles' that do not lend themselves to precise calculation, such as past and future pain, suffering, effect on life-style, embarrassment, humiliation, and economic loss." *Knifong v. Caterpillar, Inc.,* 199 S.W.3d 922, 928 (Mo. Ct. App. 2006) *overruled on other grounds by Badahman v. Catering St. Louis,* 395 S.W.3d 29, 40 (Mo. banc 2013) (quoting *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 250 (Mo. 2001)).  Moreover, the Eighth Circuit has stated that its "precedent supports upholding non-

economic jury awards for situations in which pain and suffering are significant." *Eckerberg*, 860 F.3d at 1088–89 (applying Missouri law). The Eighth Circuit has further explained that "[a]wards for pain and suffering are often 'highly subjective and should be committed to the sound discretion of the jury, especially when the jury is being asked to determine injuries not easily calculated in economic terms.'" *Id.* (quoting *Hudson,* 709 F.3d at 705).

With the jury awarding only non-economic damages, the Court first addresses the non-economic factors provided in *Emery*, before then addressing the economic factors.

**B.     Non-economic factors**

**1.     Nature and extent of Plaintiffs' injuries**

In its opposition, Plaintiffs explained at great length the evidence related to the nature and extent of Plaintiffs' injuries. Doc. 451 at pp. 20–24. In short, after having Biomet's M2a Magnum placed in both her right and left hips, Mrs. Bayes underwent seven total revision surgeries,[1] experienced twelve hip dislocations, and has increased potential for future dislocations due to the severe necrosis of her gluteus muscle that has left barely any tissue intact, which subjects her to severe physical limitations. As a result of these complications following her hip-replacement surgeries, Mrs. Bayes, fearful of her next dislocation, must be constantly vigilant of her physical limitations and thus cannot perform all the activities she planned to do with her husband in retirement. Below, the Court summarizes the evidence presented regarding the nature and extent of Plaintiffs' injuries.

Biomet's M2a Magnum was placed in Mrs. Bayes's right hip in January 2008, and then in her left hip in April 2008. Doc. 326 at 54:14–56:15, 80:8–22. In late 2010, Mrs. Bayes

---

[1] A revision surgery involves a "redo" of a previous hip implant operation. Doc. 316 at 53:23–24; Doc. 325 at pp. 66:25–67:2.

informed Dr. Daniel Martin, her implanting physician, that she had been walking with a limp and had groin pain. *Id*. at 91:16–21. Dr. Martin referred Mrs. Bayes to Dr. Paul Lux, who performed a revision surgery on Mrs. Bayes's left hip in March 2011. Doc. 334 at 37:11–15; 77:13–16. During the surgery, Dr. Lux discovered substantial damage to Mrs. Bayes's left hip, including metallosis, a pseudotumor, and tissue destruction involving her abductor tendon and the soft tissue supporting the hip structure. *Id*. at 78:15–79:1. While he resected about one-third of the soft tissue supporting Mrs. Bayes's left hip, he could not resect the remaining tissue that had been substantially compromised by metallosis without leaving Mrs. Bayes permanently crippled. *Id*. at 82:16–25. Following the operation, he stated that "it looks a hand grenade [went] off in her hip." *Id*. at 93:2–3.

Plaintiffs presented testimony that after undergoing the revision surgery by Dr. Lux, Mrs. Bayes experienced twelve hip dislocations, including one just weeks before trial. *Id*. at 247:22–248:1; 268:16–18; *see also* Doc. 199 at ¶ 9; Doc. 313 at 20:9–12. Mrs. Bayes dislocated her hips performing a variety of ordinary tasks, including taking off her sandals, bending over to pick up a remote control, rolling over in bed, or trying to sit in bleachers at her grandchildren's sporting activities. *Id*. at 235:20–25; 252:11–17; 264:13–19; 267:9–16. Her son described the embarrassment she felt when she dislocated her hip in a crowded gym while watching her granddaughter play volleyball. Doc. 316 at 230:14–231:2.

Mrs. Bayes testified that the pain of childbirth was preferable to the pain from hip dislocation. Doc. 334 at 254:16–20. She described dislocating her hip as "feel[ing] like somebody cut my leg off at the torso and then tried to reattach it to my torso with a diaper pin." *Id*. at 255:6–7. Dr. Lux and Dr. Ryan Nunley described the pain associated with hip dislocations as ten out of ten and comparable to a broken bone, respectively. *Id*. at 104:2–3; Doc. 325 at

14

117:16–18.  These pain levels remain until the hip is reset into place or she receives pain medication.  Doc. 334 at 104:13–20.  Additionally, Mrs. Bayes explained that each dislocation requires ambulance transportation to the hospital, and then depending on the severity of the dislocation, heavy sedation to relocate the hip or general anesthesia and open surgery if the hip does not relocate with external manipulation.  *Id*. at 250:19–25; 256:7–17; 259:21–261:5.

 Mrs. Bayes has undergone six revision surgeries on her left hip and one on her right hip.  Doc. 199 at ¶ 9; Doc. 313 at 20:9–12.  Mrs. Bayes now has a fully-constrained hip implant, which prevents her from achieving more than ninety-degree flexion, meaning she cannot sit in a normal position without risking dislocating her hip.  Doc. 334 at 117:6–118:8.  The fully-constrained implant adds stability, but if Mrs. Bayes's hip dislocates, she must undergo open reduction surgery to repair the implant.  *Id*. at 122:18–22.

Plaintiffs presented evidence that Mrs. Bayes will likely dislocate her hip in the future.  *Id*. at 158:15–25; 169:16–21; Doc. 325 at 117:24–118:3.  Dr. Nunley estimated that Mrs. Bayes had a ten percent chance of not dislocating her hip again.  *Id*. at 153:16–20.  Dr. George Kantor testified with a high level of certainty that Mrs. Bayes will experience future hip dislocations based upon his review of the operative reports showing that no soft tissue supports her left hip.  Doc. 316 at 126:12–17.

Plaintiffs' experts further explained to the jury that the condition of Mrs. Bayes's left hip cannot be remedied by current medical technology.  She can wear a hip brace, but the brace is bulky, irritates skin, makes sleeping more difficult, and must be taken off to use the toilet.  Doc. 325 at 142:3–10.  Dr. Nunley testified that, as designed, the brace causes physical discomfort and prevents certain physical postures.  *Id*. at 71:16–72:5.  Mrs. Bayes could also undergo a girdlestone procedure in the future, which would remove her left hip socket and leave it

15

supported by nothing but scarred soft tissue.  Doc. 334 at 131:23–132:16.  Following the

procedure, Mrs. Bayes's leg would progressively shorten until she must be confined to a

wheelchair.  *Id*. at 132:24–133:2.

Dr. Nunley and Dr. Lux testified about the practical limitations imposed by the

conditions of Mrs. Bayes's hips.  Dr. Lux explained that she will never walk a mile or climb

stairs without a bannister again and will always need a cane.  *Id*. at 158:15–25.  Dr. Nunley

testified that she must never cross her legs, rotate her torso, bend over, or sit with more than

ninety-degrees flexion.  Doc. 325 at 109:4–111:22.  Because she cannot sit with more than

ninety-degrees flexion, she must be mindful any time she sits at a restaurant, sporting event, or

even on the toilet at a family-member's house.  *Id*.  Mrs. Bayes's limitations extend to activities

like rolling over in bed and catching her toes in the sheets while asleep, getting in or out of a car,

or getting dressed.  *Id*.  As Dr. Nunley explained, Mrs. Bayes will be "walking on egg shells . . .

waiting for the next time it pops out," any time she engages in these activities.  *Id*.  Dr. Lux

echoed this sentiment, stating that she will always live in constant fear of her next dislocation.

Doc. 334 at 158:15–25.

Mrs. Bayes's testimony reflected Dr. Lux and Dr. Nunley's conclusions.  Her daily goal

is to avoid dislocating her hip, which requires her to constantly be aware to avoid crossing her

legs, sitting at less than a ninety-degree angle, twisting her torso, or keeping her legs too close

together.  *Id*. at 265:17–266:18.  Due to her condition, Mrs. Bayes lacks the ability to play on the

floor with her grandchildren and must take into account the availability of medical care when

traveling.  *Id*. at 270:8–9.

Finally, Mr. Bayes testified about the impact Mrs. Bayes's injuries have had on their

relationship.  The married couple has not been intimate for years, Doc. 326 at 146:19–147:2, and

can no longer walk on the beach or swim in the ocean together. *Id*. at 151:10–13.  He also stated

that they cannot perform all the activities they planned to do in their retirement due to Mrs.

Bayes's physical condition. *Id*. at 133:2–4.  Mr. Bayes further explained that Mrs. Bayes's did

not suffer only physical injuries.  He feels like his "wife's body, mind and soul has been

impacted—part of it destroyed, by [Biomet]." *Id*. at 129:6–17.  For the first time in their

relationship, Mr. Bayes witnessed Mrs. Bayes sink into depression and express doubts whether

she wished to remain alive in her condition and the uncertainty it causes. *Id.* at 141:16–24.  Mr.

Bayes testified that the couple live in fear of what the future may bring. *Id.* at 147:9–14.

In sum, Plaintiffs provided extensive evidence to the jury regarding the injuries suffered

by Mrs. Bayes, the pain associated with those injuries, the likelihood future injuries will occur,

and the daily impact the injuries have caused Mr. and Mrs. Bayes.  Accordingly, this factor

weighs strongly in favor of Plaintiffs.

### 2.      Awards given in comparable cases

In determining whether the jury awarded excessive damages, the Court also considers the

awards in comparable cases.  As explained below, the damages awarded to Plaintiffs fell within a

reasonable range of damages when compared to the damages awarded in metal-on-metal hip

implant cases to plaintiffs who underwent fewer revisions than Mrs. Bayes, experienced fewer

dislocations than Mrs. Bayes, and whose daily lives were less impacted than Plaintiffs'.

Plaintiffs and Biomet both argue that a verdict of $1,050,000 of non-economic damages

against Biomet in a Northern District of Iowa case involving the M2a Magnum supports their

position. *Nicholson v. Biomet, Inc.*, No. 18-CV-3057 CJW-KEM, 2020 WL 7865876 (N.D.

Iowa, Nov. 20, 2020); *see also id*. at Doc. 473 at pp. 41–43 (denying remittitur).  There, the

plaintiff underwent a single revision surgery, had no dislocations, and had returned to her pre-

revision activity level four years after undergoing the revision surgery.  *Id*. at Doc. 473 at p. 5.
Therefore, when compared to evidence that Mrs. Bayes underwent seven revision surgeries,
experienced twelve dislocations, and must walk on eggshells for the remainder of her life when
carrying out even the simplest tasks, the damages awarded in this case and *Nicholson* appear
commensurate with the evidence.

Both parties also cite to numerous verdicts reached in cases stemming from *In re: DePuy
Orthopaedics, Inc. Pinnacle Hip Implant Prods. Liab. Litig.*, 3:11-md-2244-k (N.D. Tex.), which
involves the DePuy Pinnacle metal-on-metal hip implant that caused metallosis, ion blood
contamination, and tissue/bone destruction.  Plaintiffs who underwent one or two revision
surgeries were awarded between approximately $4 million to $17.5 million in non-economic
compensatory damages.  *Andrews, et al., v. DePuy Orthopaedics*, 3:15-cv-03484-K (N.D. Tex.
Dec. 1, 2016) ($4 million ); *Davis v. DePuy Orthopaedics*, 3:15-cv-1776-K (N.D. Tex. Dec. 1,
2016) ($4 million); *Metzler v. DePuy Orthopaedics*, 3:12-cv-2066-K (N.D. Tex. Dec. 1, 2016)
($4 million); *Rodriguez v. DePuy Orthopaedics*, 3:13-cv-3938-K (N.D. Tex. Dec. 1, 2016) ($6
million); *Standerfer v. DePuy Orthopaedics*, 3:14-cv-1730-K (N.D. Tex. Dec. 1, 2016) ($6
million); *Weiser v. Depuy Orthopaedics*, 3:13-cv-3631-K (N.D. Tex. Dec. 1, 2016) ($4 million);
*Kirschner v. DePuy Orthopaedics*, 3:16-cv-01526, 2017 WL 10087150 (N.D. Tex. Nov. 14,
2017) ($17.5 million); *Miura v. DePuy Orthopaedics, Inc*., No. 3:13-cv-04119, 2017 WL
10087151 (N.D. Tex., Nov. 14, 2017) ($14 million); *Alicea v. DePuy Orthopaedics, Inc.*, No.
3:15-cv-03489, 2017 WL 10087146 (N.D. Tex., Nov. 14, 2017) ($10 million); *Barzel v. DePuy
Orthopaedics, Inc*., No. 3:16-cv-01245, 2017 WL 10087149 (N.D. Tex., Nov. 14, 2017) ($9.25
million).  With Mrs. Bayes having underwent at least five more revision surgeries than any
plaintiff in these *DePuy* cases, *Weiser*,  3:13-cv-03631-K, Doc. 294 at p. 10, *Alicea*, 3:15-cv-

03489-K, Doc. 255 at pp. 20–43, the jury award of $21 million compensatory damages is not excessive.

Verdicts outside the *DePuy* multi-district litigation also support that the jury did not award an excessive verdict. For example, in *Kline v. Zimmer Holdings Inc.*, BC44-4832 (July 22, 2019), the jury awarded approximately $7.6 million in non-economic damages to a plaintiff who underwent two revision surgeries because of a defective metal-on-metal hip implant. *See* 2019 WA Jury Verdicts & Sett. LEXIS 190. A jury returned a smaller verdict in *In re Wright Med. Tech. Inc., Conserve Hip Implant Prod. Liab. Litig*., awarding $960,000 in non-economic damages. 178 F. Supp. 3d 1321, 1369–70 (N.D. Ga. 2016), *aff'd in part sub nom. Christiansen v. Wright Med. Tech. Inc.*, 851 F.3d 1203 (11th Cir. 2017). There, the plaintiff's metal-on-metal hip implant failed, resulting in four days of immobility before surgery, a single revision surgery, a brief hospital stay, and six weeks on crutches. *Id*. Regarding future pain and suffering, the plaintiff stated that she lacked confidence skiing and that she now needed to use a walking stick while hiking. *Id*. The Court does not seek to diminish the injuries suffered by the plaintiff in *Christiansen*, but Mrs. Bayes suffered a greater number of dislocations, underwent more surgeries, and suffers from more substantial lingering effects. This comparison supports a finding that the jury's verdict of $21 million was not excessive.

Lastly, the Court addresses *Kransky v.DePuy Orthopaedics, Inc.*, No. BC456086, 2013 Jury Verdicts LEXIS 14730 (Cal. Sup. Ct. Mar. 8, 2013), which Biomet originally listed as an example of a jury verdict in a comparable case demonstrating that the jury reached an excessive verdict in this case. Doc. 441 at p. 31. As Plaintiffs note in their opposition, that the jury in *Kransky* awarded $8 million in non-economic damages to a plaintiff who underwent a single revision surgery and experienced improvements in his mobility after removing a metal-on-metal

hip implant, offers strong support that the jury did not award an excessive verdict based on Mrs. Bayes's injuries, continuing risk of dislocation, and very limited mobility.  After Plaintiffs persuasively argued that *Kransky* does not support remittitur, Biomet in reply only refer to *Kransky* to note that the *Kransky* opinion relied upon by Plaintiffs in opposition, 2016 WL 3960033 at *1–2 (Cal. App. 2016), has been deemed unpublished and thus uncitable pursuant to California Rule of Court 8.115(a).  Doc. 457 at 13 n.3.  While Plaintiffs perhaps erred in citing the opinion issued in *Kransky*, most of the facts relied upon by Plaintiffs in opposition can also be found in the very source Biomet cited to its in initial motion, *see* Doc. 441 at p. 24 (citing *Kransky v. DePuy Orthopaedics, Inc*., No. BC456086, 2013 Jury Verdicts LEXIS 14730 (Cal. Sup. Ct. Mar. 8, 2013)).  Thus, the underlying facts surrounding the verdict awarded in *Kransky* remain unchanged and therefore *Kransky* strongly supports finding remittitur inappropriate. Quite frankly, the Court considers Biomet's attempt to minimize *Kransky* wholly facile.

In sum, the verdicts returned in other metal-on-metal hip replacement cases involving less-serious damages compared to those suffered by Mrs. Bayes demonstrates that the jury in this matter did not return an excessive verdict.

### 3.    Plaintiffs' age

The "age" factor focuses on future damages, meaning that a younger plaintiff may be awarded more future damages than an older plaintiff.  *See, e.g., Payne*, 543 S.W.3d at 133 (denying remittitur partly based on the fact that the 32-year-old plaintiff would experience "pain and suffering" that "will likely endure throughout his life").  Here, Mrs. Bayes was 71 years old at the time of trial, Doc. 326 at 129:13, and Mr. Bayes was 73, *id*. at 129:13–130:3.  Plaintiffs' relatively-advanced ages weigh in favor of remittitur, but only if considered in isolation.

20

4. **The superior opportunity for the jury and the trial court to evaluate plaintiff's injuries and other damages**

As Biomet acknowledges, this factor weighs heavily in favor of Plaintiffs. *See e.g., Payne,* 543 S.W.3d at 133. Biomet attempts to downplay this factor by arguing that "the Court's necessary COVID-19 precautions deliberately distanced jurors from the witnesses and the parties, and intentionally imposed obstacles to jurors' observation of witnesses and parties with face masks and plexiglass screens." Doc. 441 at p. 32. However, Biomet fails to show how these precautions inhibited the ability of the jury to hear testimony or see the trial exhibits displayed. The Court also finds it quite unlikely that placing some jurors appropriately fifteen feet further away from the juror's box truly inhibited their ability to observe the witnesses to the extent suggested by Biomet. The true fallacy of Biomet's argument is that the jurors were just as "far away" from Biomet's witnesses as from Plaintiffs' witnesses, resulting in either no prejudice, or precisely the same prejudice, to each side. Accordingly, the Court concludes this factor weighs heavily in favor of Plaintiffs.

C. **Economic factors and whether a verdict comprised of solely non-economic damages requires remittitur**

Biomet focuses heavily on the verdict being comprised of only non-economic damages, and argues that even severe pain and medical impairment cannot alone sustain an excessive award of subjective non-economic damages. Doc. 457 at p. 12. The Court agrees that the factors dealing with economic damages offer no support to Plaintiffs as they presented no evidence of lost income, medical expenses, or other economic considerations. Doc. 362 at p. 14; Doc. 310 at 5:3–7; Doc. 357 at 19:13–17. However, under Missouri law "there is no bright-line rule that non-economic damages cannot exceed economic damages by any certain multiplier . . . ." *Evans v. FirstFleet, Inc.,* 345 S.W.3d 297, 302 (Mo. Ct. App. 2011) (quoting *Knifong,* 199

S.W.3d at 930) (internal quotation marks omitted); *see also Knifong*, 199 S.W.3d at 930 (finding "no support in the cases cited that compensatory damage awards must be remitted where the non-economic damages 'far exceed' the economic damages").  "To apply solely a multiplier or comparative approach in determining damages as a matter of course in every case, could, in a given set of circumstances, violate the mandate that once liability is established, the plaintiff is entitled to fair and reasonable compensation for his damages."  *Knifong*, 199 S.W.3d at 930. Accordingly, Missouri courts have deemed verdicts awarding only non-economic damages as not excessive.  *See, e.g.*, *Bojorquez v. O'Keeffe*, 605 S.W.3d 380, 396–400 (Mo. Ct. App. 2020); *Payne,* 543 S.W.3d at 130–133.

In the face of this case law, Biomet maintains that the solely non-economic damages at issue cannot support a $21 million dollar verdict for three reasons.  First, Biomet argues that "an award of non-economic damages must be based on evidence; it cannot be made up out of whole cloth based on a jury's emotional reaction or sympathy for a plaintiff, or from a desire to punish a defendant."  Doc. 441 at p. 27.  The case Biomet cites in support, *Stineman v. Fontbonne Coll*., 664 F.2d 1082, 1089 (8th Cir. 1981) stands for the unremarkable principle that if, after "allowing for substantial pain and suffering damages[,]" the jury's award "seems clearly excessive[,]" the Court cannot affirm that award simply because the award given "may be due to understandable sympathy for the plaintiff's circumstances and to emotional reaction to her testimony at trial[.]" Here, the Court concludes that the record supports the damages award, and thus *Stineman* does not apply.

Biomet then cites three cases that either affirmed remittitur or reduced the damages awarded because the evidence did not support the jury's award of non-economic damages.  But these three cases offer little support.  *Lewis v. Envirotech Corp.*, 674 S.W.2d 105, 113 (Mo. Ct.

App. 1984), has limited value given the very brief analysis the court of appeals gave to the issue of remittitur and its failure to even discuss the amount of non-economic damages awarded. *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639 (Mo. Ct. App. 1997), *overruled by Badahman v. Catering St. Louis*, 395 S.W.3d 29 (Mo. 2013), involved a wrongful-death claim, which has legislatively-mandated factors for courts to consider in awarding non-economic damages.  Mo. Ann. Stat. § 537.090.  Notably, with respect to the pain and suffering of the deceased, the trier of fact can only award damages for the deceased's "suffer[ing] between the time of injury and the time of death . . . ."  *Id*.  By contrast, the jury could properly award Mrs. Bayes for the pain and suffering accrued at the time of the verdict and into the future.

Lastly, in *In re Air Crash at Little Rock Arkansas, on June 1, 1999*, 291 F.3d 503, 506 (8th Cir. 2002), the court held that under the Warsaw Convention, a plaintiff could only recover damages for mental injuries that proximately flowed from the physical injuries caused by the accident.  *Id*. at 510.  The court found that "the bulk of [the plaintiff's] mental injuries did not result from these physical injuries[,]" and therefore reduced the $6.5 million verdict to $1.4 million in accordance with the injuries deemed recoverable under the Warsaw Convention.  *Id*. In sum, these three cases have limited value or are easily distinguishable.

Third, Biomet argues that "the lack of economic damages weighs in favor of remittitur because the ratio of non-economic to economic damages is a factor that courts consider in determining whether a verdict is excessive."  Doc. 441 at p. 28.  Biomet cites *Alcorn.*, 50 S.W.3d at 250 n.24, *overruled by Badahman*, 395 S.W.3d 29, for support, summarizing it as a case "remitting $40 million compensatory verdict to point where 'the ratio of non-economic to economic damages is 11.5 to 1,' notwithstanding the plaintiff's severe long-term physical injuries."  Doc. 441 at p. 28.  Biomet's summary suggests that *Alcorn* expressly considered

whether the damages awarded between non-economic and economic damages fell within an appropriate ratio. But, *Alcorn* does not support that proposition. Instead, in a footnote, the Missouri Supreme Court noted that after the plaintiff's non-economic damages were remitted, the ratio between economic and non-economic damages became 11.5 to 1. *Alcorn*, 50 S.W.3d at 250 n. 24. Then, after stating black-letter Missouri law that "[t]here is no bright line test or formula in computing non-economic losses," it explained that "there [was] no basis in this particular ratio to overrule the trial court's determination." *Id.* Thus, *Alcorn* does not suggest that a certain ratio between economic and non-economic damages must exist or even provide guidance regarding what type of ratio would be permissible.

The other cases cited by Biomet also fail to support its argument. Biomet cites *McCormack v. Cap. Elec. Const. Co.*, 159 S.W.3d 387, 398 (Mo. Ct. App. 2004), describing the case as "affirming order remitting $30.4 million in compensatory verdict to $7.7 million based on 'lost earnings multiplied by a factor of five and then another half of that added." Doc. 441 at p. 28. Like its description of *Alcorn*, Biomet's description of *McCormack* suggests that the Missouri Court of Appeals applied a specific ratio in remitting the damages. But the court applied no such formula. Instead, it found the remitted damages award appropriate because it fully compensated the plaintiff, in contrast to the jury's non-economic damages award that "was at least seventeen times [the plaintiff's] economic loss and clearly exceeded the range of awards deemed reasonable in similar cases." *McCormack*, 159 S.W.3d at 401. Thus, contrary to Biomet's description, *McCormack* did not apply a specific ratio; rather, it affirmed the lower court's remittitur simply because the amount of compensatory damages awarded by the jury was excessive when compared to similar cases. Finally, while *Fisher v. McIlory*, 739 S.W.2d 577,

581 (Mo. Ct. App. 1987) supports the proposition that a verdict is excessive when the evidence produced at trial does not support the damages award, it likewise does not apply a specific ratio.

In sum, despite Biomet's efforts to obfuscate the applicable law, under Missouri law "there is no bright-line rule that non-economic damages cannot exceed economic damages by any certain multiplier . . ." *Evans,* 345 S.W.3d at 302 (internal quotation marks omitted); *see Knifong*, 199 S.W.3d at 930 (finding "no support in the cases cited that compensatory damage awards must be remitted where the non-economic damages 'far exceed' the economic damages"). Underscoring that "no bright-line rule" exists, Missouri courts have deemed verdicts awarding only non-economic damages as not excessive. *Bojorquez*, 605 S.W.3d at 397–400; *Payne,* 543 S.W.3d at 130–133. Accordingly, the Court finds that a damages award consisting of solely non-economic damages does not render the verdict excessive.

### D.       Remittitur conclusion

The non-economic factors, save for Plaintiffs' ages, weigh strongly against granting remittitur. As explained above, Plaintiffs offered significant evidence regarding the nature and extent of their injuries and the jury had the superior opportunity to assess the extent of the pain and suffering Mrs. Bayes have and will endure in the future. Moreover, both Missouri and Eighth Circuit precedent acknowledge pain and suffering are highly subjective and thus difficult to quantify. *Knifong*, 199 S.W.3d at 928; *Eckerberg*, 860 F.3d at 1088–89 (applying Missouri law). Lastly, comparable cases demonstrate that the damages awarded to Plaintiffs fell within a reasonable range. Although the three factors involving economic damages weigh in favor of remittitur, the Court gives them only limited weight because Missouri courts have upheld verdicts consisting of solely non-economic damages without even discussing these factors. *See e.g.*, *Bojorquez v. O'Keeffe*, 605 S.W.3d 380, 396–400 (Mo. Ct. App. 2020).

In sum, upon applying the factors and considering the evidence in the case, the damages award in this case was not "so grossly excessive as to be monstrous, shocking, or plainly unjust" as to require a new trial or remittitur.  *Wright,* 877 F.3d at 374 (citing *Eckerberg*, 860 F.3d at 1087).  Rather, the verdict "fairly and reasonably compensates [Plaintiffs] for the injuries sustained."  *Est. of Snyder*, 789 F.3d at 888 (quoting *Graeff*, 576 S.W.2d at 309).  Accordingly, the Court denies Biomet's Motion for New Trial or, in the Alternative, for Remittitur.

## IV.    Conclusion

For all the reasons stated above, the Court denies Biomet's [440] Motion for New Trial or, in the Alternative, for Remittitur.  The Court also denies Biomet's [448] Motion for Oral Argument.


So Ordered this 2nd day of August 2021.

_SL R. CR_

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**